FILED

FEB - 8 2008

RICH...
CLERK...
NORTHERN DISTRICT OF... WIEKING
U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1    <u>PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY</u>

2    Name _Partida   Francisco   F.P._
           (Last)          (First)          (Initial)

3    Prisoner Number _F 22180_

4    Institutional Address _CALiPatria State Prison_

5    _7018   Blair Road   P. o. Box 5007_

6    ═══════════════════════════════════════════════════

7                   UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA

8    _Jente del estado de CA._                    CV 08            0867
     (Enter the full name of plaintiff in this action.)

9                                          )
                          vs.              )
10                                         )    Case No. _194241_
     _Francisco  Partida_                  )    (To be provided by the clerk of court)
11   _____         )
                                           )    PETITION FOR A WRIT        JF
12   _____         )    OF HABEAS CORPUS
                                           )
13   _____         )
                                           )    E-filing                  (PR)
14   _____         )
     (Enter the full name of respondent(s) or jailer in this action)  )

15

16   ═══════════════════════════════════════════════════

           <u>Read Comments Carefully Before Filling In</u>

17   <u>When and Where to File</u>

18         You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as loss of

22   good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23         If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located. If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution

28   where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS          - 1 -

1    Who to Name as Respondent

2        You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now and the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10    A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11        1. What sentence are you challenging in this petition?

12            (a)   Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14           <u>County Superior Court</u>      <u>San Francisco</u>

15           Court                              Location

16            (b)   Case number, if known <u>194241</u>

17            (c)   Date and terms of sentence <u>MARch 17 2006.   37.8.M. &amp; liFe</u>
                                                     Year.

18            (d)   Are you now in custody serving this term? (Custody means being in jail, on

19                  parole or probation, etc.)      Yes _____   No <u>X</u>

20                  Where?

21                  Name of Institution: <u>CAliPatria State Prison</u>

22                  Address: <u>7018 Blair Road P. o. Box 5007</u>

23        2. For what crime were you given this sentence? (If your petition challenges a sentence for

24    more than one crime, list each crime separately using Penal Code numbers if known. If you are

25    challenging more than one sentence, you should file a different petition for each sentence.)

26    <u>Burg1ary First desree   459.</u>

27    <u>Sexual BAttery       243.4.</u>

28    <u>False Imprisoned    226</u>

1   3. Did you have any of the following?

2      Arraignment:                                    Yes _____   No  X

3      Preliminary Hearing:                            Yes  X      No _____

4      Motion to Suppress:                             Yes  X      No _____

5   4. How did you plead?

6      Guilty _____   Not Guilty  X   Nolo Contendere _____

7      Any other plea (specify) _Me declare culpable siempre por las cosas_
       _que hice, que realmente fue un error, pero mi Abogada me declaro-_

8   5. If you went to trial, what kind of trial did you have?        _inocente._

9      Jury  X      Judge alone_____   Judge alone on a transcript _____

10  6. Did you testify at your trial?                 Yes _____   No  X

11  7. Did you have an attorney at the following proceedings:

12     (a)   Arraignment                               Yes  X      No _____

13     (b)   Preliminary hearing                       Yes  X      No _____

14     (c)   Time of plea                              Yes _____   No _____

15     (d)   Trial                                     Yes  X      No _____

16     (e)   Sentencing                                Yes  X      No _____

17     (f)   Appeal                                    Yes  X      No _____

18     (g)   Other post-conviction proceeding          Yes _____   No  X

19  8. Did you appeal your conviction?                 Yes  X      No _____

20     (a)   If you did, to what court(s) did you appeal?

21           Court of Appeal                           Yes  X      No _____

22           Year: 2007      Result: _denied_

23           Supreme Court of California               Yes  X      No _____

24           Year: 2007      Result: _denied_

25           Any other court                           Yes _____   No  X

26           Year: _____   Result:_____

27

28     (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1    petition?                                        Yes ____    No____

2    (c)    Was there an opinion?                     Yes ____    No____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                     Yes ____    No____

5           If you did, give the name of the court and the result:

6           _____

7           _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?          Yes ____     No X

10          [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16          (a)    If you sought relief in any proceeding other than an appeal, answer the following

17                 questions for each proceeding. Attach extra paper if you need more space.

18          I.     Name of Court: _____

19                 Type of Proceeding: _____

20                 Grounds raised (Be brief but specific):

21                     a._____

22                     b._____

23                     c._____

24                     d._____

25                 Result: _____Date of Result:_____

26          II.    Name of Court: _____

27                 Type of Proceeding: _____

28                 Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1        a._____

2        b._____

3        c._____

4        d._____

5        Result: _____Date of Result:_____

6    III.    Name of Court: _____

7        Type of Proceeding: _____

8        Grounds raised (Be brief but specific):

9        a._____

10        b._____

11        c._____

12        d._____

13        Result: _____Date of Result:_____

14    IV.    Name of Court: _____

15        Type of Proceeding: _____

16        Grounds raised (Be brief but specific):

17        a._____

18        b._____

19        c._____

20        d._____

21        Result: _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                    Yes _____    No_._____

24        Name and location of court: _____

25  B.  GROUNDS FOR RELIEF

26        State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27  support each claim.  For example, what legal right or privilege were you denied?  What happened?

28  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1  need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:_____

6        _____

7        Supporting Facts:_____

8        _____

9        _____

10       _____

11       Claim Two:_____

12       _____

13       Supporting Facts:_____

14       _____

15       _____

16       _____

17       Claim Three:_____

18       _____

19       Supporting Facts:_____

20       _____

21       _____

22       _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    un año antes yo y mi ex abogada no teniamos buenas

5    relaciones nunca me la cambiaron, y me mandaron

6    a un Juicio forzado por ellos, por favor ayuden me

7    Do you have an attorney for this petition?                    Yes ▇     No X

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on  01/03/08/                    Francisco Q Partida

14                 Date                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

1

2

### UNITED STATES DISTRICT COURT
#### FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

## INSTRUCTIONS FOR PRISONER'S
## IN FORMA PAUPERIS APPLICATION

4

5

6

You must submit to the court a completed Prisoner's In Forma Pauperis Application if you are unable to pay the entire filing fee at the time you file your complaint or petition. Your application must include copies of the prisoner trust account statement showing transactions for the last six months and a certificate of funds in prisoner's account, signed by an authorized officer of the institution.

7

**A.    Non-habeas Civil Actions**

8

9

Effective April 9, 2006, the filing fee for any civil action other than a habeas is $350.00. Even if you are granted leave to proceed in forma pauperis, you must still pay the full amount of the court's filing fee, but the fee will be paid in several installments. 28 U.S.C. § 1915.

10

11

12

13

You must pay an initial partial filing fee of 20 percent of the greater of (a) the average monthly deposits to your account for the 6-month period immediately before the complaint was filed or (b) the average monthly balance in your account for the 6-month period immediately before the complaint was filed. The court will use the information provided on the certificate of funds and the trust account statement to determine the filing fee immediately due and will send instructions to you and the prison trust account office for payment if in forma pauperis status is granted.

14

15

16

After the initial partial filing fee is paid, your prison's trust account office will forward to the court each month 20 percent of the most recent month's income to your prison trust account, to the extent the account balance exceeds ten dollars ($10.00). Monthly payments will be required until the full filing fee is paid. If you have no funds over ten dollars ($10.00) in your account, you will not be required to pay part of the filing fee that month.

17

18

19

**If your application to proceed in forma pauperis is granted, you will be liable for the full $350.00 filing fee even if your civil action is dismissed. That means the court will continue to collect payments until the entire filing fee is paid. However, if you do not submit this completed application the action will be dismissed without prejudice and the filing fee will not be collected.**

20

**B.    Habeas Actions**

21

22

23

The filing fee for a habeas action is $5.00. If you are granted leave to proceed in forma pauperis you will not be required to pay any portion of this fee. If you are not granted leave to proceed in forma pauperis you must pay the fee in one payment and not in installments. **If you use a habeas form to file a non-habeas civil action, you will be required to pay the $350.00 filing fee applicable to all non-habeas civil actions.**

24

25

26

27

28

IFPAPPLI-Prisoner4-06.wpd

THE ATTORNEY - CLIENT
Relationship C. BRADLEY PAYton

§ 3.1 Right to counsel. A Criminal defendant is entitled
To Counsel at all Crucial stages). of The Proceeding.
US Const amend VI: Cal Const art, § 15: See
also Pen C § 686. 859, 987. Gideon V wainwritsht
(1963) 372. US. 335, 9. L. Ed 2 d. 799, 83. Sct. 8
792. The defendan, However, has only a limited
right To have Counsel of his or her Choice
appointed. Harris V Superior Court (1977)
19 C3d 786, /40 CR 318. The right to appointed
Counsel includes The right To have ancillary
defenses Services Paid for at Public expense.
Corenesky V Superior Court (1994) 36 C3d.
367, 319, 204 CR 165. See Pen C § 987.9,
funds for ancillary Services in capital cases).
A defendant may Choose to waive The right
to be represented by Counsel and to represent
him or herself as along as The waiver is
Timely and is Knowinly and Inteligently made
Faretta V California (1975) 422. US 806. 45 Led
2 d 562, 95 Sct 2525. Representation by
Certified law Students. does not infringe
on The right to counsel
People V Perez (1979) 24 C3d, 133, 139,
155 CR 176.

15.4   IV   CHANGE of VENUE Motion BASED on
       FAIR And iMPARTiAl TRiAL REQuiREMENT.

A.     Legal standard for change of Venue Because
       No Fair and imPartial TRial can be Had

1      Reasonable likelihood standard

15.4

A.     defendant is entiled to an imPartial Jury
       U.   Duty to avoid conflict of interest
       A.   PrescreeNing for Conflicts

       2.8   to avoid conflicts, defense Counsel
       Should Screen ProsPective ClienTS before
       interviewing Them Prescreening avoids
       disqualification. See. e.g. Yorn V Superior
       Court (1979) 90 CA 3d 669, 153 CR 295.

B.     Multiples Representation
              1 Code fendants

2.9.   Conflicts of interesT; Multiple RePresentation
       defense Counsel musT avoid Conflicts of
       interest or deny a defendant's Constitutional
       right to The effective Assistance of
       Counsel. PeoPle. V. Mroczko (1983) 35 C3d 86,
       103, 197 CR 52. See also PeoPle. V. McDermott

(2002) 28 C 4 th, 946, 990, 123 CR 2d, 654,
This danger usually arises when counsel
represents codefendants. For example. if
codefendants have conflicts defenses counsel
may have to deny or weaken one defendants
defense to benefit the other.
People V Mroczko. Supra. Moreover, except
as specified in Bus & Pc § 6068(e)(a) and
Cal Rules of Prof. Cond 3-100, attorney
must maintain client confidence
and secrets inviolate. Bus & PC § 6068(e)(1).
Multiple representation may make "undivided
loyalty" difficult it is thus common practice
in california for defense attorney to represen
only one of several codefendants. When
potential or actual conflicts exist, attorney
must comply with Cal. Rules of Prof
cond 3-310 (C), which requires both clientis
informed written consent as defined in
Cal Rules of Prof cond 3-310 (A).
if defense counsel decides to represen
codefendants despite a conflict, he or her
must inform the court of the existence
of potencial or actual conflict. 35 C 3d
at 112. See below for discussion of the
Courtis obligations in this event.

immigration problems, a possible Parol hold,
a pending Probation, Revocation or another
pending case. For Client interview
form and discussion on how the interview
question relate to counsel's case and to
this book, see Chap 10...

## A. Interviewing Client

The first interview with a client serves several purposes: It permits counsel to ascertain whether a conflict exist that requires counsel to decline representation. See discussion of conflicts in §§ 2.8 - 216 with retained counsel. It allows counsel and the client to decide whether they wish to enter into an attorney-client relationship, and, if they do, to set the fee and other terms of employment. It provides an opportunity for the attorney to define the relationship. For the client, explain the respective authority of the client and the attorney, and describe the legal process in which the client will be involved. It begins the investigation process by providing counsel with background information about the case. Counsel is able to advise the client not to speak with anyone about the case about the case except counsel. Counsel can obtain the client's signature on any necessary release forms. It alerts counsel to possible motions and hearings that should be set e.g. a Pen., C § 1538.5. Motion, a severance motion, or a demurrer. Counsel can find out if there are any related problems that must be deal with e.g.

02/03/08/

"Hola" Sentes de (Hebeas Corpus) con esta
Carta, los Mando saludar a todos ustedes, esperando
Y se encuentren bien de salud, en compañia de toda
Su Familia Y amigos alrededor suyo, Despues de esto
Paso a lo siguiente, de antemano les pido disculpas
Por mi ortosrafia, Yo fui a la escuela en los Campos
donde TRabajaba, Para la escuela secundaria, con
las siglas Conocidas como (INEA) que significa
instituto NACIONAL para la Educación de los Adultos
ESA escuela, es para Sente como Yo Y otros Pobres
que no tuvimos, la manera de ir, cuando eramos
niños, Y esta carta la estoy escribiendo lo mejor
que Yo Puedo, asi es que Perdón Por toda la falta
de Acentos Y Signos de interrogación Y Por todos
los Errores, que ustedes encuentre sentes de
Hebeas Corpus, Primero necesito Su amable ayuda
Soy Persona muy Pobre Trabaje en los Campos
de aqui Y de alla Soportando los rayos del sol
Cortando uva Y Tomate algodón Y todo el trabajo
duro del Campo, aqui levantando melons sandia,
cebollas esparragos Y despues me fui de CAlexico
hasta San Francisco CAlifornia, me metí
en el Peor Error de mi vida andaba tomando
Y al ultimo me tome una de un solo Trago
Pero Ya habia tomado, pero ni mi abogada ni
el inspector lee, ni nadie, me tomaron test
de Sangre, mi ex abogada nunca lo Solicitó,
Y todos los Cargos Al Final estan sobre mi
tenia recibos de dos tickes de uno de estacionarse

Por cincuenta dolares y 00 cent
y otro por no traer licencia por la primera vez
era de 263 dolares, y pues ya tomado se me hizo
facil, entrar a robar donde ya habia robado
una vez, 6 meses atras y me halló la dueña
adentro de unos Apartamentos Para rentar
Reconoci mi error, del BURGLARY en primer grado
Pero la ventana estaba abierta y o entre
por el dinero y me sali, fue el 1 de enero
del 2003, y lo otro me acusaron de Sexual Battery
la con penetracion y algunos besos solo le pedi
Permiso para besarla y para ponerle mi dedo
en su vasina y su ano tres veces por cada lado
y siempre pedi Permiso y ella me decia que
estaba bien, y todo el tiempo como dos horas
y media estuve y o con ella, Pero la mayor Parte
yo trataba de calmarla y que no se asustara.
Pero ella tenia miedo y yo nunca la amenace
ni la vicolente por ninsun motivo, Pero todos los
y hasta demas me dieron y Para mi fue una
Sentencia con demasiado odio descriminacion, y
Racismo Asi lo siento y o, y Perdoneme que
se los disa Pero es la verdad, nunca
habia estado y o en prision, y ahora estoy
Porsando, 37 años, con 8 meses a vida, todo eso
Por que nunca tome el deal de 10 años
o la oferta, por que realmente se me hizo
muchisimo Tiempo con 100.000 mil dolares de fianza

②

Y de donde iba yo ha pagar eso, si yo apenas
ganaba lo dolares la hora, y como usted sabe
en san francisco todo es muy caro, A veces
Rentaba y A veces dormia en la calle esa
Era mi Realidad, Mi Abogada y yo tuvimos
muchas diferencias, Y ella siempre medeia
la unica forma de cambiarla era pagando
la fianza o pagando una abosada(o) nuevo
o siempre me amenazaba, en las entrevista
A veces llevava inter preter Y ha veces No
solo llegad y me decía en inslej, Que esas
eran los formas unicas, de que ella no me
Representava pagando la fianza Pasando otro
Abogada(o) o la otra unica forma tomar
la oferta, Solo esas eran la forma de
No Poder la ver en mi caso, Por ella me
dijo que todos me iban ha violar los
derechos, Y nunca me dieron la oportunidad
de hablar, Solo Cortes y Cortes y nunca
habia, Solo para cambiar de Abosada(o) ustedes
Van ha leer, Cuantas Cortes pasamos y todas
me negaron El cambio esa es una violacion
directa Creo que Peor que el delito por el
Que se me encontro culpable Por que yo Acepte
con el inspector como Seis cargos por que el
dijo que iba ayudar, Y la abogada dijo lo mismo
Y Va van haber lo que Paso, fueran mentiras
Pero Que dios los bendiga, siem Pre me dieron
dicas la verdad de lo que Paso y Te vamos

Ayudar, cese mi condena y menos 2 meses 2 vida
Sin haber delinquido Antes, Sin haber violado ha nadie
Sin amenazar A nadie, y Sin forzar ha nadie
menos MAtar o Secuestra o lastimar ha nade
Por Favor ayudenme, yo Traia un 459. y un
243.4. y un cargo de 36 fasse imprisionad
    todo eso no llegaba ni ha cinco años
    por primera, y lo años para mi eran muchos
Por que tengo testigos que yo tenia un record
limpio por los 2 o 8 años, que dure viviendo
hasta que me entregue esa noche esperando
a la policia, por que como ustedes van ha
darse cuenta, suficiente tiempo tuve para
escapar, pero no lo hice, por que yo sabia
despues de que el alcohol se fue, que habia hecho
also mas malo que robar Asi que yo estuve
esperando a la policia, y todo ese tiempo trate
de Caimar a la señora Carolina A. pero ella
no me entendia muy bien esa fue toda la
Cuestion pero como usted sabe el( D # )
Siempre Jode o friega. A todo el mundo
especialmente si uno es ilegal y Supuestamente
no tiene uno familia, Por Favor ayudenme, Ay les
mando todo lo que esta A mi favor y toda
la Ayuda que yo pedi y todas las personas
me la negavan las Juezas y Jueces
Siempre en la mayor parte de esto
me tocaron puras mujeres Solo mujeres

4

otra cosa todas los doctores o sicolosos
le pusieron 54 años a la victima y en el Juicio
ella no dice cuantos años tiene, solo son
deduciones, por que ellos no hablaron con ella
ni el inspector lee dice nada de la edad
Yo creo que tambien la pusieron demasiado
Mayor, por que mientras mas mayor, mas
tiempo me castisan, a la señora Patricia
Perez Arce Yo le consedio o me hizo dos entrevista
al doctor Jeff, le consegui solo una como un
año atras mucho antes despues del Juicio
Pero a los otros Tres ninguna por que uno
me lo mando la Jueza Jacson, y nunca llevo
interpreter, el otro Tambien me lo mandaron
la Jueza Morgan y la Jueza wooland
Y ninguno llevo interpreter, Y por ultimo
El Famoso doctor TLevvit nunca le di
entrevista, el fue con mi abogada los dos
Juntos, y eso ustedes lo saben eso es
Trampa por que hay les mando un papa
donde dice que nadie va ho enterarse
del problema Soloyo y mi abogada tambien
ellos dos Violaron la ley, y tiene las pruebas
Nunca firmo su version son pocas hojas
Y despues de eso me llevaron directo al Juicio
Por que mi abogada decia que si terminabon
mi caso no Podrian agarrar otros casos
Y eso tambien es una Violacion, Por eso
les suplico toda su ayuda Alguien me

me ayuda hacer algo por que dice que
Actuaron de muy mala Fe, conmigo, el es
Americano y ya va ha salir, pero el dice
que Siente mucha pena por mi, pero dice
que con todo lo que el me Ayudo y todo lo
que yo les mando, son Realmente pruebas
Muy Fuertes de todos mis derechos violados
Por eso yo los pido me Ayuden Espero
noticias buenas pronto, no tengo dinero
Solo estoy tratando de que me Ayuden
quitando la Vida, y algunos años porque yose
que soy Culpable, pero nunca de la forma que
ellos dicen, nunca amenace ni lastime ha nadie
ni Viole ni mate mi Rapte ha nadie
Por Favor Ayudenme se los pido de todo corazon
Por Favor que un abogado que lea español
les diga todo esto, por que yo siento que
descargaron todo su odio y su rencor conmigo
Por no tomar la oferta, y por no pasar
la Fianza, por Favor Ayudenme yose
que encontraran suficientes pruebas de todos
los derechos que me Violaron, por Favor
Ayudenme, contesten pronto, Dios los
bendiga hoy Siempre Dios pague su Ayuda
Dios los bendiga hoy y siempre Junto
con su Familia, Sinceramente Francisco
Sentenciado Vilmente, tenga piedad de mi
y perdon a todos por mi Falta
Siempre pedi perdon pero mi abogada nunca
dijo nada, solo cada mes me presentaban ⑥
En la corte, ynunca me Ayudaron

(a)
(definition)(459)          Punishment

1    Burglary is Punishable as follow:
Burglary in The first degree:
by imprisoment in The state Prison
for Two, four, or Six years:
Every Burglary in an Unhabited dwelling house

E-filing          CV 08          0867

243.4    Sexual Battery          JF    (PR)

(a)    Any Person who touches an intimate Part
of another Person while That Person is
unlawfully restrained by The accused or
an acompliee, an if The touching is against
The will of The, Person touched and is for
The Purpose of Sexual arausal.
Sexual gratification, or Sexual abuse.
is guilty of Sexual battery. A violation
of This Subdivision is Punishabled by
imprisoment in a county Jail for not
more Than one year. and by a fine not
exceeding Two Thousand dollars ($2.000) or
by imprisoment in The state Prison
for Two, Three, or four years and by
a fine not exceeding The Ten thousand dollars
($10.000)

236 (or) 237
definition).

# Punishment

(a)   False imprisoment is Punishable by a fine not exceeding one thousand dollars (1.000). or by imprisoment in the county Jail for not more Than one year. or by both That fine and imprisoment. if The false imprisoment be effected by Violence, menace, fraud, or deceit, it shall by Punishable by imprisoment in the State Prison.

(a) Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of Hebeas Corpus, to inquire into the, cause of such imprisoned or restrain't.

## Writ of Hebeas Corpus
## Title 2

(b) A writ of hebeas corpus may be prosecuted, for but not limited to, the following reasons:

(1) False evidence that is substancially material or probative on the issue of guilt or punishment was introduced againts a person at any hearing or trial relating to his incarceration; or

(2) False physical evidence, believed by a person to be factural, probative, or material on the issue of guilt which was know by the person at the time of entering a plea of guilty, which was a material factor directly related to the plea guilty by the person...

(c) Any Allegation That the Prosecution Knew or Should have Know of The false nature of The evidence referred to in Subdivision (b) is immaterial to The Prosecution of a Writ of Hebeas Corpus broughT Pursuant to Subdivision (b).

(d) Nothing in This Section Shall be Construed as limiting The grounds for which a writ of Hebeas Corpus may be Prosecuted or as Precluding The use of any other remedies.

( Enacted 1872. Amended by Code Am. 1873—74. C. 614 P. 454 § 86; Stats; 1975, C. 1047, P. 2466, § 2.)

The Relationship

The first step informing The Attorney Client relationship is usually the Client interview. The interview serves to acquaint The Attorney with The Circumstances of The Case and to inform The Client of The scope of The representation explain The legal Proceedings, and set The fee. Fees for retained Counsel are usually Set on a case by case basis rather Than at hourly rate, and are paid in advance. Procedures for Setting and Collecting fees for appointed Counsel Vary depending on The County and Court in which The work is Performed. The attorney should accept The employment whether retained or appointed. only after determining That he or She is competent to handle The case and That no conflicts of interest exist. See §§ 2.8. 2.16. When The attorney and Client have agreed on The terms of employment in a retained case, The agreement should be confirmed by a Signed retainer agreement. The AttoRNEY becomes attorney of record by filling a Pleading or appearing in Court on The Client's behalf. once Counsel ~~has~~ has

become attorney of record, legal steps in The Proceeding and Particulary tactical decision, are Typically Controlled by The attorney. People V williams (1970) 2 C3d 894. 905, 88 CR 208 The defendant, However. retains The right to decide Certain issues affecting his or her fundamental rights. People V Robles (1970) 2 C3d 205, 214, 85 CR 166. See $ 3.23 on which rights The defendant retains and which are under The attorney's Control. In felony Cases, Judges may appoint lawyers for indigent defendants only if Those lawyers represent on The record That They will be ready to Proceed with The Preliminary hearing or trial as Prescribed in The Penal Code. Pen C $ 987. 05.

Francisco Partida.

F-2180

P.O. Box 5007

Blair Road

Soledad? CA.

933

 

 

 

RECEIVED

FEB - 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States

District Court

for THE NORTHERN

District of CAlifor

450 Golden Gate Aven

Box 36060,

San Francisco CA.

94102

# TABLE OF CONTENTS

|  | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
|     Defense | 15 |
| ARGUMENT | 16 |
| **I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION TO SUBSTITUTE COUNSEL** | 16 |
| **II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING EVIDENCE OF APPELLANT'S ALLEGED NEUROLOGICAL DISORDER** | 21 |
| A. Background | 21 |
| B. No Abuse Of Discretion | 24 |
| CONCLUSION | 31 |

CV 08    0867    JF (PR)

E-filing

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*People v. Berryman*
(1993) 6 Cal.4th 1048                                                    19

*People v. Castillo*
(1987) 193 Cal.App.3d 119                                          23, 25

*People v. Castro*
(1985) 38 Cal.3d 301                                                    29

*People v. Coddington*
(2000) 23 Cal.4th 529                                               24, 27

*People v. Coleman*
(1988) 46 Cal.3d 749                                                    29

*People v. Crandell*
(1988) 46 Cal.3d 833                                                    16

*People v. Espinoza*
(2002) 95 Cal.App.4th 1287                                        29

*People v. Green*
(1980) 27 Cal.3d 1                                                      30

*People v. Hall*
(1986) 41 Cal.3d 826                                                    29

*People v. Hardy*
(1992) 2 Cal.4th 86                                                 16, 19

*People v. Hawthorne*
(1992) 4 Cal.4th 43                                                     29

*People v. Hines*
(1997) 15 Cal.4th 997                                              16, 19

**TABLE OF AUTHORITIES  (continued)**

Page

*People v. Horton*
(1995) 11 Cal.4th 1068                                      18

*People v. Jones*
(1998) 17 Cal.4th 279                                      25

*People v. Kipp*
(2001) 26 Cal.4th. 1100                                    29

*People v. Marsden*
(1970) 2 Cal.3d 118                                      16, 19

*People v. McAlpin*
(1991) 53 Cal.3d 1289                                      25

*People v. Mitcham*
(1992) 1 Cal.4th 1027                                      29

*People v. Northrop*
(1980) 132 Cal.App.3d 1027                                30

*People v. Pope*
(1979) 23 Cal.3d 412                                      29

*People v. Reeder*
(1978) 82 Cal.App.3d 543                                29, 30

*People v. Rodrigues*
(1994) 8 Cal.4th 1060                                      25

*People v. Rodriguez*
(1999) 20 Cal.4th 1                                      25

*People v. San Nicolas*
(2004) 34 Cal.4th 614                                      25

*People v. Silva*
(2001) 25 Cal.4th 345                                      16

**TABLE OF AUTHORITIES  (continued)**

Page

*People v. Smith*
(1993) 6 Cal.4th 684                                          16

*People v. Smithey*
(1999) 20 Cal.4th 936                                         24

*People v. Taylor*
(1980) 112 Cal.App.3d 348                                     29

*People v. Terrill*
(1979) 98 Cal.App.3d 291                                      20

*People v. Terry*
(1970) 2 Cal.3d 362                                           25

*People v. Watson*
(1956) 46 Cal.2d 818                                          27

*People v. Wright*
(1985) 39 Cal.3d 576                                          30

*Strickland v. Washington*
(1984) 466 U.S. 668                                        29, 30


**Constitutional Provisions**

United States Constitution
        Sixth Amendment                                       29


**Statutes**

Evidence Code
        § 352                                              23, 25
        § 353                                                  29
        § 801, subd. (a)                                       25

## TABLE OF AUTHORITIES  (continued)

**Page**

Penal Code

| | |
|---|---|
| § 28 | 25 |
| § 28, subd. (a) | 24 |
| § 29 | 24 |
| § 239 | 1 |
| § 243.4, subd. (a) | 1 |
| § 245, subd. (a)(1) | 1 |
| § 289 | 26 |
| § 289, subd. (a) | 21 |
| § 289, subd. (a)(1) | 1 |
| § 459 | 1 |
| § 667.61, subd.(a)(e)(2) | 1, 2 |
| § 667.61, subd.(a)(e)(4) | 1, 2 |
| § 667.61, subd. (a)(e)(6) | 1, 2 |
| § 12022, subd. (b)(1) | 1 |
| § 12022.3, subd. (a) | 1 |

**Other Authorities**

CALCRIM

| | |
|---|---|
| No. 1045 | 21 |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT, DIVISION THREE

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff and Respondent,<br><br>**v.**<br><br>**FRANCISCO PARTIDA,**<br><br>Defendant and Appellant. | A113842 |

## STATEMENT OF THE CASE

A November 7, 2005, amended information charged appellant with two counts of residential burglary (Pen. Code, § 459; counts 1 and 2),[1] one count of sexual battery (§ 243.4, subd. (a); count 3), eight counts of forcible digital penetration (§ 289, subd. (a)(1); counts 4 though 11), one count of assault with a deadly weapon (§ 245, subd. (a)(1); count 12), and one count of false imprisonment (§ 239; count 13). The information alleged appellant committed counts 4 through 11 during the course of a burglary (§ 667.61, subd.(a)(e)(2)) while armed with a deadly weapon (§ 667.61, subd.(a)(e)(4)) and while the victim was bound (§ 667.61, subd. (a)(e)(6)), and that he personally used a deadly weapon in connection with counts 2 through 11 and 13 (§§ 12022, subd. (b)(1)/12022.3, subd. (a).) (1 CT 269-279.)

On November 10, 2005, a jury convicted appellant on counts 1 and 3 through 13, and found true the corresponding enhancements with the exception of the allegation under section 667.61, subdivision (a)(e)(2). The jury was unable to reach a verdict on count 2 and on the allegation under

---

1. Statutory citations are to the Penal Code unless otherwise noted.

section 667.61, subdivision (a)(e)(2).  (2 CT 399-418.)[2]

On March 17, 2006, the court sentenced appellant to a term of 25 years to life on count 4 under the one-strike law.  (§ 667.61; subds. (a)(e)(4) & (a)(e)(6).)  (2 CT 477.)  The court also imposed a determinate six-year base term on count 9, a consecutive four-year term for the corresponding weapon use enhancement, a consecutive term of one year four months on count 1, a consecutive one-year term on count 3, and a consecutive four-month term for the corresponding use enhancement.  The court imposed concurrent life terms on counts 5 through 11.  (2 CT 481-485.)  Appellant filed a notice of appeal on April 19, 2006.  (2 CT 545-547.)

## STATEMENT OF FACTS

In 2004, Carolyn A. had lived at 2861 California Street, apartment no. 3, in San Francisco for more than 20 years.  (2 RT 106-107.)  Her apartment was one of 13 units in a three-story building.  The apartments had controlled access to the lobby with an intercom and "buzzer" to unlock the front door from each unit.  (2 108-109.)  Carolyn's apartment was on the second floor, and she had several locks on the entry door, including a deadbolt.  (2 RT 109-110.)

Around 8:30 a.m. on January 2, 2004, Carolyn went to work, locking her apartment door as she as left.  (6 RT 107-110.)  When she returned that evening she found the door was unlocked.  (6 RT 111.)  The kitchen window was wide open and its screen was on a ledge outside the apartment.  (6 RT 112.)  About $1,600 was missing from envelopes she had left on a table in the kitchen and from her wallet.  (6 RT 113-117.)[3]  She reported the burglary to the

---

2.  The court subsequently dismissed count 2 and the one strike allegation under section 667.61, subdivision (a)(e)(2).  (2 CT 419.)

3.  The envelopes contained money Carolyn had been collecting for a non-profit organization.  (6 RT 115.)  The empty envelopes were still on the

2

police. (6 RT 117-118.)

In late May 2004, Carolyn was on her way out of the apartment building when she saw appellant vacuuming in the lobby. (6 RT 121-122.) Appellant turned off the vacuum and said good morning to her. (6 RT 122; 8 RT 277.) She stopped, turned around, and said good morning to him. (6 RT 123.) She thought it was odd that appellant took the trouble to turn off the vacuum to greet her. As far as she could recall she had no prior contact with appellant. (6 RT 123-124.)

Around 9:00 a.m. on June 4, 2004, Carolyn left for work, locking her apartment door as usual. (6 RT 124-125.) That evening she was to sing in the choir at the Calvary Presbyterian Church which was about four blocks from her apartment. (6 RT 107.) She was to begin the rehearsal at 6:00 p.m. (6 RT 126.) She returned to her apartment about 5:45 p.m. and called her friend, Paul Angelo, who was also a member of the choir, for a ride to the church. (6 RT 126-129.) Paul agreed to pick her up around 6:45 p.m. (6 RT 127.) She undressed to change for her choir appearance. (6 RT 128-129.) While she was in a "water closet" (in Carolyn's apartment the toilet was in the water closet separate from the bathroom), she heard a rustling sound which she thought came from the bedroom. (6 RT 129-131.)

She came out of the water closet and, walking down the hall to investigate, she saw appellant standing in her bathroom. (6 RT 132, 140-141, 246.) Carolyn asked, "What are you doing in here." (6 RT 141.) She pointed towards the apartment door and said, "Get out." (6 RT 141-142.) Appellant grabbed her by the waist with one hand and put his other hand over her mouth. (6 RT 142.) He told her to be quiet. (6 RT 142-143.) They struggled face to face as appellant tightened his grip. (6 RT 143.) She resisted appellant for about five seconds and her underwear and slippers came off. (6 RT 141-144.)

table. (6 RT 114-115.)

3

Carolyn stopped struggling because appellant was increasing his grip and she thought he would injure her. (6 RT 144-145.)[4]

Appellant told her he had a knife in his bag and demanded that she "make around"—which she understood as telling her to turn around. (6 RT 145-146.) She was trying to scream but could not "get an any sound out of [her] throat." (6 RT 146.) He made her promise to not make noise and then took his hand away from her mouth. (6 RT 146-147.) He instructed her to put her arms over her head, and told her, "Don't worry. I don't want to do much." (6 RT 147.) He fondled her breasts with one hand and held her arms with the other. (6 RT 147-148.) He repeated, "Just relax. Don't worry, I don't want to much. You know me." (6 RT 148.) He told her several times, "You know me." (6 RT 148.) Carolyn did not recall being acquainted with appellant and told him, "No, I don't know you." (6 RT 148.)

Appellant grabbed a large bath towel and wrapped it around her head to blindfold her. (6 RT 148-149.) He brought her arms down and held her hands together. (6 RT 149.) He turned her around, moved her a few steps and leaned her against the wall. (6 RT 149.) He repeated, "Don't worry, relax. You know me." (6 RT 149.) He pulled up her underpants with one hand while holding her arms together with the other. (6 RT 150; 8 RT 297.) He told her, "I want to pick these things up," and she heard him pick up the toiletries they had knocked to the floor during the struggle. (6 RT 150-151.)

Appellant led her down the hall and she cooperated because she was afraid he would hurt her since he told her he had a knife. (6 RT 151.) He took her into the kitchen, which she recognized by the feel of the linoleum floor. (6 RT 152.) Carolyn explained that she kept a long bread knife on a cutting board on the counter top. (6 RT 153.) The blade was about eight inches long and the

---

4. Carolyn was five feet two inches tall and weighed about 140 pounds. (6 RT 266.) She was 54 years old when the incident occurred. (6 RT 266.)

handle was five inches. (6 RT 153-154, 261-262.) A few seconds later, appellant turned her around and walked her back out of the kitchen. (6 RT 154-155.) He led her through the living room into the bedroom. (6 RT 155.) She told him, "Please don't hurt me." (6 RT 155.)

Appellant asked her whether she had to be anywhere that evening. (6 RT 155.) She replied that she was singing at a concert in church and that her friend was coming to pick her up. (6 RT 155-156.) He asked what time her friend was coming, and she told him 6:15. (6 RT 156.) He looked over at a clock on the bed headboard and said that "it couldn't be, it is already 6:15." (6 RT 156.) She told him that the clock was fast. (6 RT 156.) Appellant asked her when she had to be at church, and she said she had to be there at 6:30. (6 RT 156-157.) She repeated that her friend was coming to pick her up. (6 RT 157.) He then sat her down on the bed. (6 RT 157.)

Appellant told her how beautiful she was and directed her to lie down on the bed with her feet touching the floor. (6 RT 157.) She felt a long, smooth, cold object, about an inch wide, against her rib cage. (6 RT 157-158.) She also felt what seemed to be a serrated edge against her skin. (6 RT 158.) She believed the object was her bread knife. (6 RT 159.)[5] He held her shoulders with his left arm. (6 RT 158.) Appellant told her again, "I don't want to do much. You are so beautiful. You know me." (6 RT 157.)

Appellant fondled her breasts and reached inside her underwear and fondled her buttocks. (6 RT 160.) At some point, he told her to stick out her tongue and, when she did so, he sucked her tongue. (6 RT 180.) He repeated how beautiful she was and he said how lonely he was. (6 RT 161.) The buzzer at the entrance into the apartment building sounded and she said, "I think that

---

5. Carolyn identified the bread knife at trial. (8 RT 256, 260.) There was a stained tissue wrapped around the knife handle which was not there when she last saw the knife on her cutting board. (8 RT 256-257, 261.)

is my friend." (6 RT 160.)  A short time later, her telephone rang and the answering machine in the bedroom picked up the call. (6 RT 161.)  She heard her friend Angelo say, "Well, I am at the church.  It's a quarter to 7:00 and you are not here and I don't know where you are." (6 RT 161-162.)  Appellant sat her up and moved his body so that he was not holding her any longer. (6 RT 162.)

At that point her blindfold slipped down, permitting her to see a clear pathway to the apartment door. (6 RT 162-163.)  She got up and made a "dash" towards the door. (6 RT 162-163.)  However, she did not make it to the bedroom door before appellant grabbed her and held her in a head lock. (6 RT 163.)  With his other hand, he pressed the towel against her face so hard that she could not breathe. (6 RT 163-164.)  He "jammed" the towel so forcefully over her mouth that it painfully pressed her lips against her teeth. (6 RT 164.)  She reached down with her free hand and attempted to grab his crotch but this had no apparent effect on appellant. (6 RT 165, 168.)  He told her, "Don't move anymore or I will break your neck." (6 RT 165.)  He twisted her head from side to side and said, "I can break it this way or I can break it this way." (6 RT 165-166; 8 RT 318.)  She thought he was going to kill her. (6 RT 166.)

He held her for about ten seconds, and when she stopped struggling he loosened his grip over her face. (6 RT 167.)  He made her promise not to scream and to keep quiet. (6 RT 167, 169.)  He made her lie down on the floor face down and then got on top of her with the full weight of his body for five to ten seconds. (6 RT 168.)  He blindfolded her with the towel again. (6 RT 169.)  He got up and walked toward the apartment door, and she heard a clicking noise as if he were checking the lock. (6 RT 170-171.)  When he returned, appellant placed the flat portion of the bread knife blade against her skin. (6 RT 171.)  He said something about the knife and that she could tell how long the blade was. (6 RT 172.)

As Carolyn was lying on the floor, appellant told her to telephone her friend and instructed her what to say. (6 RT 172-173.) He directed her to say that she was sorry and not feeling very well, that she could not make it tonight, and that she would see him tomorrow. (6 RT 173.) He told her to rehearse the message the way she was going to say it on the phone. (6 RT 173.) He said that she "wasn't saying it nicely enough." and had her repeat it several times. (6 RT 173.) She gave appellant Paul's telephone number hoping that he would check his messages and realize that she was in trouble. (6 RT 174.) Appellant dialed the number and handed her the receiver. (6 RT 175.) She left the message using an "overly calm voice" that she hoped would tip Paul off that she needed help. (6 RT 175-176.)

Appellant grabbed a black scarf and placed it around her eyes, moving the towel over her mouth as a gag. (6 RT 170, 176-177.) He led her back to the bed and sat her down. (6 RT 177-178.) He held her down and fondled her breasts. (6 RT 178.) She felt his body reclining next to her. (6 RT 179.) Paul called again and left another message. (6 RT 179.) Paul said, "Okay. Now I am worried. And I don't know what to do, but I am going to try to find somebody, talk to somebody smarter than I am and maybe they can figure out what to do." (6 RT 179.)

Appellant asked if Paul was her boyfriend and if she had sex with him. (6 RT 180.) He fondled her body and kissed her. (6 RT 180.) He put his tongue on her ear and up her nostrils, and then kissed and sucked on her breasts. (6 RT 181.) He lifted up her arm and kissed and licked her armpit, then asked her whether anyone had done that to her before. (6 RT 181.) He moved the towel to kiss her mouth. (6 RT 182.) He licked her body, including her neck, upper chest, breasts, ears, and fingers. (6 RT 187.)

He removed the towel from her mouth. (6 RT 182.) He moved her legs onto the bed, reached into her underpants, and digitally penetrated her

7

vagina. (6 RT 182-183.) He moved his finger in and out. (6 RT 184.) He removed his finger fondled her body and then penetrated her vagina again. (6 RT 184-185.) He penetrated her vagina at least five times. (6 RT 187.)

He removed her underpants and digitally penetrated her anus three separate times. (6 RT 187, 190.) They were "separate insertions" within a short period of time, but he fondled and kissed her in-between each penetration. (6 RT 188-189.) When he put his finger in her anus, he "was really moving it quite a bit, moving it very vigorously." (8 RT 327.) She told him that it hurt, and he put it back in her anus and "tried to do it softer." (8 RT 327, 340.) When she told him it still hurt, he stopped. (8 RT 327.)

She was afraid that if she resisted he would hurt her. (6 RT 182.) At some point, she began to shiver and he permitted her to get under the covers on the bed. (6 RT 190-191.) When he asked why she was shivering, she said she was cold, but she actually was shaking "from emotion, from just being terrified." (6 RT 110.) She told him she was cold because she did not want to get emotional or break down and make him angry. (6 RT 191.) Appellant got under the covers with her and continued the sexual abuse. (6 RT 190-191.)

At some point while appellant was sexually assaulting Carolyn, he received a call on his cell phone and Carolyn heard a woman's voice. (6 RT 189.) Appellant answered the phone and said, "I'm in San Francisco. I won't be able to come and see you tomorrow. I'm going to be in jail because of this beautiful lady." (6 RT 189.) He repeated this statement a couple times. (6 RT 189.) He would stop and kiss her and then speak on the phone again. (6 RT 190.) He said, "I'm going to be in jail for a long time." (6 RT 190; 8 RT 335.)

Appellant said he wanted her to know that he was Mexican. (6 RT 195.) He told her that he had followed her and he knew she wore long dresses and skirts and that he knew her body was "beautiful under those long dresses." (6 RT 193-194.) He said he was glad she wore the long dresses because he did

8

not want anyone else to see her beautiful body. (6 RT 193-194.) He explained that he had not actually followed her but he had watched her and that she was a "rich American lady." (6 RT 194.) When she said she was not rich, he replied, "Not rich in money, but rich in the beautiful body." (6 RT 194.) He told her that even if she did not call the police, he would "not be able to come back and work here." (6 RT 194.) He reiterated that she knew him. When she said she did not, he replied, "Yes, you know me. We have talked." (6 RT 194.) She recalled the brief conversation she had with the man who was vacuuming the lobby. (6 RT 194-195.)

Appellant said he knew that "he going to go to jail for a long time for this." He told her, "I know you are going to call the police," but he wanted her to wait until "tomorrow" to do so. (6 RT 186.) He said something like, "Give me the night" and that he would leave when it got dark. (6 RT 186.) He lifted up the blindfold enough to show her it was still light outside. (6 RT 186.)

The front door buzzer sounded again, and moments later there was banging on her apartment door. (6 RT 186.-187) Appellant said, "Is that your friend?", and "Does your friend have a key?" (6 RT 187.) She assured him that her friend had no key. (6 RT 187.) He then said, "Ssh ssh, be quiet." (6 RT 187; 8 RT 337.)

Appellant said he wanted to go "pee" and told her to be quiet and not to move. (6 RT 192.) She agreed to do so, and he left for a few seconds and suddenly returned as if to check on her. (6 RT 192-193.) She was still blindfolded at the time but she could hear his movements as he brushed against some materials in the hallway. (6 RT 193.) He came back and sat on the bed. (6 RT 195.) He said that somebody is coming. (6 RT 195-196.) She heard someone call out, "Carolyn, are you in there." (6 RT 196; 8 RT 338.)

She lifted herself off the bed and appellant stood up. (6 RT 196.) Carolyn said, "I am here. I am in here." (6 RT 196.) She pulled off the

9

blindfold and saw police officers in the apartment. (6 RT 196.) The bedroom was dark but the living room light was on. (6 RT 197.) The police took appellant into custody and allowed her to get dressed. (6 RT 197-198.) She estimated that it was 9:00 p.m. when the police arrived. (6 RT 199.) She told the police what happened and later gave a taped statement. (6 RT 198-199.)

Carolyn was taken to the Rape Treatment Center at San Francisco County General Hospital where saliva samples were taken from various areas of her body. (6 RT 200-201; 9 RT 363, 367-368.) The parties stipulated that the saliva contained appellant's DNA. (9 RT 446.) The nurse pointed out to Carolyn that she had a scratch across her shoulder blade. (6 RT 202; 8 RT 267.) She later developed a bacterial infection in her vagina. (6 RT 203-204.)

Paul Angelo testified that Carolyn called him around 5:45 p.m. on June 4, 2004, and arranged for him to pick her up outside her apartment around 6:25 p.m. (9 RT 385-387.) He arrived around that time and rang the buzzer at the entrance of her apartment building. (9 RT 387-388.) A few minutes later he rang the buzzer again. (9 RT 388.) He waited about 15 minutes, rang the buzzer a third time, then drove to the church. (9 RT 388-389.) When he did not find her there, he called and left a message on her answering machine. (9 RT 390.) Around 7:30 p.m., he drove back to her apartment and, managing to get into the building he knocked on the door and yelled, "Carolyn, what is going on?" (9 RT 390-391.) He did not hear any sound from the apartment and did not see any light on inside. (9 RT 392.)

Angelo walked down the street to an "ambulance place" and told the drivers about his concerns. (9 RT 392-393.) He asked them to call the police. (9 RT 393.) Around 7:45 p.m. the police arrived and Angelo went inside Carolyn's apartment building with them. (9 RT 394-395.) They said there was not sufficient reason to break down the door and they would have to wait until the manager arrived. (9 RT 395-396, 415-416.) Angelo returned to the concert

at the church. (9 RT 396-397.) Angelo subsequently checked his answering machine, received Carolyn's message, and became even more concerned. (9 RT 397–399.) He returned to her apartment and found the police had left. (9 RT 399.) He banged on her door again and said, "You know, Carolyn, they called your landlord, you know." (9 RT 399.) The police officer returned and Angelo told him about Carolyn's telephone message. (9 RT 399.)

San Francisco police officer Joseph Filamor was dispatched to Carolyn's apartment about 8:00 p.m. on June 4, 2004. (9 RT 413-414.) He met Angelo and knocked on Carolyn's door a couple times, announced "This is the police," and called out her name. (9 RT 414.) Filamor contacted the landlord and made numerous attempts to get someone to come to the door while he waiting to obtain a key for the apartment. (9 RT 415-416.) Around 8:50 p.m., the landlord arrived and the police gained entry into the apartment. (9 RT 417.) The apartment was dark. (9 RT 417-418, 421.) Filamor called out, "This is the San Francisco police." (9 RT 417.) He heard Carolyn's voice coming from the bedroom. (9 RT 418.) He looked into the bedroom and saw her naked on the bed with a black scarf covering her head. (9 RT 418-419.)[6]

Appellant was on the edge of the bed, apparently holding her down with both his arms. (9 RT 419.) Appellant appeared surprised. (9 RT 422.) He was fully clothed. (9 RT 434.) Filamor took him into custody with "very slight resistance." (9 RT 422-423.) Filamor found a bread knife on a couch in the apartment. (9 RT 426-417.) A tissue was wrapped around the handle. (9 RT 426.)

Daniel Chadbourne owned and managed Carolyn's apartment building. (10 RT 489-490.) Three or four years earlier he saw appellant on the street and hired him to do part-time work around the apartment complex. (10

---

6. Filamor noted in his police report that Carolyn was wearing underpants. (9 RT 423.)

RT 490-491.) Appellant cleaned and painted the building. (10 RT 491.) Chadbourne gave appellant a key to the building lobby so he could do work without Chadbourne being present. (10 RT 491-492.) Appellant had access to vacant apartments but not occupied units. (10 RT 491-494, 504.) Chadbourne recalled that appellant did no work in Carolyn's apartment. (10 RT 494.) However, appellant had access to the storage closet where Chadbourne kept spare keys for each apartment (occupied and vacant) in an unlocked box. (10 RT 495-498, 501.) Appellant was permitted to go into the storage closet to get equipment such as the vacuum and paint brushes. (10 RT 497-499.) There was no marking on the extra apartment keys to indicate that they were not to be duplicated. (10 RT 500.)

Until June 4, 2004, Chadbourne trusted appellant and had never received complaints about him. (10 RT 506-508.) Appellant was a conscientious worker. (10 RT 516.) Chadbourne was surprised when he heard the charges against appellant. (10 RT 516.)

San Francisco police investigator Frank Lee interviewed appellant shortly after his arrest. (10 RT 455-458.) Appellant told the police that he worked at the apartment building and the manager trusted him. (1 CT 292-293.) He stated that he gained access to Carolyn's apartment on June 4, 2004, with a key provided by the property manager. (1 CT 293-295, 322-323.) He explained that the manager had given him keys to all the apartments so appellant could paint them. (1 CT 323.) He entered her apartment on two or three previous occasions with the manager's key. (1 CT 322-323.) He knew the victim by his first name. (1 CT 316.) He watched her only when he worked at the apartment building. (1 CT 316-318.)

He admitted that he first entered Carolyn's apartment in late December 2003 or early January 2004 and took about three or four thousand dollars. (1 CT 323-326.) Appellant explained that he took the money because it was in

plain view, commenting "you know that anyone, not just me, anyone who sees money, takes it." (1 CT 328.) On that occasion, he got into the apartment through the kitchen window because he did not yet have a key. (1 CT 327.) He knew she always left that window open because he monitored the activity of all the tenants while he worked there over a period of two or three years. (1 CT 327, 330.)

Appellant stated that alcohol may have "cloud[ed] [his] mind" that evening (June 4, 2004.) (1 CT 293, 295, 298, 306.) He was "very stressed out" because he had money problems and he had received traffic tickets which cost him a lot of money. He said he "gulped down" 24 ounces of beer. (1 CT 306; see 1 CT 293-294, 298.) He claimed he entered Apartment No. 3 only to take a shower. (1 CT 295-296, 309, 332.) Carolyn came home earlier than he expected. (1 CT 296-297, 321.) He intended to sneak out of the apartment while she was using the toilet but she came out and found him. (1 CT 298-299.) She agreed to let him stay there, saying "I believe in you." (1 CT 299.)

Appellant admitted touching her breasts and putting his finger into her vagina five times (1 CT 299, 313) and into her anus three times. (1 CT 299-301, 313-314.) He also kissed and licked her breasts. (1 CT 302.) He kissed her arm pit (1 CT 305) and licked her tongue. (1 CT 312.) He explained to the officer that he sexually assaulted her because he was "fucking drunk." (1 CT 306.) He used the knife "for joking only" (1 CT 303) so that she could "feel . . . the cold on her breast." (1 CT 304.) He put the towel on her head because she was screaming. (1 CT 304-305, 328-329.) He realized she had difficulty breathing and eventually took it off. (1 CT 329.) He asked her not to scream and said that he was going to leave when it got dark. (1 CT 305, 329.) He put a cloth over her eyes because he did not want her to see his face. (1 CT 313.) He never intended to hurt her. (1 CT 305, 321.) Appellant understood that the victim was very scared but he told her to relax. (1 CT 321.)

13

He instructed Carolyn to leave a message for her friend. (1 CT 307.) He also told her to keep quiet when persons knocked at the door. (1 CT 307-308.) He acknowledged asking her not to call the police until "tomorrow" (1 CT 308.) He thought she would be able to identify him by his "picture" and he told her he was "fucking stupid." (1 CT 311.) He said she could go to church but she must wait until it was dark so people would not see his face. (1 CT 311.) He explained to the officer that he was "not a bad guy" (1 CT 309, 312), that he did not "force" Carolyn to have sex with him, and that he did no "damage" to her. (1 CT 310, 312.) He admitted to the police that he made a "big, big mistake because . . . I can go to jail if somebody watch me . . . for that but I don't do damage." (1 CT 310.)

Appellant explained his behavior as follows: "[T]he problem I have right now is that I abused the trust because I felt that I had the keys since I could see . . . whatever alcohol I had in me, I'm telling you honestly, went to my head, maybe it was because I gulped it all down and I abused the trust but I absolutely was going to take a shower, but I don't know what happened that I went into the other room, and when I was going to get out of that, well she came out, this is what happened, at that point I wasn't able to leave." (1 CT 318, ellipsis in original.) Appellant was not planning on sexually assaulting Carolyn but he took the opportunity to do so because of the "craziness of that alcohol." (1 CT 319.) He had never done anything like this before. (1 CT 319.) Appellant acknowledged that what he did was "stupid" and he was "willing to accept the consequences." (1 CT 320.) He explained that he made "only two mistakes," when he stole the victim's money and when he sexually assaulted her six months later. (1 CT 330.) These were the only "bad things" he had done. (1 CT 331.)

**Defense**

Mercado Guia worked with appellant as a painter and on other odd jobs. (10 RT 467-468.) Guia opined that appellant was a trustworthy person and "like a member of the family." (10 RT 469-472, 476.) Anna Koroza, who knew appellant since 2001 and also worked with him, testified that appellant was trustworthy. (10 RT 481-484.)

15

## ARGUMENT

## I.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY DENYING THE MOTION TO SUBSTITUTE COUNSEL

Appellant claims the trial court abused its discretion by denying his motion to substitute counsel. (AOB 11.) The record does not support his claim.

*People v. Marsden* (1970) 2 Cal.3d 118, 123, held that in order to exercise its discretion in considering a motion to substitute counsel, the court must inquire into defendant's complaints on the record. (See also *People v. Silva* (2001) 25 Cal.4th 345, 367; *People v. Hardy* (1992) 2 Cal.4th 86, 133-138; *People v. Crandell* (1988) 46 Cal.3d 833, 858.) "A trial court should grant a defendant's Marsden motion only when the defendant has made 'a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation' (*People v. Crandell, supra,* 46 Cal.3d at p. 859), or stated slightly differently, 'if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" (*People v. Hines* (1997) 15 Cal.4th 997, 1025; quoting *People v. Smith* (1993) 6 Cal.4th 684, 696.)

At the *Marsden* hearing, appellant explained that his dissatisfaction with counsel was related to the fact that the prosecutor refused to offer a more lenient sentence in the plea bargaining process. (*Marsden* RT ("MRT") 3-4.) Appellant told the court that one of the reasons he was unhappy with defense counsel was that he thought he "was going to get out in 1 year." (MRT 3.) Appellant continued, "I want to know why, why do they want to give me so

much time. . . . I mean, I know I did hurt somebody. I know that. But it's not
so much as to them giving me so much time because I never threatened, and I
never used a gun or anything like that. I always asked her for permission, and
she always gave me permission. . . . And I want to know why do they want to
give me so much time when I haven't killed anybody or anything like that."
(MRT 4.)

Appellant also questioned whether his attorney was performing well
in general, commenting "Well, if she is going to do a good job with me, then
she may continue. But she can't keep bringing me all these lies. And we will
have to see how it goes." (MRT 4.) When the court asked him whether he was
indicating that he was satisfied with defense counsel, appellant responded,
"Well, I don't know. She has to take a look there, and see if she really going
[sic] to do a good job or not." (MRT 4.) When the court assured appellant that
his attorney was one of the best, appellant replied, "then what I don't
understand is why, why is there so much time? . . . . I want to know why
doesn't one get the kind of opportunity that it see[m]s, like everybody else gets.
They come and go all the time. Why can't somebody get probation of what is
the question here with that? There is no forgiveness, for one, because you are
not from here. So what is the system here really. . . . She [defense counsel] told
me that in a year, they would give me probation or they would send me—I
don't know where. . . . I know I can fulfill anything they give me like
probation, I know I have good people outside who would make sure that my
behavior would be good. [¶] And so I need to know the reasons." (MRT 5.)

The court commented that defense counsel did not have control of the
plea bargain offered by the prosecution, and based on his (appellant's)
statements, it appeared that appellant was not dissatisfied with his attorney.
(MRT 5.) Appellant apparently agreed, responding, "So then what can be
done? [¶] So do you think it's fair that they want to give me all that time for

17

a mistake that was made when nobody was hurt or anything like that. . . ." (MRT 6.) The court then denied the motion, commenting, "Based upon the reasons which the court had heard, I am not satisfied Mr. Partida is not being represented well. . . ." (MRT 6.)

Appellant fails to demonstrate the court abused its discretion by denying the motion to substitute counsel. The court gave appellant ample opportunity to explain his concerns about defense counsel. Appellant does not claim otherwise. (See *People v. Horton* (1995) 11 Cal.4th 1068, 1103 ["the court repeatedly inquired of defendant regarding the basis for his complaints and permitted him to respond to his counsel's explanations for their actions."])

As the court noted, appellant's dissatisfaction was with the plea offer, not defense counsel. Appellant apparently agreed. Indeed, it is questionable whether appellant wanted to substitute counsel at all. When the court asked whether he was satisfied with his attorney, appellant said "I don't know. She has to take a look there, and see if she really going [*sic*] to do a good job or not." (MRT 4.) Furthermore, although the court repeatedly asked appellant if he had anything to add concerning counsel's performance, appellant simply reiterated that what he did was not so serious as to warrant a lengthy prison sentence. Appellant never provided the court with any specific complaint about his attorney except that "she was bringing him all these lies." This remark about "lies" apparently referred to the gravity of his conduct as characterized by the prosecution.

Appellant claims the court improperly relied on it subjective opinion of defense counsel's abilities. (AOB 18.) Considered in context, it is evident that the court's remark related to appellant's comment that he would have to see if counsel "is going to do a good job with me, then she may continue." (MRT 4.) The court's comment that defense counsel was one of the best in that jurisdiction was in response to appellant's concern that she do a good job.

(MRT 5.) Moreover, the court focused on the quality of counsel's performance in this case when it denied the motion. (MRT 6.) That the court found nothing wrong with defense counsel's representation was a valid reason to deny the motion to substitute counsel. (See *People v. Hines, supra*, 15 Cal.4th at p.1025.)[7/]

Appellant argues that he had an irreconcilable conflict with counsel. (AOB 21.) The record actually shows appellant had no conflict with defense counsel at all. His "irreconcilable conflict" was with the prosecution and the fact that the prosecutor considered the criminal conduct very serious even though appellant did not use a gun or physically injure the victim. To the extent there was any conflict between appellant and his attorney, it is clear that it was caused by appellant's refusal to accept the gravity of his criminal behavior. (See *People v. Hardy, supra*, 2 Cal.4th at p. 138 [a defendant is not entitled to the appointment of new counsel when he intentionally causes a conflict of interest merely to have new counsel appointed.]) *People v. Berryman* (1993) 6 Cal.4th 1048, 1070, explained: "'[I]f a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.'"

Here, appellant would have the same problem with any attorney appointed to represent him because of his unrealistic evaluation of his criminal culpability. He was fixated on the notion that his vicious sexual assault was just a "mistake" and that he should not have to serve a lengthy prison sentence

---

7. Appellant attempts to rely upon statements he made on other occasions during the trial proceedings to show there was a "conflict" with defense counsel. (AOB 26-27) These statements cannot be used to demonstrate the trial court erred in denying the motion to substitute counsel. That ruling must be evaluated on appellant's statements at the *Marsden* hearing.

because he did not use a gun or cause serious physical injury. As the court repeatedly pointed out, defense counsel cannot be faulted because appellant did not like plea offer from the prosecution. (Cf. *People v. Terrill* (1979) 98 Cal.App.3d 291, 300-302 ["The recommendation that defendant enter a plea with a maximum possible punishment of 15 years in prison under such circumstances cannot be deemed inadequate representation."])

In sum, appellant fails to demonstrate the court abused its discretion by denying the motion to substitute counsel.

## II.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING EVIDENCE OF APPELLANT'S ALLEGED NEUROLOGICAL DISORDER

Appellant claims the trial court erroneously excluded expert testimony that he suffered from a mild neurological disorder which allegedly affected his ability to form the specific intent to commit forcible digital penetration. (AOB 29.) We disagree.

### A.  Background

Appellant sought to elicit evidence at trial that he suffered from a neurological disorder which affected his ability to form the requisite specific intent under Penal Code section 289, subdivision (a), namely committing an act of sexual penetration for the "purpose of sexual arousal, gratification, or abuse." (See CALCRIM No. 1045.) At an in limine hearing, appellant presented the testimony of Patricia Perez-Arce, a neurologist, who evaluated appellant. Perez-Arce opined that appellant suffered from a "mild neuro-cognitive disorder." (3 RT 59; 7 RT 219-220.) Perez-Arce explained that appellant "has a deficit in an area of function that is related to the frontal lobe that we call executive functions, specifically his ability to abstract relevant information and to be able to shift his attention between competing demands of the environment and the executive function that he is impaired in." (3 RT 59.) Appellant also suffered impairment of memory and "perseveration" which related to an inability "to change a response that was incorrect, even though he was being told over and over that it was wrong." (3 RT 59-60.) Appellant's cognitive impairment was "longstanding" and may have been congenital. (3 RT 61-62.)

Perez-Arce concluded, based on her interview with appellant and his statement to the police, that he "did not appear to be able to understand the

21

implications, his stance vis'-a-vis' his case. He could not integrate new information and change his opinion about the risk of . . . going this way in terms of his case." (3 RT 62.) In other words, appellant did not seem to understand that he faced a long prison term for his actions—"he was unable to in a way believe that the actions that he engaged in would really result in anything of a serious nature in terms of his legal case." (3 RT 62.) Perez-Arce was particularly impressed by appellant's characterization of the incident as a "mistake." (3 RT 62-63.) Perez-Arce concluded that appellant was not malingering. (7 RT 233.)

On cross-examination, Perez-Arce agreed with the DSM-IV definition of mild neurological disorder as follows: "few if any symptoms in excess of those required to make the diagnosis are present and symptoms result in no more than minor impairment in social or occupational functioning." (7 RT 220.) This was the very conclusion Perez-Arce reached as to appellant's cognitive disorder. (7 RT 220.)

Perez-Arce noted that appellant had no history of mental illness and that he "understood the nature and quality of his [criminal] act." (7 RT 227.) She noted that appellant's brain deficiency was "not a primary mental disorder" (7 RT 222) and that he "is functioning at least at average [verbal I.Q.] level." (7 RT 231.) There was no indication he was mentally retarded. (7 RT 232.) He was able to perform such functions as keeping his car registered, paying bills, and providing food and shelter for himself. (7 RT 222-223.) Perez-Arce acknowledged that appellant told her he "navigates the border," going back and forth from Mexico to the United States, and he was able to survive in the United States without any history of arrests—all of which required "some complex mental ability." (7 RT 223.)

Appellant told Perez-Arce that he was stressed out on June 4, 2004, because he had to pay a parking ticket for $269 and he had just received another

ticket for $50 and he was worried that he would lose his car. (7 RT 228, 231.) He said he went to the victim's apartment that day looking for money because he had taken money from that same apartment six months earlier. (7 RT 228, 231.) He admitted that he "went for a knife" and he "put it to her [the victim.]" (7 RT 228-229.) Appellant indicated during the interview with Perez-Arce that he knew his conduct was "serious." (7 RT 231.)

Perez-Arce understood that appellant told someone on his cell phone during the incident that, "I cannot see you tomorrow. I am going to be in jail. I am going to jail for a long time because of this beautiful lady." (7 RT 225.) However, she believed that appellant's statement did not contradict her opinion that appellant was unable to appreciate the gravity of his behavior because that opinion depended on appellant's understanding of what constitutes "a long time." (7 RT 225-226.) Perez-Arce explained that "it is a clear statement certainly that he believed that he was going to go to jail. I don't know what his definition of a long time is except that he did not feel that the time that he was given, that he might be serving, he could not believe that." (7 RT 226.)

Defense counsel offered the testimony of Perez-Arce to negate the specific intent required for penetration by a foreign object and burglary and to disprove the necessary intent required for personal use of a deadly weapon. (Supp. RT 5-6.) Defense counsel stated there was no intent to offer the evidence to show the victim's consent. (Supp. RT 6; see *People v. Castillo* (1987) 193 Cal.App.3d 119, 124-125.)

After considering the argument of counsel, the trial court ruled the evidence was inadmissible under Evidence Code section 352.

> The evidence is presented in this case both from the victim's testimony and from the tape of the interview of the defendant after he was arrested, clearly indicates that he knew what he was doing was wrong. He indicates that the knife was used as a joke. The jury can consider that as any lay person can. Dr. Perez-Arce would not offer any additional probative evidence on that particular specific intent

23

element. [¶] He indicated apparently that he was in the victim's apartment to take a shower. Likewise the jury can consider as lay persons that testimony and Dr. Perez-Arce would not offer anything at all relevant in terms of his specific intent to the burglary charges. [¶] So the Court considered Dr. Perez-Arce's testimony to be not probative to the issues that the jury must decide, and therefore is inadmissible.

(Supp. RT 8.)

## B. No Abuse Of Discretion

Appellant fails to demonstrate the court abused its discretion by excluding the testimony. "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial. (*People v. Smithey* (1999) 20 Cal.4th 936, 960-961.) Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence vel non of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing." (*People v. Coddington* (2000) 23 Cal.4th 529, 583-584.)[8]

---

8. Penal Code section 28, subdivision (a), provides: "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

Penal Code section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent,

24

In general, "[o]pinion testimony by an expert witness is admissible if it is, inter alia, 'Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' (Evid. Code, § 801, subd. (a))." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299.)

The fact that expert testimony may be admissible on the issue of whether the defendant possessed specific intent, when relevant, does not render such evidence automatically admissible. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 651 [decision to admit expert testimony under Penal Code section 28 reviewed under an abuse of discretion standard]; cf. *People v. Castillo, supra*, 193 Cal.App.3d at pp. 124-125 [trial court had discretion under section 352 to exclude expert testimony regarding defendant's mental disabilities on the issue of consent.]) The court has discretion to determine whether to admit such expert testimony under section 352, which authorizes the trial court to exclude relevant evidence when its probative value is outweighed by its prejudicial effect. (See *People v. Jones* (1998) 17 Cal.4th 279, 304; *People v. Terry* (1970) 2 Cal.3d 362, 403.) "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

There was no abuse of discretion here. Perez-Arce concluded only that appellant suffered from a mild neurological impairment and that he had "at least" an average I.Q. The expert also testified that due to this impairment appellant had difficulty appreciating the serious penal consequences of his

---

knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."

behavior. However, as the trial court suggested, this conclusion had nothing to do with appellant's ability to act with the specific intent required under Penal Code section 289—i.e., committing the act of penetration for the purpose of creating sexual arousal or abuse. Perez-Arce did not make any finding that related to the requisite specific intent in this case. Indeed, appellant does not explain on appeal how his alleged inability to appreciate that he could be sent to prison for a significant period relates to his ability to form the specific intent to arouse or abuse. The fact that appellant did not think his behavior deserved a lengthy prison term does not in any way demonstrate he was unable to form the necessary specific intent.

Additionally, it is apparent that the expert's opinion with respect to appellant's understanding of the gravity of his actions was based principally on appellant's statements to the police and in the interview with the neurologist that appellant did not expect to face such a long prison sentence for his behavior. Perez-Arce's testimony did not directly connect the results of the *neurological evaluation* with her assessment of whether appellant understood the gravity of his actions. As the court noted, the jury could evaluate for itself the credibility of appellant's statements to the police, which included the claim that he did not realize the penal consequences of what he was doing.

Furthermore, presenting the testimony of Perez-Arce would have raised a number collateral issues regarding appellant's cognitive abilities and his past behavior. For example, appellant told Perez-Arce that he was stressed about parking fines and afraid he as going to lose his car so he decided to steal money from the victim's apartment as he had done in the past. Of course, this testimony would contradict appellant's statement to the police that he entered Apartment No. 3 only to take a shower. (1 CT 295-296, 309, 332.) The question of whether appellant realized the severe penal consequences of his actions had the potential to mislead the jury—introducing issues of sympathy

for appellant and penalty. Certainly, a failure to appreciate the penal consequences of one's criminal conduct would be no defense in this case. In sum, appellant does not demonstrate the court abused its discretion by excluding the evidence.

In any event, even if the court erroneously excluded the testimony, it is not reasonably probable the jury would have reached a more favorable verdict in the absence of the alleged error. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) As stated, there is no demonstrable connection between appellant's alleged mild neurological impairment and his ability to form the specific intent required to violate section 289. (See *People v. Coddington, supra,* 23 Cal.4th at p. 584 [any the error in excluding defense expert testimony was not prejudicial because none of the experts who testified that the defendant was mentally ill found that his illness precluded or would affect the ability to premeditate and deliberate.])

The expert testimony indicated at most a mild impairment. Perez-Arce agreed that appellant's disorder should be defined as "symptoms result[ing] in no more than minor impairment in social or occupational functioning." (7 RT 220.) Additionally, the expert's assessment that appellant did not understand the gravity of his criminal behavior was contradicted by appellant's statement during the sexual assault that he understood he was going to be put in jail for a long time because of his behavior. In short, there is no evidence that appellant's cognitive abilities in this regard were *significantly* impaired.

Furthermore, the prosecution evidence that appellant was rational and capable of forming the intent to arouse or abuse is very strong. He told Perez-Arce that he went to the apartment to steal money to pay his parking tickets. The evidence also shows that he blindfolded and gagged the victim, threatened her with a knife, threatened to break her neck and demonstrated how he could do so, and that he instructed her to leave a message for her friend. In this

27

regard, appellant had the presence of mind to tell the victim exactly what to say and had her rehearse the message before making the call. He acknowledged to the police that he understood his behavior terrified the victim but he explained that he told her to relax. (1 CT 313.) He not only knew that he could be arrested for his behavior was criminal, he realized that the victim would be able to identify him from a photograph. Finally, he told Carolyn that he had to wait until dark to leave so no one else would be able to identify him. The evidence clearly shows appellant had the ability to plan and to appreciate the consequences of what he was doing.

Appellant speculates that the jury hung on the burglary count related to the sexual assault because it questioned his mental capacity form the necessary specific intent. (AOB 38.) The record shows it was much more likely the jury gave appellant the benefit of any doubt about whether he entered the apartment only to take a shower, and then he decided to sexually assault the victim only when she unexpectedly arrived home early. (1 CT 295-297, 309, 321, 332.) The fact that the jury hung on this count does not lessen the strong evidence that appellant formed the necessary intent to commit the digital penetration.

Finally, we note that appellant attempted to justify his conduct when speaking to the police by claiming he was too "fucking drunk" to realize the significance of what he was doing. (1 CT 306, see 1 CT 293-294, 298.) Thus, his initial "defense" was intoxication. His attempt to excuse his behavior because he "gulped" beer indicates that he was not so impaired that he could not think of some plausible (if unjustifiable) excuse for his actions.

In short, the expert testimony that appellant had a mild impairment had virtually no probative value as to appellant's specific intent to commit digital penetration, whereas the prosecution evidence that he had the capacity to form the necessary specific intent was very compelling. Any error was harmless.

28

Appellant argues that the court's ruling violated his federal constitutional right to present a defense. He acknowledges that counsel did not raise this issue in the trial court. Therefore, the claim is waived. (See Evid. Code, § 353; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1044 [Sixth Amendment confrontation violation claim waived for failure to object]; see *People v. Kipp* (2001) 26 Cal.4th. 1100, 1124; *People v. Coleman* (1988) 46 Cal.3d 749, 777.)  Appellant asserts, however, that defense counsel was ineffective for failure to raise this ground in the court below. Appellant fails to establish that counsel's actions were objectively unreasonable or that it is reasonably probable the jury would have reached a more favorable verdict in the absence of counsel's alleged error. (See *Strickland v. Washington* (1984) 466 U.S. 668, 688-689; *People v. Pope* (1979) 23 Cal.3d 412, 425.)

Counsel's failure to argue that the exclusion of the evidence violated due process and his right to present a defense was not objectively unreasonable. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. (*People v. Castro* (1985) 38 Cal.3d 301, 306-307; *People v. Reeder* (1978) 82 Cal.App.3d 543, 552.)" (*People v. Hall* (1986) 41 Cal.3d 826, 834; see *People v. Hawthorne* (1992) 4 Cal.4th 43, 55; *People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1310.)

"It is also established that, "'Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and his right to present all relevant evidence of *significant* probative value of his defense.'" (*People v. Taylor* (1980) 112 Cal.App.3d 348, 365; *People v. Reeder, supra*, 82 Cal.App.3d at p. 553, italics in *Taylor*.) This does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have

more than 'slight-relevancy' to the issue presented. (*People v. Reeder, supra,* 82 Cal.App.3d at p. 543, 552.). . . [T]he proffered evidence must be of some competent, substantial and significant value. (*People v. Green* (1980) 27 Cal.3d 1, 22; *People v. Reeder, supra,* at p. 553.)" (*People v. Northrop* (1980) 132 Cal.App.3d 1027, 1042; emphasis in original; see also *People v. Wright* (1985) 39 Cal.3d 576, 587-588.)

As set forth above, the expert testimony had very little if any probative value relating to the issue of appellant's specific intent to sexually arouse or abuse. Whether appellant appreciated that he could be sent to prison for a long time because of his behavior had no relation to his ability to form the necessary specific intent. Additionally, the court's ruling did not prevent appellant from presenting a defense. As stated, he excused his behavior to the police based on his drinking too much too fast. Finally, the evidence that appellant had the capacity to form the required specific intent was very strong.

In sum, appellant does not show it is reasonably probably a more favorable determination would have resulted in the absence of counsel's alleged error. (See *Strickland v. Washington, supra,* 466 U.S. at pp. 688-689.)

CONCLUSION

Accordingly, Petitioner respectfully request that
the judgment of conviction be reversed.

Dated: 02/03/08

Respectfully submitted,

Francisco Partida
Francisco Partida

(Pro Se,)

31

## TOPICAL INDEX

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . .2

REASONS FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . .4

ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

    I.    A SUPERIOR COURT JUDGE COMMITTED
        FEDERAL CONSTITUTIONAL REVERSIBLE
        ERROR PER SE BY DENYING APPELLANT'S
        MARSDEN MOTION TO SUBSTITUTE NEW
        COUNSEL.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

        A.    State and federal standards for appointment of
            new counsel.  . . . . . . . . . . . . . . . . . . . . . . . . . . . .6
        B.    The superior court judge who denied
            appellant's Marsden motion employed an
            incorrect legal standard that must be evaluated
            de novo on appeal.  . . . . . . . . . . . . . . . . . . . . . .9
        C.    There was a complete breakdown in the
            attorney-client relationship, and the court erred
            by not conducting a complete inquiry into
            appellant's complaints against his attorney.  .14

    II    TRIAL COURT COMMITTED REVERSIBLE
        FEDERAL CONSTITUTIONAL ERROR BY
        DENYING APPELLANT'S MOTION TO ADMIT
        THE TESTIMONY OF HIS EXPERT,
        NEUROLOGICAL PSYCHOLOGIST DR. PEREZ-
        ARCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . 32

i

# TABLE OF AUTHORITIES

**Cases**

**Page**

Anders v. California (1967) 386 U.S. 738 . . . . . . . . . . . . . . . . . . 8

Brown v. Craven (9th Cir. 1970) 424 F.2d 1166 . . . . . . . . . . . . . 8
Cuyler v. Sullivan (1980) 446 U.S. 335 . . . . . . . . . . . . . . . . . . . 8

In re Miller ( 1973) 33 Cal.App.3d 1005 . . . . . . . . . . . . . . . . . .5

People v. Fiero (1991) 1 Cal.4th 173 . . . . . . . . . . . . . . . . . . . . .7

People v. Hill (1983) 148 Cal.App.3d 744 . . . . . . . . . . . . . . . . .5

People v. Lindsey (1978) 84 Cal.App.3d 851 . . . . . . . . . . . . . . .15

People v. Marsden (1970) 2 Cal.3d 118 . . . . . . . . . . . . . . . . . . .2

People v. Smith (1993) 6 Cal.4th 684 . . . . . . . . . . . . . . . . . . . .9

Smith v. Lockhart (8th Cir. 1991) 923 F.2d 1314 . . . . . . . . . . . .8

Smith v. Superior Court (1968) 68 Cal.2d 547 . . . . . . . . . . . . . .15

United States v. Moore (9th Cir. 1998) 159 F.3d 1154 . . . . . . . . .15

United States v. Wagner (9th Cir. 1987) 834 F.2d 1474 . . . . . . . .7

United States v. Williams (9th Cir. 1979) 594 F.2d 1258 . . . . . . .8

Von Moltke v. Gillies (1948) 332 U.S. 708 . . . . . . . . . . . . . . . . .8

Wood v. Georgia (1981) 450 U.S. 261 . . . . . . . . . . . . . . . . . . . .8

SUPREME COURT OF THE STATE OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,  )
                                     )
        Plaintiff and Respondent,    )  No.
                                     )
    v.                               )
                                     )
FRANCISCO PARTIDA,                   )
                                     )
        Defendant and Appellant.     )
                                     )
                                     )

## APPELLANT'S PETITION FOR REVIEW

Appellant Francisco Partida respectfully petitions this court for review of the decision of the Court of Appeal, First Appellate District, Division Three, filed on May 31, 2007. A copy of that opinion is attached hereto as the Appendix. No petition for rehearing was filed.

1

## ISSUES PRESENTED FOR REVIEW

1. Whether a superior court judge committed reversible federal constitutional error per se by denying appellant's <u>Marsden</u> (<u>People</u> v. <u>Marsden</u> (1970) 2 Cal.3d 118) motion to substitute new counsel before trial.

2. Whether the trial court committed reversible federal constitutional error by denying appellant's motion to admit the testimony of defense expert Dr. Perez-Arce, regarding appellant's mental disorder.

## REASONS FOR GRANTING REVIEW

This court should grant review to decide these important legal questions to secure uniformity of law.

The first issue presented for review herein is whether a San Francisco Superior Court judge committed reversible federal constitutional error by denying appellant's <u>Marsden</u> motion to substitute new counsel when there was an obvious breakdown in the attorney-client relationship between appellant and his deputy public defender, who kept declaring a doubt as to appellant's competency to stand trial when appellant was insistent that he wanted to go to trial

2

and would not accept any pretrial offers by the district attorney. The trial court also employed an incorrect legal standard when it denied appellant's <u>Marsden</u> motion because the court focused on the deputy public defender's reputation, rather than on the breakdown in their attorney-client relationship. The court deprived appellant of his federal constitutional right to counsel under the Sixth and Fourteenth Amendments of the United States Constitution.

The second issue presented herein is whether the trial court committed reversible federal constitutional error by denying appellant's motion to admit the testimony of his defense expert, neurological psychologist Dr. Perez-Arce, who testified at a Evidence Code section 402 hearing that appellant suffered from a mental disorder. The trial court's ruling excluding her testimony deprived appellant of his federal constitutional right to present a defense under the Fourteenth Amendment of the United States Constitution, and violated appellant's right to call Dr. Perez-Arce to testify about his mental disorder pursuant to Penal Code sections 28 and 29. The jury could have inferred from her testimony that appellant did not actually form the required mental state for the specific intent crimes of which

3

he was convicted.

## STATEMENT OF THE CASE

After a jury trial in San Francisco County Superior Court, appellant was convicted of 12 felony counts: residential burglary, sexual battery, eight separate counts of digital penetration by force or violence, felony assault with a deadly weapon, and false imprisonment. (Penal Code §§§§ 459, 243.4(a), 289(a)(1), 245(a)(1), 236).) Several enhancements were also found true by the jury. (Penal Code §§ 12022.3, 12022(b)(1).)

Appellant was sentenced under the "One Strike Law" (Penal Code § 667.61) to a term of 25 years to life in prison based on one of the digital penetration counts by force or violence charged pursuant to Penal Code section 289(a)(1), plus determinate and consecutive sentences totaling an additional 12 years and eight months.

Appellant's convictions were upheld by the First District Court of Appeal in an opinion filed on May 31, 2007.

//

//

//

4

<u>ARGUMENT</u>

I.

## A SUPERIOR COURT JUDGE COMMITTED REVERSIBLE FEDERAL CONSTITUTIONAL ERROR PER SE BY DENYING APPELLANT'S <u>MARSDEN</u> MOTION TO SUBSTITUTE NEW COUNSEL.

The trial court erroneously denied appellant's <u>Marsden</u> (<u>People</u> v. <u>Marsden</u> (1970) 2 Cal.3d 118) motion when there was an obvious breakdown in the attorney-client relationship between appellant and his deputy public defender, who kept declaring a doubt as to appellant's competency to stand trial when he was insistent that he wanted to go to trial and not accept any pretrial offers by the district attorney.  The trial court also employed an incorrect legal standard in denying appellant's motion because he focused on the deputy public defender's reputation, rather than on the obvious breakdown in their attorney-client relationship.  (<u>People</u> v. <u>Hill</u> (1983) 148 Cal.App.3d 744, 753-755; <u>In re Miller</u> (1973) 33 Cal.App.3d 1005, 1021.)

All of appellant's convictions must be reversed because he was deprived of his federal constitutional right to counsel under the Sixth

5

and Fourteenth Amendments of the United States Constitution.[1]

> A.    State and federal standards for appointment of new
>        counsel.

The legal standard for determining when a defendant may have

his appointed trial counsel relieved was first set forth by the

California Supreme Court in People v. Marsden, supra, 2 Cal.3d 118,

where the court therein held: "The right of a defendant in a criminal

case to have the assistance of counsel for his defense... may include

the right to have counsel appointed by the court ... discharged or other

counsel substituted, if it is shown ... that failure to do so would

substantially impair or deny the right ..." (Id. at p. 123, citations

omitted.)

The Marsden court held that an accused has a right to a

separate hearing at which he or she should be given the opportunity to

explain and document the basis for the complaints against counsel. (2

Cal.3d at p. 125.) The trial judge must then inquire into the reasons

_____

[1] The transcript from the court hearing on appellant's Marsden motion and
appears in a separately paginated, unnumbered volume of the reporter's transcript.
For the purposes of this Argument only, the transcript from the Marsden hearing
will be only referred to by the initials "RT__," without a volume number or
respective court date.

6

for the accused's discontent with counsel and counsel's reasons for his or her tactics. The trial court should substitute new appointed counsel only where the record "clearly shows that the first appointed counsel is not adequately representing the accused ..." (Id. at p. 123.)

A defendant's right to a Marsden hearing is based on the Sixth Amendment right which requires appointment of counsel to a criminal defendant who is unable to hire his or her own counsel. (Marsden, supra, 2 Cal.3d at p. 123, citing Gideon v. Wainwright (1963) 372 U.S. 335, 339-343.) The California and federal courts have held that an accused is entitled to new appointed counsel on a sufficient showing of inadequacy of representation or an irreconcilable conflict between counsel and the accused. (People v. Fiero (1991) 1 Cal.4th 173, 204; United States v. Wagner (9th Cir. 1987) 834 F.2d 1474, 1481.)

Where an unbridgeable rift exists between counsel and client and communication between the two has broken down, the ability of counsel to perform the constitutional function contemplated by the Sixth Amendment is fatally compromised, for the adversarial process protected by the Sixth Amendment requires that the accused have

7

"counsel acting the role of an advocate." (Anders v. California (1967) 386 U.S. 738, 743.)

It is well settled that the Sixth Amendment right to counsel contains a correlative right to representation that is unimpaired by conflicts of interest, by divided loyalties (see e.g. Cuyler v. Sullivan (1980) 446 U.S. 335), or by unbridgeable rifts between counsel and client. (See e.g. Wood v. Georgia (1981) 450 U.S. 261, 271; Von Moltke v. Gillies (1948) 332 U.S. 708, 725; Smith v. Lockhart (8th Cir. 1991) 923 F.2d 1314, 1320.) Consequently, courts have held that it offends the fundamental precepts of the Sixth Amendment to foist upon a defendant a lawyer with whom effective communication and trust are entirely absent. (United States v. Williams (9th Cir. 1979) 594 F.2d 1258, 1259-1261; Brown v. Craven (9th Cir. 1970) 424 F.2d 1166, 1169.)

There are two distinct legal tests for a trial court to decide whether to appoint new counsel. A Marsden motion should be granted if "the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel"; or, if "the defendant and the attorney have become

8

embroiled in such an irreconcilable conflict that ineffective

representation is likely to result." (People v. Smith (1993) 6 Cal.4th

684, 696, citations omitted.)  Those two legal standards apply

regardless of when the Marsden motion is made; that is, before,

during, or after trial.  (Ibid.)

> B.    The superior court judge who denied appellant's Marsden
>        motion employed an incorrect legal standard that must be
>        evaluated de novo on appeal.

After some introductory remarks, the following exchange

occurred between the court and appellant at the Marsden hearing:

" The court: And is there any other reason, sir?

" The defendant: You know, there are so many reasons.  I just
can't tell you all of them.

" The court:  Is that all you wish to say, sir?

" The Defendant: Well, I want to know if they are going to take
care of this case properly.  Are they going to work on it properly or
not?

" The court: Anything else, sir?
" The defendant: And I want to know why do they want to give
me so much time when I haven't killed anybody or anything like that.

" The court: Are those your reasons, sir?

" The defendant: Well, if she is going to do a good job with me,
then she may continue.  But she can't keep on bringing me all these

lies.  And we will have to see how it goes.

"The court: Are you now saying, Mr. Partida, that you will be satisfied with representation by Miss Isa?

"The defendant: Well, I don't know.  She has to take a look there, and see if she really going to do a good job or not.

"The court: Mr. Partida, from my knowledge of Miss Isa, she is one of the best attorneys here in this Hall of Justice.  When she represents you, you are getting the best representation you could possibly get.

"The defendant: Well, then what I don't understand is why, why is there so much time?

"The court: Is there anything else?

"The defendant: Well, also I want to know why doesn't one get the kind of opportunity that it sees, like everyone else gets.  They come and go all the time.  Why can't somebody get probation or what is the question here with that?  There is no forgiveness, for one, because you are not from here.  So what is the system here really?

"The court: Is there anything else specific to your attorney, Miss Isa?

"The defendant: She also told me that, she also told me that in a year, they would give me probation or they would send me I don't know where.  And I still don't see any clarity...

"The court: Mr. Partida, there are certain things that your attorney, no matter who that person is, does not have control of.  Your attorney, so far as I can tell from your statements, I cannot see that there is any good reason for you to be dissatisfied with her.

"The defendant: So then what can be done?  So do you think

10

it's fair that they want to give me all that time for a mistake that was made when nobody was hurt or anything like that in–

" The court: Mr. Partida, that's not up to me to decide. I am only here to hear of your dissatisfaction with your attorney...

" Based upon the reasons which the court has heard, I am not satisfied Mr. Partida is not being represented well and therefore, I am going to deny the motion." (7-15-05, RT 4-6.)

After quickly going through appellant's stated reasons for excusing his attorney (RT 3-5), the court stated: "... from my knowledge of Miss Isa [appellant's deputy public defender], she is one of the best attorneys here in this Hall of Justice. When she represents you, you are getting the best representation you could possibly get." (RT 5 emphasis added .)

The court finally stated its reasons for denying appellant's motion as follows: "Based upon the reasons which the court has heard, I am not satisfied Mr. Partida is not being represented well. And therefore, I am going to deny the motion." (RT 6 emphasis added .)

The superior court judge who denied appellant's motion committed reversible error per se by employing two incorrect legal standards. First, he based his decision on his own personal,

11

subjective evaluation of the public defender's reputation; and second,

he did not apply the second or alternative test for deciding a Marsden

motion, that is where there is an irreconcilable conflict between the

defendant and his attorney. (People v. Smith, supra, 6 Cal.4th 684,

696.)

It is now well established that a court deciding a Marsden

motion must base its decision on the attorney's performance in that

case, or on the specifics of the irreconcilable conflict between the

defendant and the attorney in that case. (In re Miller, supra, 33

Cal.App.3d 1005, 1021; People v. Hill, supra, 148 Cal.App.3d 744,

753-755.) In Miller, the Court of Appeal reversed the defendant's

murder conviction despite the overwhelming evidence of the

defendant's guilt because the trial judge did not inquire adequately

into the disagreement between the defendant and his attorney, and

because the court denied the motion on the basis of his own opinion

that the public defender was a competent attorney.   The trial court

also did not make an adequate inquiry into the specifics of the

defendant's request. (Id. at p. 1021.)

In People v. Hill, supra, 148 Cal.App.3d 744, the Court of

12

Appeal reversed the defendant's conviction for several reasons, including the trial court erroneously denying the defendant's initial Marsden motion.   The Hill court stated emphatically "... that a judge cannot base his disposition of a request for substitution of counsel on his or her own confidence in the current attorney and observations of that attorney's previous demonstrations of courtroom skill." (Id. at p. 753.) The trial court has a duty to make an adequate inquiry into the defendant's complaints and must when appropriate ask follow-up questions of the defendant and his attorney. (Id. at pp. 753-755.) ( People v. Hill, supra; In re Miller, supra. )

The superior court judge here obviously employed an incorrect legal standard when it stated that appellant's deputy public defender was "one of the best attorneys here in this Hall of Justice." (RT 5.)

The court also employed an incorrect legal standard when it concluded that the public defender was representing appellant "well." (RT 6.) Even though the court did not ask defense counsel any questions, the court made the conclusory finding that she was representing him "well."   The court completely ignored the second test for deciding Marsden motions, which is whether the "defendant

13

and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." (People v. Smith, supra, 6 Cal.4th at p. 696, see also People v. Fiero, supra, 1 Cal.4th at p. 204.)

For the reasons stated in more detail below in part C, there was an irreconcilable conflict between appellant and his attorney given that he accused her of lying to him about his case. (RT 4.) The court below completely failed in its duty to inquire further into appellant's accusation and to question defense counsel in regard to that serious allegation. (People v. Hill, supra, 148 Cal.App.3d at p. 755.) By failing to address those serious complaints, the court committed reversible error per se by applying the incorrect legal standard here. Therefore, appellant's convictions must be reversed on this ground alone because the court's error constitutes reversible error per se. (People v. Hill, supra, at p. 755.)

    C.    There was a complete breakdown in the attorney-client relationship, and the court erred by not conducting a complete inquiry into appellant's complaints against his attorney.

In some circumstances, disagreements between an attorney and

14

his or her client may signal a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel. (People v. Robles (1972) 2 Cal.3d 205, 215.) A disagreement over trial tactics may require the substitution of appointed counsel when there is a breakdown in the attorney-client relationship. (People v. Lindsey (1978) 84 Cal.App.3d 851, 859.) A cooperative relationship between counsel and the client is necessary, but particularly in a criminal case where the client's liberty is at stake. (Smith v. Superior Court (1968) 68 Cal.2d 547, 561.)

Several federal circuit courts of appeal have found a violation of an accused's Sixth Amendment right to counsel when there were irreconcilable conflicts or breakdowns in communication between the client and counsel. ( Brown v. Craven (9th Cir. 1970) 424 F.2d 1166, 1169.) (See also United States v. Moore (9th Cir. 1998) 159 (9th Cir. 1998) 159 F.3d 1154, 1158-1160 [an irreconcilable conflict between the defendant and his attorney resulted in the denial of his right to counsel].)

Appellant was obviously very frustrated with his deputy public

15

defender. He was unhappy with the district attorney's pretrial offer of 10 years in state prison and wanted to know why he was facing so much time in state prison in a non-homicide case. (RT 4.) At one point he told the court: "You know, there are so many reasons. I just can't tell you all of them." (RT 4.) In response to his statement, the court only replied: "Is that all you wish to say, sir?" Appellant repeated: "... I want to know if they are going to take care of this case properly. Are they going to work on it properly or not?" Once again, the court responded, "Anything else, sir?" (RT 4.)

Appellant then told the judge if "she is going to do a good job with me, then she may continue. **BUT SHE CAN'T KEEP BRINGING ME ALL THESE LIES.** And we will have to see how it goes." (RT 4 emphasis added.) In response to appellant's statement he was being told "lies" by his attorney, the court did <u>not</u> ask a single clarifying question about that obviously serious accusation.

The Court of Appeal in its opinion misread that statement by appellant to refer to "lies" regarding the "prosecution's characterization of the gravity of his conduct." (Opinion at p.6.) That is an inaccurate reading of appellant's statement because

16

appellant's use of the word "she" was obviously a reference to his trial attorney, not the district attorney or the judge. (RT 4.)

Appellant's accusations against his attorney cried out for further clarification by the court. The judge should have questioned his attorney regarding what legal work she had done, or not done. (People v. Hill, supra, 148 Cal.App.3d at p. 753-755.) The court below was obliged here to make further inquiry into appellant's serious complaints against his attorney. (Ibid.) The court here failed to question appellant or his attorney in depth about any of his complaints. (United States v. Moore, supra, 159 F.3d 1154, 1160; Brown v. Craven, supra, 424 F.2d 1166, 1169.) Just as in Brown v. Craven, supra, the "state court summarily denied the motions, making no adequate inquiry into the cause of Brown's dissatisfaction with his counsel ... ." (Ibid.)

There was an irreconcilable conflict between appellant and his attorney here that substantially impaired his federal constitutional right to the effective assistance of counsel. Defense counsel here kept declaring a doubt as to appellant's competency to stand trial against her client's wishes without an adequate medical basis. Defense

17

counsel first declared a doubt as to his competency at the conclusion of the preliminary hearing held on December 1, 2004. Four psychologists and psychiatrists examined appellant at the request of the court. All four doctors found that appellant was competent to stand trial and did not have any mental disorders, even though he may have had a serious personality disorder.[2]

While appellant's attorneys obviously disagreed with his decision to reject the district attorney's pretrial offer, that legal decision was for appellant to make. His deputy public defender was obviously dissatisfied with appellant's decision to proceed to trial when he was facing so much state prison time. However, defense counsel's continued declarations of doubt as to appellant's competence only added to appellant's frustration with his attorney and

---

[2]Those reports were by Drs. Jeff Gould, Robert Cassidy, Douglas Korpi, and Roland Levy. All four reports appear in volume 1 of the clerk's transcript. (1CT 42, 1CT 108, 1CT 115, and 1CT 257.) Defense counsel finally found a neuropsychologist who wrote a report dated January 12, 2006, after appellant's jury trial, in which she raised a question as to appellant's competence to stand trial. (2CT 466-470.) The defense expert, Dr. Perez-Arce, testified at a Evidence Code section 402 hearing during trial regarding appellant's mental state at the time of the crime. She evaluated appellant on June 11, 2005, but she did not prepare a report regarding his competency until January 12, 2006. She concluded only that he had a mild impairment of his cognitive executive functions. (2CT 466-470.)

contributed to the breakdown in their relationship. It was obvious by the time of the <u>Marsden</u> motion that there was an irreconcilable conflict between them and a complete breakdown in their relationship. Appellant thought that his public defender was lying to him, which was a symptom of his mistrust in his attorney. (RT 4.)

The trial court forced appellant to proceed to trial with an attorney when he was deeply dissatisfied with her representation. (<u>Brown</u> v. <u>Craven</u>, <u>supra</u>, 424 F.2d at p. 1169-1170.) Therefore, the court below committed federal constitutional error by denying his motion when there was an irreconcilable conflict that substantially impaired her representation of him. Trial counsel effectively denied appellant his state and federal constitutional right to a speedy trial by repeatedly declaring a doubt as to his competency; thereby delaying his trial for 10 months after his preliminary hearing. Accordingly, appellant's convictions must be reversed because the erroneous denial of his motion is prejudicial error per se. (<u>People</u> v. <u>Hill, supra,</u> at p. 755.)

II.

## THE TRIAL COURT COMMITTED REVERSIBLE FEDERAL CONSTITUTIONAL ERROR BY DENYING APPELLANT'S MOTION TO ADMIT THE TESTIMONY OF HIS EXPERT, NEUROLOGICAL PSYCHOLOGIST DR. PEREZ-ARCE.

Appellant was evaluated by a neuropsychologist, Dr. Perez-Arce, who testified at an Evidence Code section 402 hearing that he suffered from a mental disorder, a neurological cognitive impairment. The trial court committed reversible federal constitutional error by denying appellant's motion to allow Dr. Perez to testify in front of the jury under Penal Code sections 28 and 29, that appellant suffered from a mental disorder from which the jury could infer that he did not actually form the required mental state of specific intent for the digital penetration counts (Penal Code sec. 289(a)(1)).

Appellant's trial attorney was ineffective because she did not object on federal constitutional grounds to the trial court's denial of her motion to admit the doctor's testimony. The trial court's error deprived appellant of his federal constitutional right to present a defense at trial under the Fourteenth Amendment of the United States Constitution and requires reversal of the digital penetration counts

20

charged in counts 4-11 (Penal Code § 289(a)(1)).

A.    The testimony of Dr. Perez

There was a bifurcated Evidence Code section 402 hearing where Dr. Perez testified on October 27, 2005, and November 3, 2005.[3] Dr. Perez interviewed appellant in his native language, Spanish, and administered 14 tests. She concluded that he had a "deficit in an area of function that is related to the frontal lobe that we call executive functions, specifically his ability to abstract relevant information and to be able to shift his attention between competing demands of the environment and the executive function that he is impaired in." (3RT 59.) Appellant suffered from a mental disorder, which she described as a "mild neurocognitive disorder." (Ibid.) He also suffered from "perseveration," which Dr. Perez described as persevering on a response or task regardless of how much feedback he was given. (3RT 61.) His impairment was chronic and could have been congenital due to early childhood illnesses such as

_____

[3]The transcripts of Dr. Perez's testimony at the Evidence Code section 402 hearing appear in volumes 3 and 7 of the reporter's transcript. The trial court denied appellant's motion to admit her testimony on November 7, 2005. The transcript from that court hearing is contained in a supplemental reporter's transcript on appeal and will be referred to herein as "SRT ___."

epilepsy, etc. (3RT 61-62.) She testified that "he was clearly ...

unable to in a way believe that the actions that he engaged in would

really result in anything of a serious nature in terms of his legal case."

(Ibid.)

Dr. Perez described his impairment as a "mental disorder,"

which results from organic brain deficiency. (7RT 222.) She opined

that he was not malingering and that appellant insisted that he was

totally sane. (7RT 233.) She testified that appellant told her that on

the day of the charged sex offenses, he was stressed out because he

had driven to Chinatown to get a haircut; and he had received a

parking ticket, which stressed him out because of the amount of

money he owed. (7RT 228.)

B.     The trial court's exclusion of Dr. Perez's testimony
        violated appellant's federal constitutional right to a fair
        trial and Penal Code sections 28 and 29.

In the early 1980s, the state legislature and the voters abolished

what was then known as the "diminished capacity" defense. (Penal

Code §§ 28, 29.) Penal Code section 28 now provides that evidence

of a mental disorder may not be admitted to negate the "capacity to

form any mental state ... ." However, evidence of mental disorder is

22

admissible on the issue of whether the defendant "... actually formed a required specific intent ... when a specific intent crime is charged." Penal Code section 29 provides that an expert may not testify "... as to whether the defendant had or did not have the required mental states ..."

California courts have concluded that those two statutes permit a defendant to offer evidence that he suffers from a mental disease or defect, and that the jury may hear evidence about that mental disease from which it could infer that he did not actually form the required mental state. (People v. Coddington (2000) 23 Cal.4th 529, 583, overruled on another ground, Price v. Superior Court (2001) 25 Cal.4th 1046.)

In People v. Nunn (1996) 50 Cal.App.4th 1357, 1364-1365, the court held that an expert may not offer an opinion on the ultimate question of whether the defendant had a particular mental state at the time of the crime. However, sections 28 and 29 permit detailed testimony from an expert regarding whether he had a mental disorder at the time of the crime. In Nunn, the expert psychologist was properly allowed to testify that the defendant tended to overreact to

23

stress and apprehension, and that his condition might result in impulsive action under certain conditions. The expert could have testified regarding whether the incident in question was the type that might result in impulsive reaction. (Id. at p. 1365.) (People v. Young (1987) 189 Cal.App.3d 891, 906 [a psychiatrist was allowed to testify to a diagnosis of the defendant's mental disease at the time of the crime, but not to the ultimate legal issue of whether the defendant acted with malice].)

During the section 402 hearing, defense counsel made an offer of proof that Dr. Perez's testimony regarding appellant's mental disorder was only being offered to negate the required mental state for the specific intent crimes. (7RT 212.) Before the court announced its ruling on the record, defense counsel made another offer of proof that her testimony was relevant and admissible under Penal Code section 28 on the issue of whether he actually formed the required specific intent for the Penal Code section 289, subdivision (a) charges and the personal use of a deadly weapon allegations under Penal Code section 12022.3, which were alleged in counts 4-11. (SRT 5-6.)

24

The court stated its reasons for denying appellant's motion as follows:

> "...the court ... agrees with the People that under a [Evidence Code section] 352 analysis her testimony is far more prejudicial ... than it was probative of any issue.
>
> "The evidence is presented in this case ... from the victim's testimony and from the tape of [the] interview of the defendant ... clearly indicates that he knew what he was doing was wrong. He indicates that the knife was used as a joke. The jury can consider that as any lay person can. Dr. Perez-Arce would not offer any additional probative evidence on that particular specific intent element.
>
> "So the court considered [her] testimony to be not probative to the issues that the jury must decide, and therefore is inadmissible." (SRT 8.)

The trial court's ruling was erroneous for several reasons. First, she incorrectly relied upon Evidence Code section 352 to deprive appellant of his right under Penal Code sections 28 and 29 to produce expert testimony regarding his mental disorder on the legal issue of whether he actually formed the required specific intent for the digital penetration charges. Defense counsel did not call her expert to testify as to his capacity to form the required mental state, nor to testify as to

25

the ultimate question of whether he acted with the required specific

intent on the day of the incident. Defense counsel laid the necessary

evidentiary foundation through her testimony at the 402 hearing to

require that the court admit the expert's testimony under sections 28,

29, and 352.

Appellant also had the federal constitutional right to put on the

defense that he had a mental disorder; that he was stressed out on the

day of the incident; and that given his mental disorder, it may have

affected his perceptions and conduct at the time of the charged

offenses. (People v. Coddington, supra, 23 Cal.4th 529, 583; People

v. Nunn, supra, 50 Cal.App.4th 1357; People v. Young (1987) 189

Cal.App.3d 891, 906.)

The trial court incorrectly relied upon Evidence Code section

352 to deprive appellant of his federal constitutional right to call an

expert witness whose testimony was not only relevant, but was

admissible under sections 28 and 29. Trial courts may not rely upon

section 352 to exclude evidence that is relevant under the California

Evidence Code when that exclusion would infringe upon the

defendant's constitutional right to present a defense at trial. (People

v. <u>Burrell-Hart</u> (1987) 192 Cal.App.3d 593, 597-599 [the proffered
evidence regarding the victim's character was relevant under
Evidence Code section 1103, and it was reversible error for the court
to exclude that evidence under section 352].) "Evidence Code section
352 must bow to the due process right of a defendant to a fair trial
and his right to present all relevant evidence of significant probative
value to his defense." (<u>Id</u>. at p. 599.)

The prosecution did not show exactly how the expert's
testimony would have actually prejudiced the prosecution. Nor did
the prosecution show that her testimony would have misled the jury
or confuse the jury regarding the required legal elements for the
digital penetration charges. San Francisco juries are very
sophisticated, and a jury composed of reasonably intelligent people
could have easily understood her testimony. Therefore, her testimony
was relevant and admissible under Evidence Code sections 352, 801,
802, and 803.

The trial court's ruling deprived appellant of his federal
constitutional right to present a defense at his trial. The federal
constitution "guarantees criminal defendants a meaningful

27

opportunity to present a complete defense." (<u>California</u> v. <u>Trombetta</u> (1984) 467 U.S. 479, 485.)  (See also <u>Washington</u> v. <u>Texas</u> (1967) 388 U.S. 14; <u>Chambers</u> v. <u>Mississippi</u> (1973) 410 U.S. 284, 302-303.)

C. <u>Defense counsel was ineffective in failing to object on federal constitutional grounds.</u>

Defense counsel should have objected on the above-described federal constitutional grounds when the trial court denied her motion to admit the expert's relevant and admissible testimony.  A reasonably competent defense attorney would have objected on federal constitutional grounds to preserve the issue for future appellate and habeas review.

Thus, appellant was deprived of his federal constitutional right to the effective assistance of counsel at trial under the Sixth Amendment of the United States Constitution.  (<u>Strickland</u> v. <u>Washington</u> (1984) 466 U.S. 668.)  Furthermore, there could have been no informed, conceivable tactical reason for her not to object on federal constitutional grounds given that she was the moving party.

D. <u>The court's ruling is reversible federal constitutional error.</u>

The trial court's ruling violated appellant's federal

28

constitutional right to due process, rendering his trial fundamentally

unfair. (See *Estelle v. McGuire* (1991) 502 U.S. 62,70,112 S.Ct 475;

*People v. Partida* (2005) 37 Cal.4th 428, 439. ["[T]he admission of

evidence, even if erroneous under state law, results in a due process

violation only if it makes the *trial fundamentally unfair*."].) To

determine whether an evidentiary ruling denied defendant due process

of law, "the presence or absence of a state law violation is largely

beside the point because "a failure to comply with the state's rules of

evidence is neither a necessary nor a sufficient basis" for granting

relief on federal due process grounds. (*Jammal v. Van de Kamp* (9th

Cir. 1991) 926 F.2d 918, 919-920.)

Under *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S.Ct.

824, in the case of a federal due process violation, reversal is required

unless the State can prove beyond a reasonable doubt that the error

did not contribute to the verdict. (See *People v. Boyette* (2002) 29

Cal.4th 381,428 [*Watson* standard applies to prejudicial-error analysis

for errors of state law, while beyond-a-reasonable-doubt standard of

*Chapman v. California, supra,* 386 U.S. 18, 87 S. Ct. 824, applies to

federal constitutional errors.].)

Given the victim's testimony and appellant's statement to police, there was no question that appellant committed the physical acts with which he was charged. The question for the jury to decide was whether he had the required intent for all of the specific intent crimes he was charged with. Significantly, the jury did not reach a unanimous verdict as to the second count of residential burglary, which was charged as having occurred on the same day as the charged sex offenses.

All of the digital penetration counts here must be reversed because of the trial court's federal constitutional error in not permitting the defense expert to testify. Those counts required that he have the "specific intent to cause sexual abuse ... ." (CALJIC No. 10.30, CT 365.) The only way to explain appellant's bizarre behavior that night was to have an expert testify regarding his mental disorder. The expert would have testified that appellant suffered from a neurological cognitive disorder, which then would have allowed the jury to decide if he actually formed the required specific intent for the digital penetration counts.

//

30

CONCLUSION

Accordingly, Petitioner respectfully request that

the judgment of conviction be reversed.

Dated: 02/03/08/

Respectfully submitted,

Francisco Partida

Francisco Partida

(Pro Se,)

31

1        COURT OF APPEALS OF THE STATE OF CALIFORNIA

2                FIRST APPELLATE DISTRICT

3                     ---oOo---

4  THE PEOPLE OF THE STATE OF     )
    CALIFORNIA,                 )

5                        )

        Plaintiff/Respondent,  )

6                        )
    vs.                    )Appellate No.

7                        )San Francisco Co. No.

    FRANCISCO PARTIDA,         )

8                        )
        Defendant/Appellant.   )

9  _____)

10

11            ON APPEAL FROM THE JUDGMENT
     OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

12   IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

13

    THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE

14

15

16           REPORTER'S TRANSCRIPT ON APPEAL

17             November 1, 2005

18               Volume V

19              Pages 80 - 92

20

21

22

23

24

25                            ENDORSED
                              F I L E D

26                San Francisco County Superior Court

27  Reported by:  Kent S. Gubbine, CSR #5797      JUL 2 6 2006

28                       GORDON PARK-LI, Clerk
                           BY: MA. BENIGNA D. GOODMAN
                                Deputy Clerk

COPY

1        SUPERIOR COURT OF CALIFORNIA

2            COUNTY OF SAN FRANCISCO

3   BEFORE THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE PRESIDING

4              DEPARTMENT NUMBER 27

5                 ---ooXoo---

6   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
7              Plaintiff,             )   SCN 194241
                                      )   Court No.
8   vs.                               )
                                      )   **1369 HEARING**
9   FRANCISCO PARTIDA,                )
                                      )   **VOLUME V**
10             Defendant.             )
    _____   )   Pages 80 - 92

11

12

13

14          **Reporter's Transcript of Proceedings**

15            Tuesday, November 1, 2005

16

17  **APPEARANCES OF COUNSEL:**

18       For Plaintiff:

19           Kamala Harris, District Attorney
             850 Bryant Street - Suite 300
20           San Francisco, California 94103
             BY:  MARIANNE BARRETT, Assistant District Attorney

21

22       For Defendant:

23           JEFF ADACHI, PUBLIC DEFENDER
             555 Seventh Street - Suite 205
24           San Francisco, California  94103
             BY:  KATIE ISA, Deputy Public Defender

25

26

27  Reported By:  Kent S. Gubbine, CSR #5797

28

# I N D E X

**1368 WITNESS:**                                                    **PAGE**

**Levy, Roland**

Examination by the Court                                              84
Examination by Ms. Isa                                               85
Examination by Ms. Barrett                                           88

1    Tuesday, November 1, 2005                    2:13 o'clock p.m.

2                          ---ooXoo---

3        **THE COURT:**  Let's go on the record in People versus

4    Francisco Partida, and this is a hearing pursuant to Penal Code

5    Section 1369 regarding the competency of the defendant.

6        The record will reflect that both counsel are present.  Mr.

7    Partida is present and is being assisted by the certified

8    Spanish interpreter.  Also present is Dr. Roland Levy who

9    examined the defendant this morning as I understand it?

10       So in my discussions before we went on the record with

11   counsel, as I understand it, counsel are agreeing that we may,

12   the Court may conduct this hearing; is that correct?

13       **MS. BARRETT:**  Yes, Your Honor.

14       **MS. ISA:**  Yes.

15       **THE COURT:**  And unfortunately we don't have a written report

16   but Dr. Levy will disclose his findings to us.  Is that

17   agreeable?

18       **MS. BARRETT:**  Yes.

19       **MS. ISA:**  Yes.

20       **THE COURT:**  So why don't we swear Dr. Levy and ask him to

21   sit up here at the witness stand where we can all hear him.

22       (Witness sworn.)

23       **THE WITNESS:**  I do.

24       **THE CLERK:**  Please take your seat, Doctor.

25       Kindly tell us your full name and spell it for the record.

26       **THE WITNESS:**  Roland Levy, R-o-l-a-n-d, L-e-v-y.

27       **THE CLERK:**  Thanks, Doctor.

28       **THE COURT:**  Ms. Isa, do you want to proceed by questioning

1   or shall we just ask him to describe what he has done and

2   disclose his findings and the reasons for them?

3       **MS. ISA:**   The Court could do that.  At some point I would

4   like to further examine him.  But if the Court wants to ask him

5   about his findings, I think that is probably the best.

6       **THE COURT:**   Why don't we start with that then.

7                        **ROLAND LEVY**,

8   called as a witness for the 1369 competency hearing, having been

9   duly sworn, testified as follows:

10                        **EXAMINATION**

11      **BY THE COURT**

12  **Q.**  First of all, Doctor, since I have not personally had any

13  cases with you before, can you tell me a little bit about your

14  background and qualifications to do a 1369 examination?

15  **A.**  Well, I attended medical school at UC San Francisco

16  graduating in 1947.  I began my psychiatric training in 1948 at

17  the Palo Alto Veterans Hospital, and after two and a half

18  years -- that was interrupted by two years of military service

19  as a psychiatrist -- I went back and completed my training.

20      Then the next four years I was half time at the University

21  as the psychiatric consultant to the Department of Surgery and

22  private practice.  In 1947 I became Chief of Psychiatry and

23  Neurology at the San Francisco Veterans Hospital.  And in 1949 I

24  went back to Langley Porter Institute and remained on the staff

25  there until 1983 -- no, '87.

26      I started forensic work on a regular basis in 1961, and I

27  was a consultant with the San Francisco courts, the San Mateo

28  courts and the federal courts.

1    **Q.**   And approximately how many of these 1368 examinations have

2    you performed.

3    **A.**   Several thousands.

4        **THE INTERPRETER:**   The interpreter did not hear.

5        **THE COURT:**   Several thousands.

6    **Q.**   So this morning you interviewed the defendant Francisco

7    Partida?

8    **A.**   Yes, I did.

9    **Q.**   And you did that with the assistance of a Spanish

10   interpreter?

11   **A.**   Yes, the interpreter and the Public Defender sat through the

12   entire interview.

13   **Q.**   Okay.   And why don't we just go directly to what your

14   findings are?

15   **A.**   In term of competence, I concluded that he was competent.

16   He is well able to understand the nature and purpose of the

17   proceedings and he has the ability to cooperate with counsel

18   even though he choses not to do so.

19       **THE COURT:**   Okay.   Ms. Isa, do you have any additional

20   questions?

21       **MS. ISA:**   Just a couple.

22                        **EXAMINATION**

23       **BY MS. ISA**

24   **Q.**   You indicated that he understands the nature and

25   consequences of the proceedings and the charges against him?

26   **A.**   Yes, he understand all of that.   He disagrees with the

27   severity of what he did and the severity of the possible

28   punishment.

1  **Q.**  Do you believe that he really understands that the

2  consequences are as indicated in this case, 25 to life, that he

3  actually understands that concept of what that means?

4  **A.**  He understands it, but he has the expectation that that

5  won't happen or at least his hope is that it won't.

6  **Q.**  You indicated at some point you were the Chief of Psychiatry

7  in neurology.  Do you have a background in neuropsychology?

8  **A.**  No.

9  **Q.**  Was there any part of your evaluation -- I know that you

10  spoke with Dr. Perez-Arce prior to interviewing Mr. Partida; is

11  that correct?

12  **A.**  Yes, I did.

13  **Q.**  Do you have any expertise in the area of cognitive

14  impairments such as those you discussed with Dr. Perez-Arce?

15  **A.**  Not with the actual testing, but certainly with the results.

16  **Q.**  Did your evaluation of him include those diagnoses of those

17  issues of his cognitive impairments.  In other words, were you

18  able to test for that as an impairment on his competency and

19  ability to understand?

20  **A.**  I didn't do specific testing, but I don't believe that he

21  has cognitive impairments.  What he does have is a very rigid

22  personality structure, and he wants things to go in a certain

23  order and he wants to pretty much control the way things are.

24  And that would show up in some of the testing that she did.

25  **Q.**  But you don't have any basis for your finding that he

26  doesn't have a cognitive disorder because you didn't do any

27  testing; is that right?

28  **A.**  No, but intellectually he appears to be quite normal.

1    **Q.**  In the sense of verbal ski?

2    **A.**  Verbal skills, yes.

3    **Q.**  But there was no testing done to determine that?

4    **A.**  No.  Well, she did testing of verbal skills and she stated

5    that they were at least normal.

6    **Q.**  The verbal skills were normal?

7    **A.**  Yes.

8    **Q.**  She also told you that there were other areas that he was

9    deficient?

10   **A.**  Yes, she referred to frontal lobe syndrome.

11   **Q.**  And did your examination of him -- did you further examine

12   that possibility of frontal lobe impairment before making your

13   determination whether he understood the nature and consequences

14   of the charges against him?

15   **A.**  Not specifically, but frontal lobe impairment is something I

16   have seen in the VA and it's actually quite different than what

17   he shows.  They tend not to be able to stick to a certain topic.

18      In his case it is hard to get him off of one topic onto

19   another.  He is much more an obsessive compulsive personality

20   order.  Very rigid, very set and difficult to convince that

21   things might not be the way that he sees them.

22   **Q.**  So it's your belief that you don't think any further testing

23   would alter your opinion --

24   **A.**  No.

25   **Q.**  -- in that?

26   **A.**  Not in terms of competence, no.

27      **MS. ISA:**  I don't believe I have any further questions.

28      **THE COURT:**  Ms. Barrett?

1    **MS. BARRETT:**  Just briefly.

2                          **EXAMINATION**

3    **BY MS. BARRETT**

4    **Q.**  Doctor, you are the third psychologist to find the defendant

5    trial competent; correct?

6    **A.**  Well, I'm the second psychiatrist to find him competent out

7    of four examinations.

8    **Q.**  I see.  So in addition to you a psychiatrist and a

9    psychologist has found the defendant trial competent; correct?

10   **A.**  Another psychiatrist and two psychologists.

11   **Q.**  Two psychologists.  And it was our understanding previously

12   that the defendant's prior evaluations were not done with the

13   assistance of a Spanish interpreter for those interviews.  And

14   based upon your document review of these prior mental fitness

15   evaluations, you have discovered that on Dr. Gould's examination

16   of the defendant, he did in fact have a Spanish interpreter

17   present; is that correct?

18   **A.**  Yes, that's been almost a year ago.

19   **THE INTERPRETER:**  The interpreter didn't hear.  Did or

20   didn't?

21   **MS. BARRETT:**  Did.

22   Thank you.  I have no further questions.

23   **THE COURT:**  Anything else, Ms. Isa?

24   **MS. ISA:**  Nothing further.

25   **THE COURT:**  Okay.  And, Dr. Levy, thank you very much for

26   assisting us with the evaluation and we look forward to your

27   written report.  Thank you so much.

28   (Witness excused.)

1    **THE COURT:** Any additional evidence?

2    **MS. BARRETT:** Not on behalf of the People.

3    **MS. ISA:** Nothing further, Your Honor.

4    **THE COURT:** Any argument?

5    **MS. BARRETT:** Submitted.

6    **MS. ISA:** I think I stated -- I stated before last week, I

7    do believe that, with all due respect to Dr. Levy, he is a

8    psychiatrist and he has done a number of these competency

9    evaluations, but in light of the findings that were disclosed to

10   me through a neuropsychologist, I would reiterate that I think

11   to fully determine his competency I think that a

12   neuropsychologist needs to evaluate Mr. Partida and I believe

13   that that should be done.

14   **THE COURT:** Anything else?

15   **MS. BARRETT:** Submitted.

16   **THE COURT:** Well, the Court does find that pursuant to 1368

17   and 1369, that this defendant is competent to stand trial.  And

18   so the criminal proceeding are reinstated and tomorrow at

19   10:00 o'clock we will have the jury in and we make opening

20   statements.

21      Anything else then at this time.

22   **MS. ISA:** You know, the only thing I wanted to bring to the

23   Court's attention, this will become an issue on Thursday before

24   the 402 hearing, I don't think we put on the record that the

25   Court had ordered me to disclose the notes of my evaluating

26   psychologist to the District Attorney.  And pursuant to the

27   order I did disclose those notes.

28      And contained in those notes are statements that my client

1   made, and presumably if Dr. Perez-Arce's testimony were admitted

2   into evidence and the Court was allowing that testimony, those

3   statements I think would be relevant to her opinion that she

4   formed.  I think that's what she would testify too because I

5   think that was important to her evaluation.

6       However, with respect to the issue of if this Court does not

7   admit that testimony and finds that it is not admissible during

8   this trial, I know that the District Attorney has subpoenaed her

9   as a prosecution witness for the statements that my client made

10  to her.  And I wanted to state my objection to that because it

11  is attorney-client privilege.  It was only provided pursuant to

12  a court order for the purpose of a 402.  This is before we have

13  even decided the issue of whether or not she is going to be

14  testifying.  And if she does not testify and it is not relevant,

15  I believe that the attorney-client privilege pursuant to those

16  notes would still be protected.

17      I just wanted to state that objection now and I guess we can

18  take it up on Thursday after the Court makes its decision and

19  make that sure that the record was noted with respect to that.

20      **MS. BARRETT:**  I think it make sense to address these issues,

21  Your Honor, if and when they become relevant.

22      **THE COURT:**  What I would appreciate, counsel, since there is

23  an issue here that I have not examined in a very, very long time

24  is if you have any particular case law that would assist the

25  Court regarding the confidentially, the purpose and the notes of

26  the doctor.  And also regarding the relevancy of the doctor's

27  testimony to begin with.  I am not certain as I sit here how I

28  am going to rule on this or why.  And any case law that you have

1    would greatly assist the Court.

2        **MS. BARRETT:**  I cited two cases the other day, Your Honor,

3    the Williams case and the Castillo case, I believe.  I am not

4    sure if the Court took those citations down, but I will provide

5    them to the Court tomorrow.

6        **THE COURT:**  Yes, please.  Thank you.

7        **MS. BARRETT:**  Thank you.

8        **MS. ISA:**  Thank you.

9        (Whereupon, the proceedings were adjourned at 2:28 o'clock

10   p.m.)

11                          ---ooXoo---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   State of California                    )
                                           )
2   County of San Francisco                )

3

4

5        I, Kent S. Gubbine, Official Reporter for the Superior

6   Court of California, County of San Francisco, do hereby certify:

7        That I was present at the time of the above proceedings;

8        That I took down in machine shorthand notes all proceedings

9   had and testimony given;

10       That I thereafter transcribed said shorthand notes with the

11  aid of a computer;

12       That the above and foregoing is a full, true, and correct

13  transcription of said shorthand notes, and a full, true and

14  correct transcript of all proceedings had and testimony taken;

15       That I am not a party to the action or related to a party

16  or counsel;

17       That I have no financial or other interest in the outcome

18  of the action.

19

20

21  Dated:   July 25, 2006

22

23  _____

24           Kent S. Gubbine, CSR No. 5797

25

26

27

28

COURT OF APPEALS OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

---oOo---

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) |
| Plaintiff/Respondent, | ) ) ) |
| vs. | ) Appellate No. ) San Francisco Co. No. |
| FRANCISCO PARTIDA, | ) ) |
| Defendant/Appellant. | ) ) |

**COPY**

ON APPEAL FROM THE JUDGMENT
OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN FRANCISCO

THE HONORABLE MARY C. MORGAN, JUDGE

REPORTER'S TRANSCRIPT ON APPEAL

August 2, 2005

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 8 2006

GORDON PARK-LI, Clerk
BY: MA. BENIGNA D. GOODMAN
Deputy Clerk

Reported by:   Teanna L. Ward, CSR #11918

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE MARY C. MORGAN, JUDGE PRESIDING

DEPARTMENT NUMBER 22

---oOo---

PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
            Plaintiff,             )    SCN 194241
                                   )    Court No. 2167376
vs.                                )
                                   )
FRANCISCO PARTIDA,                 )
                                   )
            Defendant.             )
                                   )
_____    )


### Reporter's Transcript of Proceedings

Tuesday, August 2, 2005

**APPEARANCES OF COUNSEL:**

    For Plaintiff:

        KAMALA D. HARRIS, DISTRICT ATTORNEY
        850 Bryant Street - Suite 300
        San Francisco, California 94103
        BY: **DONNA LEE**, Assistant District Attorney

    For Defendant:

        JEFF ADACHI, PUBLIC DEFENDER
        555 Seventh Street - Suite 205
        San Francisco, California  94103
        BY: **KATHERINE ISA**, Deputy Public Defenders


Reported By:  Teanna L. Ward, CSR #11918

```
 1   Monday, December 27, 2004, a.m. session
 2                      ---oOo---
 3                    FANNY SUAREZ,
 4   Official court interpreter for the defendant, translated from
 5   the English language into Spanish, and from Spanish into English
 6   as follows:
 7        THE COURT:  Francisco Partida, Line 402.
 8        Do you want Mr. Partida out?
 9        MS. ISA:  That's fine.  Yeah, sure.
10        THE COURT:  Yes.  Okay.
11        MS. LEE:  Is this being assigned too, your Honor?
12        THE COURT:  Yes.
13        MS. LEE:  Do we know what department?
14        THE COURT:  Yes.  You can stand in for Ms. Barrett.
15        This matter is assigned to Judge Ragan forthwith for jury
16   trial.
17        MS. LEE:  I need to be sworn.
18        THE COURT:  Carolyn, would you swear her in.
19                    DONNA LEE,
20            having been duly sworn, testified as follows:
21        MS. LEE:  Your Honor, Donna Lee on behalf of Marianne
22   Barrett.  She believes as the attorney for the party within, the
23   People of the State of California, that the Honorable Judge
24   Ragan, the judge before the trial of the aforesaid action is
25   pending, is prejudiced against the party and the interest of the
26   party, and that the declarant cannot receive a fair and
27   impartial hearing and trial on this matter.
28        THE COURT:  That motion is granted.
```

1      This matter is assigned to Department 27, Judge Jackson,

2   forthwith for jury trial.

3      **MS. ISA:**   Thank you, your Honor.

4      **THE DEFENDANT:**   Can I say something now?

5                       ---oOo---

State of California                    )
                                       )
City and County of San Francisco       )




     I, Teanna L. Ward, Official Reporter for the

Superior Court of the State of California, City and County of

San Francisco, do hereby certify:

     That I was present at the time of the above proceedings;

     That I took down in machine shorthand notes all proceedings

had and testimony given;

     That I thereafter transcribed said shorthand notes with the

aid of a computer;

     That the above and foregoing is a full, true, and correct

transcription of said shorthand notes, and a full, true and

correct transcript of all proceedings had and testimony taken;

     That I am not a party to the action or related to a party

or counsel;

     That I have no financial or other interest in the outcome

of the action.



Dated:   July 31, 2006


                    _____

                         Teanna L. Ward, CSR #11918

1           COURT OF APPEALS OF THE STATE OF CALIFORNIA

2                FIRST APPELLATE DISTRICT

3                   ---oOo---

4   THE PEOPLE OF THE STATE OF     )
    CALIFORNIA,                 )
5                          )
         Plaintiff/Respondent,  )
6                          )
    vs.                     )Appellate No.
7                         )SF Nos. 194241/2167376
    FRANCISCO PARTIDA,        )
8                          )
         Defendant/Appellant.   )
9   _____)

10

11              ON APPEAL FROM THE JUDGMENT
     OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
12    IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

13

         THE HONORABLE TERI L. JACKSON, JUDGE
14

15

           REPORTER'S TRANSCRIPT ON APPEAL
16

               August 5, 2005
17

18

19

20

21

22

23                              ENDORSED
24                           F I L E D
                   San Francisco County Superior Court
25                       JUL 1 2 2006
26                  GORDON PARK-LI, Clerk
                 BY: MA. BENIGNA D. GOODMAN
27                              Deputy Clerk

28   Reported by:  Judith N. Thomsen, CSR #5591, RMR, CRR

1        SUPERIOR COURT OF CALIFORNIA

2          COUNTY OF SAN FRANCISCO

3    BEFORE THE HONORABLE TERI L. JACKSON, JUDGE PRESIDING

4              DEPARTMENT NUMBER 27

5                 ---oOo---

6   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
7              Plaintiff,            )   SCN 194241
                                      )   Court No. 2167376
8   vs.                              )
                                      )   **1368 PROCEEDINGS**
9   FRANCISCO PARTIDA,               )
                                      )   Pages 1 - 4
10             Defendant.            )
                                      )
11  ─────────────────────────────────)

12          **Reporter's Transcript of Proceedings**

13              Friday, August 5, 2005

14

15  **APPEARANCES OF COUNSEL:**

16      For Plaintiff:

17          KAMALA HARRIS, District Attorney
            850 Bryant Street - Suite 300
18          San Francisco, California 94103
            BY:  **JOHN ZAHAR**, Assistant District Attorney
19               (Specially appearing for ADA Marianne Barrett)

20      For Defendant:

21          JEFF ADACHI, PUBLIC DEFENDER
            555 Seventh Street - Suite 205
22          San Francisco, California  94103
            BY:  **KAUSER SIDDIQUI**, Deputy Public Defender

23

24

25

26

27

28  Reported By:  Judith N. Thomsen, CSR #5591, RMR, CRR

1  <u>Friday, August 5, 2006</u>                                    10:07 A.M.

2      **THE COURT:**  Mr. Zahar, could you stand in for Ms. Barrett?

3      **MR. ZAHAR:**  Yes, Your Honor.

4      **THE COURT:**  All right.  We waived the appearance of

5  Mr. Francisco Partida.  This is on line 27.

6      **MR. ZAHAR:**  John Zahar for the People standing in for

7  Ms. Barrett.

8      **THE COURT:**  Okay.

9      **MS. SIDDIQUI:**  Kauser Siddiqui on behalf of Mr. Partida.

10      **THE COURT:**  All right.  The criminal proceedings have been

11  suspended.  The Court has expressed a doubt and appointed two

12  experts to evaluate Mr. Partida pursuant to 1368.  But the

13  Court -- not only because of the record did the Court express a

14  doubt but as to his behavior prior to the case being called, and

15  I would like to note that for the record.  During the lunch hour

16  recess, which is approximately, if I am not mistaken -- what was

17  it, an hour and a half? -- Mr. Partida was in the holding cell

18  singing at the top of his lungs, although in key, serenading

19  the -- not only the courtroom itself but as well as the whole

20  hallway that involved many chambers.  When the case was finally

21  called, he came out, and, of course, the record speaks for

22  itself.

23      Mr. Partida at that time, or somewhere in the discussions

24  with the Court in determining his competence to represent

25  himself, indicated that during the lunch hour he was reviewing

26  documents in the holding cell, which I did inform or ask the

27  bailiff to check to see if there were any documents in there, in

28  which the bailiff said there were not.  And, as the Court noted,

1   he was in the holding cell singing.

2       Once the defendant -- once the Court expressed a doubt, the

3   defendant was returned back to the holding cell where he

4   proceeded to sing again at the top of his lungs.  So based on

5   the record as well as his behavior, the Court had a doubt as to

6   his competence to stand trial.

7       Thank you.  Thank you very much, Ms. Siddiqui.

8       And I believe that the 1368 report will be in Department 22

9   on August 24th at 9:00 o'clock.

10              (Whereupon proceedings adjourned at 10:08 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    State of California                    )
                                            )
2    County of San Francisco                )

3

4

5         I, Judith N. Thomsen, Official Reporter for the Superior

6    Court of California, County of San Francisco, do hereby certify:

7         That I was present at the time of the above proceedings;

8         That I took down in machine shorthand notes all proceedings

9    had and testimony given;

10        That I thereafter transcribed said shorthand notes with the

11   aid of a computer;

12        That the above and foregoing is a full, true, and correct

13   transcription of said shorthand notes, and a full, true and

14   correct transcript of all proceedings and testimony taken;

15        That I am not a party to the action or related to a party

16   or counsel;

17        That I have no financial or other interest in the outcome

18   of the action.

19

20

21   Dated:    July 11, 2006

22

23

24                      Judith N. Thomsen, CSR No. 5591

25

26

27

28

COURT OF APPEALS OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

      Plaintiff/Respondent,

vs.

FRANCISCO PARTIDA,

      Defendant/Appellant.

        ) Appellate No.
        ) San Francisco Co. No.

ON APPEAL FROM THE JUDGMENT
OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE

REPORTER'S TRANSCRIPT ON APPEAL

OCTOBER 14, 2005

Volume I

Pages 1 - 21

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 6 2006

GORDON PARK-LI, Clerk
BY: MA. BENIGNA D. GOODMAN
Deputy Clerk

Reported by:  Kent S. Gubbine, CSR #5797

COPY

1    SUPERIOR COURT OF CALIFORNIA

2    COUNTY OF SAN FRANCISCO

3    BEFORE THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE PRESIDING

4    DEPARTMENT NUMBER 27

5    ---ooXoo---

6    PEOPLE OF THE STATE OF CALIFORNIA,)
                                       )
7              Plaintiff,             )    SCN 194241
                                       )    Court No.
8    vs.                              )
                                       )    **MOTIONS IN LIMINE**
9    FRANCISCO PARTIDA,               )
                                       )    **VOLUME I**
10             Defendant.             )
     _____   )    Pages 1 - 21

11

12

13

14              **Reporter's Transcript of Proceedings**

15                   Friday, October 14, 2005

16

17   **APPEARANCES OF COUNSEL:**

18        For Plaintiff:

19            Kamala Harris, District Attorney
              850 Bryant Street - Suite 300
20            San Francisco, California 94103
              BY:  MARIANNE BARRETT, Assistant District Attorney
21

22        For Defendant:

23            JEFF ADACHI, PUBLIC DEFENDER
              555 Seventh Street - Suite 205
24            San Francisco, California  94103
              BY:  KATIE ISA, Deputy Public Defender
25

26

27   Reported By:  Kent S. Gubbine, CSR #5797

28

3

| | |
|---|---|
| 1 | <u>Friday, October 14, 2005</u>                    <u>1:51 o'clock p.m.</u> |

2                          ---ooXoo---

3      **THE COURT:**  Okay.  We are in open court in the matter of

4  People versus Francisco Partida, Superior Court Number 194241.

5      Counsel, your appearances please.

6      **MS. BARRETT:**  Good afternoon, Marianne Barrett for the

7  People.

8      **MS. ISA:**  Katie Isa appearing on behalf of the defendant

9  Francisco Partida who is being assisted by the Spanish

10  interpreter.

11      **THE COURT:**  Okay.  And he is present in Court with us.

12      **THE INTERPRETER:**  Maritza Zurita, Z-u-r-i-t-a, Spanish

13  interpreter, certified.

14      **THE COURT:**  Thank you.  The matter has been referred here

15  from Department 22 for jury trial.  And counsel and I have met.

16      Was there anything that you wanted to state first for the

17  record?

18      **MS. ISA:**  Mr. Partida had indicated that he wanted to

19  address the Court.  If I could have a moment to find out what he

20  wanted to address the Court about?

21      **THE COURT:**  Does he understand too that anything he tells

22  the Court, that Mr. Barrett is here and that she, of course,

23  will be listening?

24      **MS. ISA:**  Yes.

25      (Discussion between counsel and client, not reported.)

26      **MS. ISA:**  Judge, he really wants to be able to address the

27  Court.  I advised him it is probably not the best thing, but at

28  this point he wants to address the court.

1    **THE COURT:** All right. Mr. Partida, what would you like to
2  tell the Court?

3    **THE DEFENDANT: (Through the Interpreter):** (Through the
4  Interpreter) I want to know why is it that the attorney
5  Trujillo treated me so bad. He treated me badly and he wants me
6  to, by all means, just go ahead and take the ten years.

7    And who is my attorney? Is it Trujillo attorney or is it
8  this attorney who is next to me? Two attorneys have been sent
9  to me to take those ten years. I know I made a mistake but --

10    **MS. ISA:** Don't talk about the case. It is really important
11  that you do not talk about the case. You can talk about the
12  attorney situation.

13    **THE DEFENDANT: (Through the Interpreter):** (Through the
14  Interpreter) So what is the situation here? Do I have -- am I
15  being forced to take those ten years?

16    **THE COURT:** Counsel, do you want to enlighten the Court to
17  exactly what he is talking about?

18    **MS. ISA:** Yes, yesterday evening after we had discussions
19  about, you know, the trial, I went to see him with a very
20  experienced attorney from my office who is Spanish-speaking, Mr.
21  Trujillo. The Court knows him.

22    He wanted to make sure that Mr. Partida understood what the
23  offer was and that my advice to him based on the facts of the
24  case and his exposure was, to take the ten years in light of the
25  maximum penalty that he is facing.

26    **THE COURT:** What the maximum penalty?

27    **MS. ISA:** In this case it is 25 years to life if he
28  convicted of any of the sex charges and any of the allegations,

1  any one of the three allegations:  The blindfolding which is a

2  tying and binding, or the burglary and the use of the knife, or

3  commission of a sex act in the course of a burglary and the use

4  of a knife.  So Mr. Trujillo tried to explain to him that it

5  would be in his best interests to take the ten years.

6     So I think that is what he is referring to now.  I am still

7  his attorney.  Mr. Trujillo only assisted me because he has been

8  doing this for over 22 years and he is Spanish speaking, and I

9  thought he should be with us to talk to you, but I am still the

10  attorney on the case.

11     **THE COURT:**  Okay.

12     **THE DEFENDANT: (Through the Interpreter):**  (Through the

13  Interpreter)  What I want to know is when is the trial going to

14  start and when is it going to be over?

15     **THE COURT:**  We are here commencing the trial today with what

16  is called motions in limine.  Both counsel have addressed the

17  Court with certain issues that the Court will make a ruling

18  about.  And the first thing that we are going to do is to talk

19  about what the trial schedule will be.

20     So we are starting this afternoon with motions.  And then

21  our next day for trial will be on October 19th in the afternoon.

22  We anticipate that counsel and the Court will be again in open

23  court addressing motions.  It is possible that day we will have

24  a hearing from the police inspector who took an alleged

25  statement from Mr. Partida and we also on that day will be

26  finalizing the jury questionnaire that defense counsel has

27  presented to the Court so that we can find out all of the

28  relevant information about the prospective jurors.

1    On the 20th, Thursday, we will swear several panels of
2    prospective jurors and we will determine from those jurors who
3    will be available to serve and those jurors will fill out the
4    questionnaires and answer many questions about their beliefs
5    regarding this particular type of case and the criminal justice
6    system in general.

7    Then on the Thursday, October 27th, we will bring back those
8    jurors and question them in open court.

9    **THE DEFENDANT: (Through the Interpreter):**  I want to know
10    why do they take so long with all of this.  That's all.

11    Why am I going to sit down?

12    **THE COURT:**  Please have a seat, sir.

13    **THE DEFENDANT: (Through the Interpreter):**  I just want to
14    know when it starts and when it is over.

15    **THE COURT:**  I am explaining to you the trial schedule so you
16    understand what we are doing.  On the 27th and 28th we expect
17    that we will have our jury selection completed.  And then on
18    October 31, we will have opening statements and the presentation
19    of evidence, and we expect that the evidence will be started
20    October 31 and conclude no later than November 3rd or 4th.

21    And then we expect on November 7th that counsel will make
22    their closing arguments and I will instruct the jury and we have
23    the jury deliberate in secret and we will see if they reach any
24    verdicts.

25    So we anticipate that the very farthest that this case will
26    last is November 9th.  By then the jury should have completed
27    all of their deliberations and reached verdicts if they can do
28    so.

1     So, counsel, is that trial schedule acceptable?

2     **MS. ISA:**  Yes, Your Honor.

3     **THE COURT:**  Counsel?

4     **MS. BARRETT:**  Yes.

5     **THE COURT:**  Okay.  So --

6     **THE DEFENDANT: (Through the Interpreter):**  I just want to

7  have one single interpreter.  I don't want one and then another

8  and then another.

9     **MS. ISA:**  We don't have a choice.  The rule of the court is

10  too much for one interpreter to interpret everything.

11     **THE DEFENDANT: (Through the Interpreter):**  Because I am

12  getting confused with the whole thing.

13     **MS. ISA:**  Will the Court address that, please?

14     **THE COURT:**  We schedule interpreters to attend to the trial.

15  Considering the trial is so lengthy and intense, the

16  interpreters need time away from interpreting so that their

17  minds can be clear and they do the very best job.

18     **THE DEFENDANT: (Through the Interpreter):**  If the case is so

19  serious, why has this taken so long?

20     **THE COURT:**  Well, I cannot answer that question.  It has

21  been assigned to me for trial and I am prepared to devote my

22  energy and time to the trial.

23     **THE DEFENDANT: (Through the Interpreter):**  But I was sent

24  here once before and then they send me back to 22 for the same

25  reasons.

26     **THE COURT:**  At this time what I would like to do is go down

27  the motions in limine.  Most of them are very, very routine.

28  And some of them I may rule and then, counsel, if the ruling is

1  not anticipated, you can stop me and we can address the issues

2  further.

3      Perhaps, let's turn to the defense motions in limine first.

4  Number one is the Court should exclude any testimony from

5  prosecution witnesses regarding Mr. Partida's guilt, whether he

6  committed any of the offenses charged or their opinions as to

7  the definitions of those offenses.

8      And I would grant that motion.

9      Number 2, all witnesses should be excluded from the

10  courtroom under Evidence Code Section 777.

11      Typically that is granted and I will grant that except both

12  sides may have an investigating officer or inspector or

13  investigator to assist them in court who may be present.  And

14  also considering the nature of the case, the victim may have up

15  to two support persons present in court with her during her

16  testimony.

17      And all of the witnesses shall not discuss their testimony

18  with one another.  That is a typical order.

19      Number three, defendant's request for notes, including rough

20  notes of all witnesses.  That is granted in that all of the

21  notes of the witnesses shall be turned over except if some notes

22  are not turned over, it would not be an automatic exclusion.

23  The Court would reserve the remedy in that event.  It may be

24  exclusion.  It may be something else.

25      Number four, exclusion of any written documents or other

26  physical evidence not already disclosed to the defense.  The

27  Court would reserve ruling on that.  If it occurs the Court will

28  determine what the appropriate remedy will be.

1    Number 5, all potentially exculpatory evidence must be

2    disclosed to the defense and that is granted.

3    Number six, any undisclosed prior conviction or arrest must

4    be excluded.

5    Do we have any information regarding this?

6    **MS. ISA:** I don't believe that we do, Your Honor.

7    **THE COURT:** So really this is moot.

8    **MS. ISA:** It is moot.

9    **THE COURT:** The Court will note it as moot.

10    Number 7, any material that the People tend to introduce for

11    purposes of impeachment for any defense witness must be

12    disclosed to the defense.

13    Is that an issue in this case?

14    **MS. BARRETT:** I don't believe so, Your Honor.

15    **MS. ISA:** I doubt it. I can't imagine -- I don't believe

16    any of my witnesses have any criminal records so.

17    **THE COURT:** There may be a doctor that testifies. Is there

18    any information regarding that doctor?

19    **MS. BARRETT:** I have just been given a resume. That's all.

20    **THE COURT:** So you have not done any independent

21    investigation and have piles of transcripts from prior testimony

22    or anything like that?

23    **MS. BARRETT:** Not at this point.

24    **THE COURT:** Okay. Well, at this point the Court will grant

25    the request.

26    Number 8, the defense counsel requests any testimony by

27    named reportee Paul E. Angelo not include reference to

28    accolades, awards or similar distinctions that he may have

1  received from San Francisco County as a result of his

2  involvement in this case.

3     **MS. ISA:**  He actually did receive an award from the police

4  so that is what I moving to exclude.

5     **THE COURT:**  Any opposition to that?

6     **MS. BARRETT:**  No, Your Honor.

7     **THE COURT:**  Okay.  That will be granted.

8     Number 9, this is a request to sever Count I of the

9  information, burglary in the first degree from the remaining

10  incidents.  Let's return to that one in a minute because that I

11  think will take some argument.

12     Number 10, the defense counsel puts the prosecution on

13  notice that she has a duty to see that the witnesses testifying

14  for the prosecution, volunteer no statements that would be

15  inadmissible pursuant to the Court's rulings on these motions.

16  That, of course, is granted, but also defense counsel must

17  likely notify her witnesses should the Court make rulings that

18  affect their testimony.

19     And let's turn to the District Attorney's requests.  Her

20  motions in limine include number one, an order excluding all

21  witnesses from the courtroom.  The Court has already ruled on

22  that motion.  It mirrors the defense motion.

23     Number 2, an order that the parties shall provide each other

24  with complete discovery, including a list of witnesses they

25  intend to call and their addresses, statements, any reports or

26  statements of experts.  That would be granted.  I believe that

27  is pursuant to the Penal Code, yes.

28     Number 3, defense be required to make an offer of proof as

1  to each witness they expect to call so that cumulative,

2  irrelevant, inadmissible and prejudicial evidence is not

3  presented to the jury.

4      Is there any problem with that, counsel?

5      **MS. ISA:**  No problem with that.

6      **THE COURT:**  That will be granted.  And I believe with the

7  defense doctor, unless there is a report that satisfies

8  everyone's questions in the case, we will need to set a hearing

9  for that expert witness.

10      Number 4, an order excluding any witness whose name and

11  address has not previously been provided to the People.  The

12  Court would reserve ruling on that particular motion.

13      Number 5, an order excluding all written documents of

14  physical evidence not already disclosed to the People.  The

15  Court would reserve ruling on that particular motion.

16      Number 6, an order excluding any testimonial evidence from

17  the defendant's witnesses expressing opinions as to the guilt or

18  innocence of the defendant.  That would be granted.

19      Number 7, an order to exclude evidence of prior sexual

20  conduct of the victim.  And at this point I believe it is not

21  really an issue, so that would be granted.

22      Number 8, an order prohibiting any references to the

23  potential sentence the defendant may receive if convicted for

24  these offenses, including but not limited to the references to

25  the loss of liberty.  Typically I grant this request.

26      **MS. ISA:**  Understood.

27      **THE COURT:**  So that will be granted in this case.

28      Number 9, an order protecting the anonymity of the victim,

1   specifically insuring that all parties and transcripts of any

2   and all proceedings refer to the complaining witness by her

3   first name and the first letter of her surname.  It would

4   Carolyn A.  And the Court may instruct that the victim is being

5   so identified only for the purpose of protecting her privacy.

6   That would be granted.

7       An order allowing the admission in the People's case in

8   chief the defendant's mirandised statement made on June 5th,

9   2004, to Inspector Frank Lee.  We are going to have a hearing, a

10  402 hearing, on that issue.

11      Number 11, an order allowing the victim in this case to have

12  a support person sitting next to her on the witness stand

13  throughout her trial testimony if she so chooses, and possibly

14  the attendance of up to two persons of her own choosing as

15  support persons.  That would be granted.

16      Number 12, an order permitting the introduction of DNA

17  evidence.  That would be granted.

18      Number 13, an order allowing the admission during the People

19  case in chief the defendant's statements made while he assaulted

20  the victim on her bed and talking on the phone.

21      **MS. ISA:**  I would request a 402 on this as well.

22      **THE COURT:**  Why don't we go ahead and have a 402 at the time

23  of the Inspector's 402, so we can flush it out further?

24      **MS. ISA:**  Instead perhaps of bringing the complaining

25  witness in, perhaps the inspector or you could make an offer of

26  proof as to exactly what the statements will be?

27      **MS. BARRETT:**  Right.

28      **MS. ISA:**  And I think they are in the transcript already,

1  but we need to clarify what they will be and then maybe we can

2  have a discussion about it.

3      **THE COURT:**  I think that would be beneficial because this,

4  of course, is an important part of the case.  So I will reserve

5  ruling on that until we can conduct a full hearing.

6      At this time shall we return to the issue of the motion to

7  sever Count I?

8      **MS. ISA:**  I would like to make one comment.  With respect to

9  12, the Court granted that.  I just wanted to indicate that DNA

10  is not really an issue from the defense's standpoint, so I think

11  there will be a stipulation with respect to the DNA evidence.

12      **THE COURT:**  I appreciate that.  Thank you for clarifying the

13  record.

14      So a motion to sever Count I, which is a burglary which

15  occurred in January from the remaining counts which include a

16  burglary and other sexual assault counts occurring in June, both

17  of the same year and all against the same victim and all

18  occurring at the same location.

19      Counsel, did you want to add anything to what you have

20  already stated in your papers?

21      **MS. ISA:**  The only thing that I would add with respect to

22  this is I think that the defenses to each of those charges would

23  be very different.  In the more recent case, the -- I think that

24  the defense would be, the defendant would be prejudiced because

25  there would be an assumption made because he, if they were able

26  to prove that he committed the act in January, then it is more

27  likely that he would have committed the act in June.

28      And I think there is than issue in June with respect to

whether there is a first degree burglary with an intent to commit any felony.  I think that there are statements that have been provided to the Inspector with respect to the intent to go in and just take a shower.

Whereas with the first degree burglary, if the People are able to actually prove that case, necessarily it involves Mr. Partida's statements to prove.  Without his statement they would not be able to prove it, without the statements that were obtained the June 2004 -- excuse me, May of 2004, they would not be able to prove that incident because there was no evidence that was Mr. Partida but for his own confession to that.

And with respect to the more recent incident, I think it's not only critical to the charge of the burglary itself, and the defense of the burglary itself, but anything that would prejudice him with respect to that burglary because he is facing 25 to life if they find that he committed that burglary in the more recent incident in May of 2004.  He will prejudiced.

If a jury sees that he admitted he came in in January to steal money -- he came in, he stole money and he left.  And in June, they are more likely to attach that to find him guilty of the -- I keep saying the May incident.

**THE COURT:**  It says June.

**MS. ISA:**  It is June, I am sorry.  The June incident where his exposure and the prejudice is so high for them to just say, well, he came in once to commit a theft, I am sure that's what his intent was on the second time.  And if they, in fact, find that, the prejudice isn't just that he would be convicted of a first degree burglary in June, but that they would be convicted

1    of a 25 to life -- they would find an allegation to be true that

2    causes him to be face an exposure of 25 to life.

3        So the prejudice is actually more than the mere conviction

4    to a second, you know, a second first degree burglary because

5    the prejudice is substantial. And for that reason I think that

6    the cases should be separated because it would clearly prejudice

7    the minds of the jurors and it would influence, it would be bad

8    character evidence coming in, and for the reason I would ask

9    that the Court sever that first count.

10       I will leave it at that. I will submit it on that.

11       **THE COURT:** Ms. Barrett.

12       **MS. BARRETT:** Your Honor, I would basically reiterate what I

13   have pointed out in my moving papers. Let me highlight a few

14   things:

15       Both incidents share a common, significant element. There

16   has been no strong showing of prejudice by the defense. The

17   cross admissibility of evidence in each case is substantial.

18   Both burglaries are obviously classes of the same type of crime,

19   and the prior burglary is clearly relevant to his intent at the

20   time of his subsequent entry.

21       The fact that he stole several thousand dollars from this

22   same victim a number of months prior, I don't believe that the

23   prejudicial value outweighs its probative value and would rely

24   on my moving papers in opposition.

25       **THE COURT:** Anything else?

26       **MS. ISA:** I would submit on the papers.

27       **THE COURT:** So the matter being submitted, the motion to

28   sever is denied. The Court has considered this carefully and

1  has weighed the prejudice versus the probative value and agrees

2  with the People in their points and authorities that the

3  prejudice is not substantial and the probative value does far

4  outweigh any prejudice that the defendant would suffer.

5      Having all of these or both of these incidents tried by the

6  same jury does prevent harassment, needless repetition of

7  evidence and saves the State time and money.  And they are of a

8  common class of crime.  The evidence is cross admissible.

9      So therefore the motion will be denied.

10     Any other thing that we need to state for the record?  Oh,

11  there was another --

12     **MS. ISA:**  There is a motion just with respect to a record

13  making objection, to simplify things that were -- so that we are

14  federalizing the issue as well so I don't have to make a lengthy

15  record.

16     **THE COURT:**  So this is defense counsel's motion to permit

17  her to refer to her brief in place of lengthy record making

18  objections.  And I have reviewed this.

19     Is there any opposition to this, Ms. Barrett?

20     **MS. BARRETT:**  I have one issue, if I could have a minute to

21  review it for just a second.

22     **THE COURT:**  I should let both of you know, since I don't

23  believe I have tried any cases with either of you, it is my

24  practice in the front of the require all objection are legal

25  objections only, five words or less.  So I do appreciate, you

26  know, any short cuts.

27     **MS. BARRETT:**  Your Honor, the only issue I really have in

28  this other brief that counsel has filed is at the top of page 4

1   when objecting to a certain type of argument by the prosecutor,

2   the defense can say "prosecution error." I don't think that is

3   really appropriate, and I think that would be up to the Court to

4   determine if it is truly prosecutorial error. I think it could

5   leave the minds of the jurors, that I have done something very

6   impermissible and I just don't think it is appropriately worded

7   there.

8       **THE COURT:** Well, when I reviewed this I appreciated that I

9   thought it was better than jumping up and saying "prosecutorial

10  misconduct."

11      I don't anticipate that this will be the kind of case that

12  prosecution error is going to even be suggested, so instead of

13  allowing counsel to state "prosecution error," if you could just

14  ask to approach and we will place it on the record at an

15  appropriate time.

16      **MS. BARRETT:** Thank you, because at the top of page 5 it

17  further expands on was prosecution error means, and it includes

18  prosecution comments that are irrelevant. So if I happen to say

19  something that Ms. Isa feels is irrelevant, I would have an

20  irrelevance objection than an prosecution error objection. But

21  I think we will be fine with this.

22      **THE COURT:** Other than that then the shorthand request will

23  be granted.

24      **MS. ISA:** There is also included in here --

25      **THE COURT:** Excuse me?

26      **MS. ISA:** I'm sorry, Your Honor, there is also included in

27  here something with respect to asking that the complaining

28  witnesses be addressed by their name, obviously in this case the

18.

1    first name, and not by victim.

2        **THE COURT:**  Where was that?

3        **MS. ISA:**  That is going to be at page 5.  It's part 2.  And

4    I would ask the Court to rule with respect to that.

5        **THE COURT:**  It says "The complaining witnesses and the

6    defendant should be addressed by their names and not by

7    conclusionary and argumentative labels which assumes facts not

8    in evidence and undermines the presumption of innocence."

9        **MS. BARRETT:**  I object to that, Your Honor.

10       **THE COURT:**  Do you want to state anything further than you

11   have stated in your papers?

12       **MS. ISA:**  Nothing with respect -- I mean it's stated in

13   there.  I'd ask that they call her the complaining witness as

14   oppose to victim or just use her first name.  I think it has a

15   connotation.  The jury picks up on that and it is difficult to

16   separate from the person who is sitting here.

17       **MS. BARRETT:**  I think that it is just slicing hairs, Your

18   Honor.  After doing this for so many years, it's virtually

19   impossible to not slip up and call the victim the victim and the

20   defendant the defendant.  It just seems so diminimous and it

21   seems to actually insult the jury that we are taking away the

22   province of their decision making by our use of labels.  So I

23   don't see the harm in doing so, especially since slips may be

24   inadvertent and unintentional.

25       **THE COURT:**  Anything else?

26       **MS. ISA:**  Nothing further.

27       **THE COURT:**  Submitted?

28       **MS. BARRETT:**  Submitted.

19

1     **MS. ISA:**  Submitted.

2     **THE COURT:**  I tried this on one case when I first returned

3   to the Hall of Justice and resumed jury trial work, and I found

4   it not to be completely workable because there were slips.  The

5   defendant is the defendant by nature of the complaint and the

6   information.  The victim is described as a victim in the police

7   reports and in other literature.

8     What I would prefer -- I am going to deny the request -- but

9   I would prefer as much as possible to not use these terms.  And

10  I have also find in my experience which I think is even more

11  lengthy than the prosecutor's is that we have very sophisticated

12  juries in San Francisco and they do not at all seem to care what

13  the labels are that are placed on these individuals.  They are

14  are fully capable of making up their own minds.

15    But once again I would prefer as much as possible that we

16  refer to the witnesses by the appropriate surnames, except of

17  course in this case the victim will be referred by not her real

18  last name, but as -- I don't know, if you refer to her as Ms. A

19  or --

20    **MS. BARRETT:**  I would just tend to refer to her by her first

21  name.

22    **THE COURT:**  By her first name.  Okay.

23    **MS. BARRETT:**  Does Your Honor's preference extend to the

24  defendant?

25    **THE COURT:**  I prefer it as much as possible.  I am not

26  barring you from calling him the defendant, but I think everyone

27  in this courtroom deserves dignity.  It is the Court's

28  preference.

1        Anything else for the record?

2        **MS. ISA:**  The only last motion is with respect to if any

3    medical records are going to be introduced, any hearsay

4    statements that would be contained within those medical

5    records -- I am not sure if you are going to introduce them

6    actually?

7        **MS. BARRETT:**  I haven't actually yet decided.  We can always

8    deal with it when the issue arises.

9        **MS. ISA:**  Can we reserve it?

10       **THE COURT:**  Let's reserve the issue on this.  I did want to

11   discuss this with counsel to see if this was really going to be

12   a problem in this case.  I will reserve the issue and reserve

13   ruling on the issue.

14       Anything else then for now?

15       **MS. BARRETT:**  Just the questionnaires and I believe we will

16   do that in chambers.

17       **THE COURT:**  Yes, we will do that in chambers so Mr. Partida

18   may go back to where he came.  The next court date will be,

19   let's set it for October 19th at 1:30 in the afternoon.

20       (Whereupon, the proceedings were adjourned at 2:27 o'clock

21   p.m.)

22                           ---ooXoo---

23

24

25

26

27

28

1  State of California                    )
                                          )
2  County of San Francisco                )

3

4

5      I, Kent S. Gubbine, Official Reporter for the Superior

6  Court of California, County of San Francisco, do hereby certify:

7      That I was present at the time of the above proceedings;

8      That I took down in machine shorthand notes all proceedings

9  had and testimony given;

10     That I thereafter transcribed said shorthand notes with the

11 aid of a computer;

12     That the above and foregoing is a full, true, and correct

13 transcription of said shorthand notes, and a full, true and

14 correct transcript of all proceedings had and testimony taken;

15     That I am not a party to the action or related to a party

16 or counsel;

17     That I have no financial or other interest in the outcome

18 of the action.

19

20

21 Dated:  July 25, 2006

22

23                    _____

24                    Kent S. Gubbine, CSR No. 5797

25

26

27

28

1          COURT OF APPEALS OF THE STATE OF CALIFORNIA

2                   FIRST APPELLATE DISTRICT

3                         ---oOo---

4   THE PEOPLE OF THE STATE OF          )
    CALIFORNIA,                         )
5                                       )
            Plaintiff/Respondent,       )
6                                       )
    vs.                                 )Appellate No.
7                                       )San Francisco Co. No.
    FRANCISCO PARTIDA,                  )
8                                       )
            Defendant/Appellant.        )
9   _____)

10

11                ON APPEAL FROM THE JUDGMENT
         OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
12        IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

13
       THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE
14

15

16              REPORTER'S TRANSCRIPT ON APPEAL

17                     March 17, 2006

18                       Volume XIV

19                     Pages 652 - 686

20

21

22

23

24

25

26                                     ENDORSED
                                       F I L E D
                                       San Francisco County Superior Court

                                       JUL 2 6 2006

27   Reported by:  Kent S. Gubbine, CSR #5797

28                                     GORDON PARK-LI, Clerk
                                       BY: MA. BENIGNA D. GOODMAN
                                                    Deputy Clerk

COPY

1    SUPERIOR COURT OF CALIFORNIA

2    COUNTY OF SAN FRANCISCO

3    BEFORE THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE PRESIDING

4    DEPARTMENT NUMBER 25

5    ---ooXoo---

6    PEOPLE OF THE STATE OF CALIFORNIA,)
                                       )
7              Plaintiff,             )    SCN 194241
                                       )    Court No. 2167376
8    vs.                              )
                                       )    **JUDGMENT AND SENTENCE**
9    FRANCISCO PARTIDA,               )
                                       )    **VOLUME XIV**
10             Defendant.             )
     _____   )    Pages 652 - 686
11

12

13

14    **Reporter's Transcript of Proceedings**

15    Friday, March 17, 2006

16

17    **APPEARANCES OF COUNSEL:**

18        For Plaintiff:

19            Kamala Harris, District Attorney
              850 Bryant Street - Suite 300
20            San Francisco, California 94103
              BY:  MARIANNE BARRETT, Assistant District Attorney
21

22        For Defendant:

23            JEFF ADACHI, PUBLIC DEFENDER
              555 Seventh Street - Suite 205
24            San Francisco, California  94103
              BY:  KATIE ISA, Deputy Public Defender
25

26

27    Reported By:  Kent S. Gubbine, CSR #5797

28

1    Friday, March 17, 2006                    10:55 o'clock a.m.

2                           ---ooXoo---

3        **THE COURT:**  So let me call the matter.  This is People

4    versus Francisco Partida, Superior Court Number 194241.

5        Counsel, your appearances please.

6        **MS. ISA:**  Katie Isa appearing for Francisco Partida who is

7    being assisted by the certified Spanish interpreter.

8        **MS. BARRETT:**  Good morning, Your Honor.  Marianne Barrett

9    for the People.

10       **THE INTERPRETER:**  Elizabeth McCarthy, certified Spanish

11   interpreter.

12       **THE COURT:**  And Mr. Partida is present.  And first of all,

13   do you waive arraignment for judgment and sentence?

14       **MS. ISA:**  Your Honor, I am actually -- well, I would, I

15   would first like to make a motion for a new trial which I have

16   previously indicated to the Court I think would be proper to do

17   before commencing sentencing.

18       **THE COURT:**  I think that's part of the legal cause; is that

19   correct?  Let's go ahead then.  Ms. Isa.

20       **MS. ISA:**  Your Honor, I would like to make a motion for a

21   new trial based on the Court's denial of expert testimony that

22   defense requested be presented at trial.  The defense had

23   previous requested that Dr. Patricia Perez-Arce testify on the

24   issue of Mr. Partida's mental state, his cognitive impairment.

25       We did have a 402 hearing and the Court denied defense

26   counsel's motion.  I think that was in error and I request a new

27   trial based on that.  It was relevant.  It is certainly is

28   admissible on specific intent crimes; notably in this case the

1    allegation of a personal use with a knife.  And that was one of

2    the two allegations which the jury found to be true which are

3    mandating that the sentence be 25 to life.

4        And I do believe that that testimony would have shed light

5    and given information to the jury with which to analyze and

6    interpret the facts of the case and apply it to the law.  And I

7    think that denial was improper and I would make that motion at

8    this time.

9        **MS. BARRETT:**  I object, Your Honor, and I will submit it

10   based on my earlier arguments during course of this trial on

11   that issue.

12       **THE COURT:**  Anything further?

13       **MS. ISA:**  Nothing further.  I would submit.

14       **THE COURT:**  The motion for a new trial is denied.

15       So now, do you waive instruction and arraignment for

16   judgment and sentence?

17       **MS. ISA:**  I do.

18       **THE COURT:**  Is there any legal cause why the judgment should

19   not now be pronounced?

20       **MS. ISA:**  Your Honor, at this time I would renew my previous

21   1368 motion.  I do have a doubt as to Mr. Partida's competency,

22   and I have expressed this doubt several times throughout the

23   trial along with other judges who have expressed this doubt

24   based on actions throughout different proceedings.  Most

25   recently since this trial concluded, my conversation was my

26   client, observations of him when he is in court and specifically

27   my conversation with him two nights ago, after that conversation

28   it is incumbent upon me to raise a doubt before the Court.

1    I do have a serious doubt as to his competency.  He went

2    through a trial.  It was explained to him before trial what the

3    consequences of it could be.  It's been explained by me and this

4    Court several times since then.  I don't think he understands

5    and I have a serious doubt as to his ability to understand the

6    quality and nature of these proceedings and the sentencing to

7    which he is about now to enter.

8    My most recent conversation with him in custody two nights

9    ago, he not only expressed a question that he didn't even think

10   that the jury had convicted him of any of the sex-related

11   offenses, but only the burglaries.  He thought they convicted

12   him of one of the burglaries which they did not convict, and the

13   other burglaries.  But he had indicated to me when I asked him

14   whether or not it was okay to contact former employers to have

15   them here at sentencing, he told me that he would like them to

16   be here because they told him work is piling up and they need to

17   know how soon he is going to be getting out so he can do that

18   work or if they need to hire someone in the interim.

19   He has absolutely no comprehension of what the sentencing

20   proceedings mean, and I do have a serious doubt as to his

21   competency and I would ask the court under Section 1368 to

22   appoint another doctor.

23   The Court is also privy to as attached to my sentencing

24   memorandum, a formalized written report by Dr. Patricia

25   Perez-Arce, who is a neuropsychologist and evaluated Mr.

26   Partida.  None of these evaluating doctors pursuant to 1368 were

27   doctors that were versed in neuropsychology.  She does find a

28   cognitive impairment that directly relates to his inability to

1  understand these proceedings and his inability to understand

2  offers that are relayed, to go outside of his box.  And she has

3  indicated that that causes him, makes unable to assist in his

4  defense and he is unable to assist me at the sentencing.

5      And I believe that based on those changed circumstances and

6  the new conversation I have had with him, that it is incumbent

7  upon the Court to order a doctor to evaluate him on the issue of

8  competency.

9      **THE COURT:**  Ms. Barrett.

10     **MS. BARRETT:**  Thank you, Your Honor.  Your Honor, throughout

11  the course of these proceedings the defendant has repeatedly had

12  this issue of a doubt raised.  We have the benefit of four

13  separate reports by experts who have evaluated him, two

14  psychiatrists and two psychologists -- the first report from

15  December 24th of 2004, the second report from August 15th of

16  2005, the third report from August 21st of 2005, and finally the

17  fourth report from November 1st of 2005.  All of these

18  professionals found the defendant competent to stand trial.

19     In the last report by Dr. Rowland Levy who is a

20  psychiatrist, he indicates that he actually spoke with the

21  neuropsychologist that Ms. Isa just referred to who had recently

22  tested the defendant prior to this report in November, and

23  despite that conversation, Dr. Rowland Levy found the defendant

24  competent.

25     None of these four experts found that he had Axis I mental

26  disorder, and as mentioned, they all found him trial competent.

27  The defendant's condition and his ability to understand the

28  nature of these proceedings has been consistent.  There has been

1  no change in circumstance.  Certainly no substantial change in

2  circumstance that warrants any further proceedings along these

3  lines.

4     I think at this point to entertain any further inquiries

5  along these lines would delay justice, and the victim in this

6  case is so entitled to justice and to the sentencing going

7  forward today, Your Honor.

8     **THE COURT:**  Mr. Isa.

9     **MS. ISA:**  I would just say that I am not questioning whether

10  people are entitled to finality, but not at the expense of

11  someone who has a mental disorder or cognitive impairment that

12  makes them incompetent to proceed within.  An Axis I disorder is

13  the exact problem with many of the previous reports, that they

14  were looking for an Axis I disorder.  We know that that not be

15  the issue.

16     It's a cognitive issue, and none of the evaluating

17  psychologists addressed the cognitive issue.  And that is

18  something that repeatedly comes up again and again.  And it was

19  raised most vividly two nights ago.

20     And I would submit on my request.

21     **THE COURT:**  Submitted, Ms. Barrett?

22     **MS. BARRETT:**  Yes.

23     **THE COURT:**  Okay.  Well, the Court does have a continuing

24  duty make proper inquiry regarding a defendant's capacity to

25  stand trial or to understand the nature of the sentence

26  procedure.  And what the Court must look to is to see if it is

27  presented with a substantial change of circumstance or with new

28  evidence that casts a serious doubt on the validity of prior

1    findings.

2    And in this particular case Mr. Partida had been evaluated

3    pursuant to Penal Code Section 1368 several times, once was even

4    during the trial itself.  So the Court must be presented with

5    substantially new evidence or changed circumstances.

6    When a competency hearing has already been held and the

7    defendant has been found competent to stand trial, the Court is

8    not required to hold a second competency hearing unless it is

9    presented with substantial change of circumstances or with new

10    evidence casting a serious doubt on the validity of the

11    competency findings, and the Court make take its personal

12    observations of the defendant into account in determining

13    whether or not there has been a significant change in the

14    defendant's mental state.

15    And several of the cases that address this are People versus

16    Thomas 1977 74 Cal App 3rd 75; People versus Zatko, Z-a-t-k-o, a

17    1978 case found at 80 Cal App 3rd 534; People versus Murrell,

18    M-u-r-r-e-l-l, a 1987 case found at 196 Cal App 3rd 822; People

19    versus Lawley L-a-w-l-e-y, a 2002 case, found at 27 Cal 4th 102;

20    and People versus Jones, a 1991 case found at 53 Cal 3rd 1115.

21    This Court finds that the burden has not been met that there

22    is any substantial change of circumstances or any new evidence

23    casting a serious doubt on the validity of the prior competency

24    findings.  It appears to this Court that the concerns raised by

25    counsel evidence behaivor that has been consistent throughout

26    these proceedings.  So the Court will not hold a 1368 hearing,

27    and we proceed with sentencing unless there is a legal cause why

28    sentence should not now be pronounced.

1    Is there any other legal cause?

2    **MS. ISA:**  No, Your Honor.

3    **THE COURT:**  Okay.  So first of all I have read and

4    considered the Adult Probation report dated December 13th, 2005,

5    the People's sentencing statement, the People's amended

6    sentencing statement, the defendant's sentencing memorandum and

7    points and authorities and attachment, and the defendant's

8    supplemental documents of support of sentencing memorandum.

9       The Court's tentative decision as to the defendant's

10    sentence is to sentence defendant to a prison term for an

11    aggregate term of twelve years, eight months, for a determinate

12    sentence plus a consecutive sentence of 25 years to live to be

13    served after the determinate term.

14       The defendant is not eligible for probation pursuant to

15    Penal Code Section 667.61(h).

16       The Court has reviewed in the pre-sentence report the

17    following factors in aggravation and mitigation:  I will address

18    them briefly.

19       Circumstances in aggravation:

20       That the crime involved the threat of great bodily harm

21    pursuant to Rule 4.421(A)(1).

22       The victim was particularly vulnerable pursuant to Rule

23    4.421(A)(3).

24       The manner in which the crime was committed indicates

25    planning, Rule 4.421(A)(8).

26       The crime involved the actual taking of great monetary

27    value, Rule 4.421(A)(9).

28       The defendant took advantage of a position of trust to

1  commit the offense, Rule 4.421(A)(11).

2      The defendant has engaged in violent conduct which include a

3  serious danger to society, Rule 4.421(b)(1).

4      Circumstances in mitigation, the Court finds as followings:

5      The defendant has no record of prior convictions, Rule

6  4.423(B)(1).

7      And the defendant was suffering from a mental or physical

8  condition that significantly reduced culpability for the crime,

9  Rule 4.423(B)(2).

10      The Court finds that under the facts and circumstances of

11  this particular case, these factors in aggravation and

12  mitigation in effect balance each other out.

13      The Court sentences the defendant to the following

14  determinate term pursuant to Penal Code Section 1170.1:

15      The Court selects Count IX, a violation of 289(a)(1) of the

16  Penal Code, and this is sexual penetration of the anus, as the

17  principle term for six years in state prison plus a consecutive

18  mid term of four years for the use of a deadly weapon in the

19  commission of this sex offense pursuant to 12022.3(a) for a

20  total term of 10 years in state prison as the base term.

21      The Court selects Count I, a violation of 459 of the Penal

22  Code, burglary in the first degree, as a subordinate consecutive

23  term for one third of the mid term of one year, four months.

24      The Court selects Count III, a violation of 243.4(a) of the

25  Penal Code, sexual battery plus the use of a deadly weapon

26  allegation under Penal Code Section 12022(b)(1), consecutive for

27  a one third of the mid term of the offense and the allegation

28  for a consecutive term of one year, four months.

1    So the aggregate determinate term in state prison is twelve

2  years eight months.

3    And the Court sentences the following counts concurrently to

4  the above determinate sentence:

5    Counts V, VI, VII and VIII, a violation of 289(a)(1), sexual

6  penetration of the vagina, for the mid term six years with a

7  consecutive use of a deadly weapon pursuant to 12022.3(a) of the

8  Penal Code for the mid term of four years for a total of ten

9  years concurrent for each of those counts.

10    Counts X and XI, a violation of Penal Code Section

11  289(a)(1), sexual penetration of the anus, for a mid term of six

12  years plus a consecutive mid term of four years for the use of

13  weapon allegation of 12022.3(a) of the Penal Code, for a total

14  of ten years for each of those counts concurrent to the sentence

15  previously imposed.

16    Count XII, a violation of 245(a)(1) of the Penal Code,

17  assault with a deadly weapon, the Court sentences concurrent the

18  mid term of three years for that offense.  So that would be

19  concurrent to the term previously imposed.

20    For Count XIII, a violation of 236 of the Penal Code, for a

21  mid term of two years plus a consecutive one year for the

22  allegation of use of a deadly weapon under 12022(b)(1) Penal

23  Code, for a total of three years for that count concurrent to

24  the determinate sentence previously imposed.

25    In deciding whether to impose full, separate or consecutive

26  sentences pursuant to 667.6(c) in lieu of concurrent or

27  consecutive sentences pursuant to Penal Code Section 1170.1(a),

28  the Court has considered the criteria set out in Rule 4.425.

1      The crimes alleged in Counts V, VI, VII, VIII, IX, X and XI,

2    and their objectives were predominantly dependent on each other

3    and involved ongoing acts of threats or violence and committed

4    so close in time and place as to indicate a single period of

5    aberrant behavior.

6      The burglary alleged in Count I and the sexual battery

7    alleged in Count III were separate and distinct crimes from the

8    violations of 289(a)(1) of the Penal Code and are therefore

9    sentenced consecutively.

10     Consecutive to the foregoing determinate term in Count IV,

11    defendant was convicted of a violation of 289(a)(1) of the Penal

12    Code, sexual penetration of the vagina, an offense listed

13    667.61(c) of the Penal Code.  It was pleaded and proved that the

14    offense occurred under two or more of the following

15    circumstances set out in Subdivision E, to wit, the defendant

16    personally used a dangerous or deadly weapon within the meaning

17    of Penal Code Section 667.61(a)(e)(4), and the defendant tied or

18    bound the victim in violation of Penal Code Section

19    667.61(a)(e)(6).

20     Therefore, the defendant is sentenced to state prison

21    consecutively to the above-determinate term for an addition life

22    sentence and must serve 25 years of this life sentence before

23    being eligible for patrol.

24     The Court strikes the 12022.3(a) Penal Code use of a weapon

25    allegation associated with Count IV as it was used to impose the

26    25 years to life indeterminate term pursuant to Penal Code

27    Section 667.61(f).

28     The Court finds that this is a one strike case pursuant to

1   Penal Code Section 667.61(g) in that the sex offenses occurred

2   on a single occasion and were committed in close temporal and

3   spacial proximity.  The Court references People versus Jones, a

4   2001 case found at 25 Cal 4th 98.

5       The Court also finds that this sentencing is not governed by

6   Penal Code Section 667.6(d) requiring a full consecutive term

7   for each violation of 289(a)(1) of the Penal Code as against a

8   single victim in that insufficient evidence supports the theory

9   that these crimes were committed on separate occasions as

10  defined by that section.  The victim was initially assaulted and

11  fondled, led to the bed.  Then she attempted her escape and was

12  captured.  The defendant returned her to the bed at which time

13  over an undetermined period further kissed, fondled and finally

14  the sexual penetration took place -- penetrations took place.

15      The three penetration of the anus took place in rapid

16  succession at the same time three of the vaginal penetrations

17  occurred.  At one point the defendant's cell phone rang and the

18  defendant indicated that he was going to jail because of the

19  beautiful lady which might have indicated the defendant's

20  reasonable opportunity to reflect on his actions.

21      However, with the sequence of events as described at trial,

22  the Court is not able to determine with the requisite degree of

23  certainty exactly when this call took place over the course of

24  the various Penal Code Section 289(a)(1) offenses.  So

25  therefore, full consecutive terms for the 289(a)(1) offenses are

26  not the sentencing choice of the Court.

27      The defendant has the following credits pursuant to Penal

28  Code Section 667.61(f), which also designates 15 percent good

1    conduct credit.  As of today's date he has 652 days of actual

2    time spent in custody plus 97 days of 15 percent good conduct

3    credits for a grand total of 749 days of custody credits.

4        He must also pay a $20 court security fee.

5        A Victims' Indemnity Fund fine of $2,400.

6        A parole fine of $2,400.  That is stayed pending his

7    successful completion of his parole.

8        He must register for live as a sex offender pursuant to 290

9    of the Penal Code which means within five days of moving

10   permanently or temporary he must register with the sheriff if he

11   is in an unincorporated area or with the police department if he

12   is within an incorporated area.

13       And I believe those are my reasons and my tentative sentence

14   as set forth.  So at this point we start with the People.

15       **MS. BARRETT:**  Your Honor, just a few corrections to

16   pre-sentence report, if I may.  First of all, on page 5 at the

17   top where it says "Victim statement," the second sentence in

18   that paragraph, the sentence that beginning with "In addition,"

19   it should say "the victim made a claim," not "the defendant made

20   a claim."  And the victim's claim for restitution is in the

21   amount of $6,440.

22       Secondly on page 11, they did not check the registration

23   requirement under 290.  The Court indicated it for the record.

24   But the pre-sentence report I think should have that line 11 on

25   page 11 checked.

26       Also on that same page at the top, "Restitution," the

27   restitution amounts need to be modified slightly.

28       **THE COURT:**  What page again?

1    **MS. BARRETT:**  Page 11 at the very top, the paragraph that is

2    indicated as "A".  The restitution to the Restitution Fund

3    should be in the amount of $2030, not $2400.

4        **THE COURT:**  How do you get that?

5    **MS. BARRETT:**  That's supported by the paperwork that we have

6    on the CR-110.

7        **THE COURT:**  Well, this is -- isn't that the restitution fine

8    to VIF, $200 per count for the felony counts?

9    **MS. BARRETT:**  Oh, it may be.

10       **THE COURT:**  Because that's what I indicated, $2400.  That's

11   what I meant.  And at this point I did not in my tentative

12   decision address the issue of restitution because we had not

13   gotten there.  But the Court will be ordering some amount of

14   victim restitution.

15   **MS. BARRETT:**  The amount of $2400 can remain the same then.

16   I would ask as far as the amount to the victim, be modified to

17   the amount of $6,440, and the amount to the Victims'

18   Compensation Board, that will be claimed is $2030.

19       I understand we are going to be putting these issues off to

20   another date, but as far as the pre-sentence report goes, those

21   are the amounts that we will be representing.

22       **THE COURT:**  Thank you, Mr. Barrett.  While we are on the

23   issue of modifying the probation report, was there anything, Ms.

24   Isa, that you found to be in error?

25   **MS. ISA:**  Not in error.  I would ask the Court to -- I

26   understand we are going to proceed, but a circumstance in

27   mitigation is the admission of wrong doing early and I think

28   Mr. Partida's statement to the police in admitting wrongful

1  acts, including the first degree burglary to which they weren't

2  even investigating him at that point, I think that deserves to

3  be a circumstance in mitigation pursuant to Section 4.423(B), I

4  think it is 3 or 4.  I have it in my sentencing memo.

5  **THE COURT:**  The Court is go to deny that request.

6  **MS. BARRETT:**  Your Honor, with respect to the Court's

7  tentative ruling, we would submit it.  The People have no qualms

8  with the Court's tentative ruling at this point.

9  **THE COURT:**  Perhaps at this point we should proceed -- I

10  understand that there are certain statements that the parties

11  wish to have presented.

12  **MS. BARRETT:**  Yes, Your Honor.

13  **THE COURT:**  Would now be a good time to turn to that?

14  **MS. BARRETT:**  Yes.

15  **MS. ISA:**  Yes.

16  **MS. BARRETT:**  The victim in this case Carolyn A. would like

17  to make a statement to the Court.

18  **THE COURT:**  And she is present.  You can sit if you wish.

19  **MS. CAROLYN A.:**  I am just trying to gather my composure.

20  Good morning, Your Honor.  Thank you for allowing me to

21  address the Court this morning.  My name is Carolyn A. and I

22  want to tell you about, about how my life has changed since

23  Francisco Partida burglarized my apartment twice, the first time

24  stealing a substantial amount of money, most of which belonged

25  to my church choir.  The second time holding me captive and

26  helpless, blindfolding me and threatening me with a knife and

27  with superior physical strength and sexual assaulting me several

28  times over a period of several hours, the longest three hours of

1   my life.

2       I have been a member of the church choir for over 25 years.
3   I became the choir secretary after my first year and have been
4   deeply involved in choir fundraising for more than 15 years.  I
5   don't get paid for this.  I do it for love of the music and for
6   love of the choir itself.  The choir is like a family to me.
7   When the choir money was stolen, I experienced feelings of
8   extreme guilt and remorse.  I felt as if I had let down the
9   entire group.  They had entrusted me with this responsibility
10  and I had failed to live up to their trust.

11      As bad as that theft was, this man stole much more a few
12  months later when he held me captive and sexually assaulted me.
13  He stole my peace of mine, my sense of well-being, my ability to
14  feel safe in the world or even to be able to walk into my own
15  home without wondering if there may be someone inside waiting to
16  attack me.  This is a place I have lived for a very long time.
17  I had always felt safe there.  Even after the first burglary I
18  still felt secure as long as I kept the kitchen window where it
19  appeared the burglar had entered closed and locked.

20      All that changed in June of 2004.  Since the assault I have
21  had to change the way I go about some of the most basic
22  functions of daily living, things as simple as entering my own
23  apartment or getting something out of my car.  Before this man
24  Mr. Partida attacked me, I never gave a second thought to these
25  kinds of things.  I never worried about intruders and it never
26  entered my mind that such a person might be in my apartment
27  waiting to do me harm.

28      For sometime after the assault I wouldn't go into my

1  apartment after dark without a friend present.  My friend would
2  have to come upstairs with me and wait until I had turned on all
3  the lights and checked each room and closet, every nook and
4  cranny to be sure no one was lying in wait for me.  To this day
5  I still check every room each time I come home, whether it is
6  dark or light outside.

7      I used to think nothing of going down the back stairs of the
8  building late at night if I needed to go to my car.  It was
9  months after the assault before I would venture to go down those
10 stairs after dark, and even now I avoid it if I can.

11     Just a couple of weeks ago when I came home after work I saw
12 a note one of my neighbors had posted by the mail boxes, warning
13 other tenants that he had seen a suspicious person in the
14 building earlier in the week.  It was with extreme trepidation
15 that I approached my apartment and put the key in the lock.  My
16 heart was racing, my head pounding.  I picked up the big Maglite
17 flashlight that I now keep just inside the door and proceeded to
18 shine it in every corner of every room, turning on all the
19 lights, as I entered each room until I had satisfied myself that
20 no one else was in the apartment.

21     So why didn't I move to a new place after undergoing these
22 traumatic events?  I did consider relocating but the thought of
23 moving into a strange building probably in a new neighborhood
24 where everybody would be unfamiliar, my neighbors, the other
25 buildings and people in the area, even the people moving through
26 the area, seemed like going from the frying pan into the fire.
27 And the intense panicky feelings I have sometimes experienced
28 when spending the night away from my own apartment have

1    convinced me that it is better for me to stay in this place and
2    this neighborhood that is familiar to me as the back of my hand.
3        Let me explain what I mean.  On occasion I house-sit for
4    friends, stay in their home when they are out of town.  It's is
5    an arrangement that gives my friends piece of mind while
6    travelling, and for me it is kind of like a mini vacation.
7    Since the assault, even in these somewhat familiar surroundings,
8    I have experienced sheer terror after having been awakened in
9    the middle of the night by some sound, my heart pounding so hard
10   that I can feel it in my head, feeling paralyzed with fear and
11   with the overwhelming, sickening sense that someone had gotten
12   into the house and is going to attack me.
13       Over time I have found ways to overcome my panic in these
14   situations, sometimes by sleeping with the lights on.  I never
15   had to sleep with the lights on before this man Mr. Partida
16   committed these crimes against me.
17       Another way in which the assault has affected me is that I
18   have suffered from nightmares in which I am confronted in my
19   home by a menacing person or I am pursued by someone who wants
20   to hurt me.  I have also experienced what I call waking
21   nightmares where I have been sitting at my desk at work or
22   riding on the bus or anywhere, and suddenly I am confronted with
23   the image of Mr. Partida in my bathroom doorway overpowering me
24   and blindfolding me or putting me into a choke hold and
25   suffocating me with the towel when I tried to escape.  Other
26   times I have had the experience of reliving the things he did to
27   me while he had me pinned on the bed that night.
28       I am receiving psychological counseling and that is helping

1    me deal with the emotional symptoms I have experienced in the

2    aftermath of Mr. Partida's attack on me.  I have also taken a

3    self-defense course which has helped alleviate my feelings of

4    helplessness when confronted with the possibility of being in a

5    dangerous or threatening situation.

6        And I am extremely fortunate to have many dear friends who

7    have given me and who continue to give me tremendous emotional

8    support and encouragement.  I owe them a huge debt of gratitude

9    that I will never be able to repay.

10       Before this assault I thought of myself as a reasonably

11   independent, strong-minded person, and although I felt anything

12   but strong during the time Mr. Partida was committing these

13   crimes against me, although I didn't know during those three

14   hours whether I was going to live to see the sun rise on

15   June 5th, I have survived the trauma he inflicted on me.  I was

16   strong enough that very night to tell Officer Filamor and

17   Inspector Lee and the nurse at San Francisco General Hospital

18   what he did to me.  I was strong enough to stand up in court a

19   year and a half later during the trial and tell the jury what he

20   did to me.

21       And I am strong enough to stand before you now, Your Honor,

22   to say that people should not be allowed to do what he did to

23   me.  Mr. Partida should be punished for what he did.  The People

24   of the State of California need to see that he doesn't have the

25   opportunity to do to someone else what he did to me.

26       Thank you.

27       **THE COURT:**  Thank you, ma'am.  Any additional statements,

28   Ms. Barrett?

1    **MS. BARRETT:**  Would anyone else care to speak?

2    Thank you.

3    **THE COURT:**  Ms. Isa, do you have any statements to present

4    on behalf of Mr. Partida?

5    **MS. ISA:**  I do, Your Honor.  I have a couple of people who

6    would like to speak.

7    **THE COURT:**  Good morning, ma'am.

8    **MS. LLIGE:**  Good morning.  My name is Milagros LLige.

9    **THE COURT:**  Could you spell it, please?

10   **MS. LLIGE:**  M-i-l-a-g-r-o-s, last name L-l-i-g-e.  I am a

11   widow.  And Francisco has been working for me and I have known

12   him for seven years.  He was hard working, honest man, and me

13   and my family was treated with respect and he never did any

14   inappropriate behavior toward us.

15   And I thank you if you have compassion to this man and I

16   think this is his first offense.

17   Thank you, Your Honor.

18   **THE COURT:**  Thank you, ma'am.

19   Good morning ma'am.

20   **MS. MERCADO:**  Good morning, Your Honor.  I am Guia Mercado

21   and I am a resident of San Francisco.

22   **THE COURT:**  Can you spell your name, ma'am?

23   **MS. MERCADO:**  G-u-i-a, last name M-e-r-c-a-d-o, and I

24   testified before.  I was in Court before.

25   And I am just here to give support to Francisco, and ask if

26   I can you to have compassion in your judgment, I would

27   appreciate it.  Thank you.

28   **THE COURT:**  Thank you, ma'am.

1    **MS. ISA:** Your Honor, I would like to address the Court with

2   respect to the tentative sentencing and --

3    **THE COURT:** Wasn't there another letter you wanted read into

4   the record?

5    **MS. ISA:** I am going to read that into the record. Would

6   you prefer that I do that first?

7    **THE COURT:** Let's do all the statements first.

8    **MS. ISA:** As the Court and the District Attorney are aware,

9   I have received three letters written by jurors who were a part

10   of this jury. And I would like to read one, and I will address

11   parts of a couple of the other ones because I think these

12   letters indicate how the jurors who sat on this jury and

13   listened to all of the evidence at trial in which nothing was

14   really excluded from their, from them as far as facts that could

15   have been even more harmful. None of that was exclude. This

16   jury heard it all.

17    I would like to read what he wrote and this is

18   juror number 12, seat 12 in the case.

19    "I am writing this note to you, to the Honorable Charlotte

20   Woolard. I am writing this note to you because as a juror on

21   this case who spend much time and effort listening and

22   considering all the parts of this case, I have very strong

23   feelings about the outcome. I feel that we followed the letter

24   of the law and found Mr. Partida guilty based on the law and we

25   looked past our emotions as a jury as much as we could.

26    "However, now that we did our part and executed a fair and

27   impartial trial for both parties, it is now your turn."

28    Just a moment, Your Honor.

1    "It is now your turn to also incorporate your ability as a

2    judge to take into account the more humane aspects of the trial

3    when sentencing that we were not allowed to take into account in

4    finding a verdict.  I believe that Mr. Partida, while found

5    guilty and therefore should absorb consequences for being so,

6    should be placed with appropriate consequences taking into

7    consideration many things that we the jury had to set aside

8    during deliberations as well as those that we did not.

9        "The bulleted list is a complication of the items I feel

10    should be considered with his sentencing.  While I have no

11    experience with sentencing and am ignorant to the law and how it

12    actually works, I do believe that a sentence of 25 to life, and

13    certainly anything above that, is inappropriate and extreme in

14    this case.  Please know that I completely feel for the victim

15    and what she has been going through, and as I stated I was one

16    of the jurors that found Mr. Partida guilty.  But I believe that

17    Mr. Partida is not the typical sexual assault criminal and the

18    circumstances of that should be take into account.  He is not a

19    criminal rapist and he should not be treated like one.

20        "While he is guilty it would seem to me that the point of

21    sentencing is to take into account these types of factors (prior

22    incidents, states of mind, personal references) and determine a

23    sentence appropriately.  Otherwise we would not have or need

24    this process at all.

25        "In this scenario when someone is found guilty, they

26    immediately and automatically receive the mandated sentence as

27    the guilty verdict is laid down without thought, consideration

28    or discussion.  But that, of course, is not how our judicial

1   system works.  It operates to have a sentence hearing so all
2   these things can be taken into consideration and to lay down a
3   sentence as that is appropriate.  That is why I implore you to
4   consider the items listed below and others that I have not
5   thought of that maybe someone else will raise.
6       "The items that I believe the Court should take into
7   account:
8       "There was no prior criminal record.
9       "No complaints from other tenants, female or male, sexual or
10  non sexual.
11      "Years of dedicated service to the building owner without
12  complaints from the owner.
13      "Years of dedicated service in the homes of women with only
14  glowing references and no complaints, including any
15  inappropriate behavior toward them, their friends or their
16  daughters.
17      "This incident is incongruent with his history of no
18  criminal record, no complaints among tenants of the building and
19  strong personal references.
20      "Testimony from a female friend who testified she told Mr.
21  Partida she was not interested in him romantically even though
22  he was, and not only did he not react or ever make an
23  inappropriate advance, he remained a loyal friend that lent her
24  money and helped her find work.
25      "No evidence in any direction to support why he was in the
26  apartment, and therefore that could not be used to support
27  either side, specifically not to commit sexual crimes.
28      "Mr. Partida's hiding in the bathroom at the end of the hall

1  until she found him tells me that he could been in the bathroom

2  hiding, waiting for an opportunity to leave.  He wasn't waiting

3  behind the door, pouncing on her as soon as she entered with the

4  intent to commit sexual crimes.

5      "He never even unbuttoned a button from his shirt let alone

6  his pants, again not showing any intention of hurting or even

7  sexually assaulting which leads me to my next point that:

8      "The victim even testified she believed "It was like he

9  thought he was being romantic" and not criminal.

10     "His mental state that evening of the car, money and other

11 trouble he was having and drinking alcohol.

12     "The victim came home earlier than usual and he knew her

13 usual routine, so even if one were to assume he went in with

14 some intent, I believe it was not to commit a sexual crime

15 because she would not normally have been there.

16     "And it was proven that Mr. Partida told the victim that he

17 would break her neck, with his accent and condition of the

18 apartment and the victim stating that it was like he thought he

19 was being romantic, he could have said something else like, 'be

20 careful or you will break your neck'.

21     "Again, please understand, none of these excuse the crimes

22 and we did find him guilty, but in my opinion this is not a

23 horrible person that has a history of crimes that we do not want

24 on the streets.  This is a good person who made a very bad

25 mistake and should as a result deal with the consequences.  But

26 the consequences should be appropriate not only with the crimes

27 committed, but also with the factors listed.

28     "I thank you for your serious consideration.  As a juror and

677

1   therefore one of the only people most familiar with most, if not
2   all aspects of this case, as a community member, as a human
3   being and a caring individual, I greatly feel for the victim and
4   what she has been through and we found Mr. Partida guilty.

5      "But now for sentencing I do not find Mr. Partida a threat
6   to this or any other community, but a good, decent, hard working
7   man without a criminal background that made a very bad mistake
8   and is in need of mental health help.  And it is not that I
9   merely feel sorry for Mr. Partida.  I found him guilty, but
10  while doing so, during the trial and the deliberations, it was
11  apparent to other jurors and myself as we discussed in the
12  deliberation room that this was a man that put himself in the
13  wrong situation.  This isn't some man that was raised in a poor,
14  broken family and has been committing crimes all of his life
15  over and over again, and we feel bad because he had a bad family
16  situation.  This is a man that made a very bad, one time mistake
17  and should not be thrown in jail for many years ruining his life
18  because of it.  He should receive mental health help,
19  counselling and rehabilitation because he can be a successful
20  member of this community.

21     "I hope I have conveyed my thought articulately.  It is
22  difficult to know what to write in a letter as this, but I feel
23  an obligation as a jury member to not merely walk away once the
24  verdict is read, but to continue my service through the final
25  day of sentencing because our process does not end with the
26  verdict being read and I believe that we are obligated to find a
27  verdict that is just and appropriate and a sentence that is
28  appropriate and fair, to the true nature of the person found

1  guilty and all of the circumstances surrounding his situation.

2      "Thankfully, ▮▮▮▮▮▮▮▮▮▮▮▮

3      Your Honor, both the District Attorney and I submitted

4  sentencing memorandum to support of our positions.  And the

5  District Attorney asked the Court to use all the tools it can to

6  keep Mr. Partida separated from society for the rest of his

7  life.  And essentially what this Court's tentative decision and

8  tentative ruling is doing is exactly that.  With the sentence

9  the Court is imposing and Mr. Partida's age, he would not even

10  be eligible for parole until he is almost 80 years.  That is the

11  rest of his life if he even makes it that far.

12      This Court has the power, though it is limited by a 25 to

13  life and a one strike sex case, it has the power to at least

14  give Mr. Partida the opportunity to re-enter society at age 60,

15  65.  But it is taking it away by its tentative sentence.

16      And I think that this letter from the juror most clearly

17  relates the fact that Mr. Partida is not an ongoing threat to

18  society.  He had never committed a crime before he was 37, 38

19  years old.  He is coming up on his 40th birthday.  And this is a

20  far cry from the ten years that was initially proposed to

21  resolve this case, a proposal which if Mr. Partida was not

22  cognitively impaired as supported by the documents submitted by

23  Dr. Patricia Arce-Perez, a neuropsychologist, he would have

24  accepted and he would have been let back out into society in six

25  and a half years.

26      Now, we understand that when you make a choice of going to

27  trial -- I don't know that he was making a choice based on

28  competence, but when he makes a choice, what the end result is,

1   the Court is faced with, is 25 to life, something it can't
2   strike.  And I understand that.  I am not asking the Court to do
3   that.  But the previous ten years that would have allowed Mr.
4   Partida to enter back into society, that the District Attorney
5   proposed, that her office put a stamp of approval on, and that
6   Carolyn A., the victim in the case, also approved, should not be
7   taken away from him merely because he exercised his right to go
8   to trial or merely because he suffers from a cognitive
9   impairment that makes him simply incapable of understanding
10  this.

11      The Court heard him again and again when the Court tried to
12  explain to him, again and again that if he goes to trial and
13  loses, he will get 25 to life minimum.  And he kept saying,
14  "where is the dead body, where is dead body.  Show me the dead
15  body."  And not just to Your Honor, this same reframe lasted the
16  first time we were sent to trial before Judge Jackson when she
17  herself declared a doubt as to his competence.

18      He should not be punish for going to trial with the sentence
19  that the Court is imposing.  He should be punished for this
20  offense.  The ten years proposal in the beginning, that would
21  have been a just punishment.  The 25 to life now that the Court
22  is now compelled to impose is more than enough, more than enough
23  to punish, to relay that actions have consequences, to insure
24  the safety of Carolyn A., to insure the safety of our community.
25  But this isn't a man who has been out on a criminal rampage
26  throughout his life.  He is just not that person.  And the Court
27  has evidence of that, both at trial, with his record, and I
28  don't think that our jurors feel that either.

680

1     I would ask the Court to consider the mitigating factors.  I
2   would ask the Court to consider the ramifications of its
3   tentative sentence.  It is within this Court's power to stay all
4   of the additional 289 charges, to sentence him to the 25 to life
5   on Count IV and stay a three-year, a six-year term, run them all
6   concurrent.  It is within this Court's power to dismiss, to
7   strike the enhancement allegations, the personal use of a knife
8   allegation.  It is entire with this Court's province.  The only
9   such allegation that can't be stricken is the use of the gun.
10      The Court can do this and I would ask the Court to exercise
11   its discretion in these circumstances because 25 to life is more
12   than enough.  It will insure Carolyn's safety and security most
13   definitely.  And I would ask the Court to consider that.
14      Thank you.
15      **THE COURT:**  Thank you, Ms. Isa.
16      Mr. Barrett.
17      **MS. BARRETT:**  Your Honor, the amended sentencing calculus
18   that I gave you this morning fully justifies this Court in
19   imposing a 99 year to life sentence.  The facts fully support
20   that.  Your Honor's tentative ruling I believe clearly considers
21   compassion, justice, fairness.
22      I think all of the things Ms. Isa is asking to you exercise
23   at this point, I believe that your very well reasoned and very
24   well thought out and calculated sentence of 37 years to life
25   takes all of that into consideration and is entirely just and
26   adequate considering what Mr. Partida did, considering the
27   impact that his actions on two separate occasions -- not one,
28   but two separate occasions separated by a six-month period --

1   had on his women's life.  You heard the impact that his actions

2   had on her life.  It is an impact that will stay with her

3   forever.  I believe the Court's tentative sentencing calculus is

4   very fair, very just, and should be followed at this point, Your

5   Honor.

6       **MS. ISA:**  I think a sentence of 25 to life, taking away the

7   rest of Mr. Partida's younger years will also stay with him for

8   the rest of his life.  The impact that will have is

9   unimaginable, just as what Carolyn is going through and what she

10  has gone through is unimaginable.

11      But, Your Honor, it is not just and it is not taking into

12  account the mitigating factors to keep him in prison without a

13  possibility of even coming before a parole board until his 80th

14  birthday.

15      On that I would submit.

16      **THE COURT:**  Is the matter submitted as to the sentencing,

17  except of course for the issue of restitution?

18      **MS. BARRETT:**  Yes.

19      **MS. ISA:**  Yes, Your Honor.

20      **THE COURT:**  The Court did put a lot of thought into this

21  particular case, and we all agree that 25 to life is the

22  mandatory indeterminate term required by law under the one

23  strike sexual assault sentencing structure.

24      And the Court was willing to approve the ten year pretrial

25  offer.  The People had offered the 10 years.  The victim had

26  agreed to the 10 years.  Unfortunately the 10 years, the 10-year

27  offer was not taken, the case did not resolve and we did go to

28  trial.  The 10-year offer was extremely generous, particularly

1   in view of the situation where a repeated sexual assault

2   occurred in a woman's home that had been previously burglarized

3   by the defendant.

4       And the Court listened very carefully to the facts and

5   circumstances of this case.  There is a previous residential

6   burglary.  There is the repeated sexual penetrations that

7   occurred to the victim in her own home.  The impact on this

8   victim is, she described it, but it is incredible.  It changed

9   her life.

10      And the Court did review the defendant's statement in the

11  pre-sentence report in that he states that he didn't sexually

12  assault anyone as accused.  He didn't use a knife.  He said he

13  was under the influence of alcohol and was making a joke out of

14  the situation and he added that he told the victim to call the

15  police because he was no longer under the influence of alcohol.

16  And from what he remembers of the incident, he didn't do

17  anything so bad which shows a certain degree of callousness that

18  does not bode well for Mr. Partida.

19      And the Court considering the events that transpired, the

20  Court believes that the sentencing choices are appropriate.  It

21  has exercised compassion by not imposing the full and

22  consecutive terms for the sex crimes and the weapons and

23  enhancements.  And the Court does stand by its sentence.

24      So tentative sentence that the Court pronounced shall become

25  the judgment and sentence of this Court.

26      As to the issue of restitution, was there a brief recitation

27  at this time?

28      MS. BARRETT:  Your Honor, I would like to file with the

1    Court the two CR-110's that we have in this case, one ordering

2    restitution to the victim and one ordering restitution to the

3    State Victim Compensation Board.  The supporting documentation

4    is attached to each of these.

5        I understand that Ms. Isa would like addition time to review

6    these documents and I certainly have no objection to that.

7        **THE COURT:**  So is the back-up documentation attached to what

8    you are presenting to the Court?

9        **MS. BARRETT:**  Yes, it is.

10       **THE COURT:**  As to the issue of restitution, the Court is

11   going to specifically reserve jurisdiction over that issue

12   because, especially since Ms. Isa has not had adequate time to

13   prepare for that aspect of the sentencing proceedings.

14       Was there anything additional, Ms. Barrett, that you wanted

15   to submit or is this pretty much everything?

16       **MS. BARRETT:**  That is everything.

17       **MS. ISA:**  The only thing I would request if it exists is I

18   know that the $2030 reflects money that was paid from the

19   Victims' Fund.  I don't know what that was for and if there is

20   any accounting of what that was for, because it just indicates a

21   number and I am not really sure what it was for.  It would

22   helpful to know that so it is in the record.

23       **MS. BARRETT:**  Ms. Anderson is here.  She is our restitution

24   specialist, Your Honor, from the DA's Office.  Maybe she can

25   speak that to that issue.

26       **THE COURT:**  Please keep your voice up, please.

27       **MS. ANDERSON:**  Sure.  Ann Anderson with the DA's Office.

28   Those payments were made on behalf of the victim to a therapist

1    for a time period which is indicated on the front of those

2    pages.  The time periods with the list of dates are on there.  I

3    can go over that with you if would you like.

4        **MS. BARRETT:**  My understanding, Your Honor, is that it's for

5    psycho-therapy appointments and it's not a double payment.

6    These are moneys that were paid to the therapist.  Additional

7    moneys were paid to the therapist by the victim, but is that

8    there is no double billing on that issue.

9        I have nothing further, Your Honor.

10       **THE COURT:**  Was there any other inquiry, Ms. Isa, at this

11   time you wish to make?

12       **MS. ISA:**  No, not with respect to these documents.  I would

13   just ask for a couple of days to review them.

14       **THE COURT:**  Have you discussed with your client whether he

15   wishes to be in court for the conclusion of the restitution

16   aspect of this proceeding?

17       **MS. ISA:**  Let me just ask him.

18       I think it is -- again it is incumbent upon me to indicate

19   that I don't have an answer to that question.  Mr. Partida just

20   indicated to me he doesn't understand.  He doesn't know what the

21   sentence is.

22       **THE COURT:**  Perhaps it would be best not to waive his

23   appearance and if we could put this on for Tuesday of next week,

24   the 21st?

25       **MS. BARRETT:**  That's fine, Your Honor.

26       **THE COURT:**  Okay.  So the matter will be put over to 9:00

27   a.m. sharp on Tuesday, March 21st, and that will be for the

28   conclusion of this sentencing that will include the restitution

1    aspect.

2        The Court does find good cause to continue this particular

3    part of the sentencing to that day, and at that time the Court

4    will provide Mr. Partida with his parole and appellate rights.

5    So that will start the running of the clock.

6        **MS. BARRETT:**  Very well.  Thank you, Your Honor.

7        **THE COURT:**  Thank you.

8        (Whereupon, the proceedings were adjourned at 12:05

9    o'clock p.m.)

10                          ---ooXoo---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   State of California                )
                                        )
2   County of San Francisco            )

3

4

5       I, Kent S. Gubbine, Official Reporter for the Superior

6   Court of California, County of San Francisco, do hereby certify:

7       That I was present at the time of the above proceedings;

8       That I took down in machine shorthand notes all proceedings

9   had and testimony given;

10      That I thereafter transcribed said shorthand notes with the

11  aid of a computer;

12      That the above and foregoing is a full, true, and correct

13  transcription of said shorthand notes, and a full, true and

14  correct transcript of all proceedings had and testimony taken;

15      That I am not a party to the action or related to a party

16  or counsel;

17      That I have no financial or other interest in the outcome

18  of the action.

19

20

21  Dated:   July 25, 2006

22

23  _____

24          Kent S. Gubbine, CSR No. 5797

25

26

27

28

*Roland Levy, M.D.*
555 Nineteenth Street
San Francisco, California 94107
415 861-1439

## PSYCHIATRIC CONSULTATION

November 1, 2005

The Honorable Charlotte Woolard
Judge of Superior Court, Dept. 27
Hall of Justice
850 Bryant Street
San Francisco, CA 94103

Re:    PARTIDA, Francisco
SC#:   194241

Dear Judge Woolard:

Pursuant to your order, I examined the above-named defendant at the San Francisco County Jail on this date in order to determine his trial competence according to sections 1368/1369 of the penal code. He is a 38-year-old, unmarried father who has been charged with burglary and numerous sexual offenses.

The interview was conducted with a Spanish interpreter and the defendant's attorney was present throughout the interview.

### PRESENT OFFENSE:

According to the police report, the incident occurred in an apartment on California Street on June 4, 2004, and involved a 54-year-old woman who was sexually assaulted.

The defendant told me that he had been working on Mangles Street, leaving about 4:00 p.m. and going to a liquor store on Monterey Boulevard, where he purchased two bottles of beer, 24 ounces each, because he was "hot and tired." He then drove to Chinatown to get a haircut and when he returned to his car he found a parking ticket for having parked in an illegal zone. He stated that he got very angry because he had some $273.00 in unpaid tickets and he then drove over to California Street, where he purchased two more bottles of beer. He drank one and then took the other one inside with him, stating that it was a building in which he had been working for the past few years. He stated that he entered apartment number eight because he had previously noted $200.00 in an envelope and he wanted the money in order to pay one of the tickets. He stated that he heard steps outside and, looking through the peephole, saw the woman who lived there, so he hid in the shower. He stated that she then undressed to her underwear and was talking on the phone. He stated that he felt very embarrassed for her and also scared for himself and he wanted to leave, but instead of running out, which he stated he felt would upset

her, he tried to calm her down, help put her underwear back on, and then blindfolded her. He then described in some detail what transpired, including getting a knife from the kitchen which he described as a butter knife, although the victim described it as a bread knife, and he stated that he put it on her chest in a manner similar to what he had observed in a porno film that he had seen. He stated that he did carry out various sexual acts with her, but he does not believe that they are as serious as portrayed in the various reports, and thus he feels that he is being overcharged because he is Mexican.

The defendant essentially denied any prior offenses and any psychiatric history. He stated that he is in good health except for headaches, which he blames on a head injury suffered as a child when he was trying to knock mangos out of a tree and a rock hit him on the forehead, leaving a very noticeable scar.

PAST HISTORY:

The defendant stated that he as born in Mexico on December 3, 1966, and has been in the United States on three occasions, the last time arriving here in the 1990s. *1996*

The defendant stated that he never met his father and mother resides in Mexico with one of his half brothers. The defendant is one of 11 living children, but he does not maintain much contact although he has sent money.

The defendant reported a minimal education and quitting in the third grade of middle school in order to work. He stated that he sold newspapers and shined shoes around age 12 or 13 and in San Francisco he has done unskilled labor, and in the past few years has worked for two different women, and stated that these are the best jobs that he has had.

The defendant stated that he has never married, but he has an 18-year-old daughter in Mexico with whom he has no contact

The defendant was extremely reluctant to talk about his sexual history, but stated that his last girlfriends were two living in San Jose and he would not say when he was last in contact with them. He stated that it was not nice to talk about female lovers because it was improper.

MENTAL EXAMINATION:

The defendant was alert, not particularly cooperative, but appeared to be correctly oriented, and of average intelligence. His affect was somewhat angry and he did not like being interrupted or directed, wanting to tell his story in his own way. He appeared to be very rigid in his thinking, concrete, stubborn, and controlling. He frequently eluded to racism as being involved in his offense, particularly in the severity of the punishment that he might face. He indicated that he had been offered 10 years, but refused to accept it despite facing a much longer sentence if convicted. When asked how he would feel if found guilty and sentenced to a long term, he indicated that he realized that this was a possibility, but he would not accept pleading guilty and

To: The Honorable Charlotte Woolard
Re: Francisco Partida

November 1, 2005
Page 3

serving less time because he does not believe that his crime was sufficient to warrant such a long sentence.

## ADDITIONAL INFORMATION:

I reviewed three reports conducted by expert witnesses, two psychologists, and one psychiatrist. None of them found evidence of a mental disorder.

I also talked with a neuropsychologist who had recently tested the defendant and described him as having some cognitive impairment, particularly in new learning and being able to modify his thinking.

## DISCUSSION:

From my assessment, it is my opinion that the defendant does not have an axis I diagnosis. I believe that he has a personality disorder with predominantly obsessive compulsive features, which certainly interferes with his ability to accept what his attorney tells him. However, this is a personality disorder and not a mental disorder, and therefore I conclude that he is able to understand the nature and purpose of the proceedings and he has the ability to cooperate with counsel in a rational manner, but may not do so because of his very rigid stance.

The defendant's problem is not one that would respond to psychiatric treatment and antipsychotic medication is not appropriate.

Respectfully submitted,


Roland Levy, M.D.


RL/jmh

# DOUGLAS R. KORPI, PH.D.
### LICENSED PSYCHOLOGIST PSY 5812

Office Address
110 Gough Street, Suite 203
San Francisco, CA 94102

TELEPHONE 415 333 4255
FAX 510 654 6910
Email douglaskorpi@hotmail.com

Mailing Address
4096 Piedmont Ave. #143
Oakland, CA 94611-5221

August 15, 2005

## CONFIDENTIAL PSYCHOLOGICAL EVALUATION

**NAME:** PARTIDA, Francisco
**DATE OF BIRTH:** 12/3/66
**SF MUNI COURT NO:** 2167376
**SFSC COURT NO:** 194241
**DATE OF EVALUATION:** 8/5/05

### REASON FOR REFERRAL:

Mr. Partida was referred for a Competency Evaluation, pursuant to Penal Code Section 1368, by the San Francisco Superior Court, the Honorable Teri L. Jackson presiding. Mr. Partida was arrested on 6/4/04 in connection with two counts of robbery, one count of sexual battery, eight counts of penetration with a foreign object, one count of assault with a deadly weapon, and one count of false imprisonment, all in the matter of a 54-year-old woman. The Defendant does not, at least insofar as we know, have any psychiatric history, but his attorney, Katy Isa, informs me that he seems to have grave difficulties understanding the nature of his predicament. Accordingly, the Court has ordered that two psychologists perform an evaluation related to trial competency.

### EVALUATION PROCEDURE:

I met with Mr. Partida on 8/5/05, for a period of approximately 45 minutes, attempting a Mental Status Examination and Clinical Interview. Ultimately, the Defendant refused to continue with any complete interview. As well, I spoke briefly with his attorney and reviewed the following documents:

1. Transcription of taped discussion between Inspector Lee and Mr. Partida, dated 6/5/04.
2. San Francisco Superior Court information, dated 12/23/04.

RE: PARDITA, Francisco
August 15, 2005
Page 2

## MENTAL STATUS EXAMINATION:

Francisco Partida is a 38-year-old Mexican man, of approximately average height and weight, who has a scar on his forehead, wears a mustache, and, at least on the day I met with him, presented in Jail issue, looking to have attended adequately to his grooming and hygiene. He spoke in a very thick Spanish accent and his English was barely serviceable. When I suggested that I utilize the services of a translator the Defendant stood up and indicated that he wanted to leave. We continued our discussion, but with the Defendant's cooperation less that optimal. Indeed, after about 45 minutes he simply stood up and left the room, indicating that he was quite through with me. Stumbling through the interview, the two of us were able to have a discussion of sorts, but Mr. Partida was clearly the man who was more in control. I noted that he did appear alert and coherent. His emotional expression was irritated and he spent most of his time explaining to me how it was that attorneys, his included, lied, have a system that conspires against Mexicans, and it was impossible to gain a fair trial owing to the fact that everyone (the District Attorney, the Judge, and the Public Defender) were all in cahoots. He was remarkably rigid in his thinking, he kept repeating himself, and he seemed impervious to a reasonable discussion regarding his current predicament. In this manner, I struggled to obtain what information I could, and in the end found myself displeased with the lack of data from the Defendant.

## CLINICAL INTERVIEW:

Mr. Partida told me that he was born in Mexico. He never knew his father, but has maintained some sort of contact with his mother. She remains in Mexico. He has a brother who lives in San Diego, but he refuses to have any sort of contact with him: "This is my problem, I don't want to involve him." He stated that he has been in the United States about nine years and that the United States has not given him a good job. As to what sort of employment he has had over the course of the past nine years he explained that he did everything. He stated that he had worked in one "building" for about two-and-a-half years, and that he had been involved in cleaning or janitorial work for a good eight years. He thought that his boss had been very fair with him and he made references to feeling as if he had let his last boss down.

Mr. Partida explained that he had no psychiatric history, explaining to me that, "I'm not crazy." He also stated that he was not a sex offender. He stated that he had no medical difficulties as well. As to substance abuse, the Defendant explained to me that he started drinking at about age 15 or 16, but that he didn't drink on a daily basis, he had never drunk alcohol in the morning, and he had never suffered a blackout. Insofar as he was concerned, he did not have any sort of an alcohol problem. He stated that, once, he drank a 40-ounce can of beer, "Right before the crime, I don't know what happened after I go in that room...and maybe my brain didn't work."

RE: PARDITA, Francisco
August 15, 2005
Page 3

As to his legal predicament, Mr. Partida spent a good deal of time explaining why it was that he was going to defend himself. He stated that his attorney lied to him. At this point, he pulled out a file of papers and explained that he had been going to the library everyday, looking up his charges. He now understood that he could not be charged more than $200 for each of his offenses, and thus he should be able to get out of jail for $10,000. He was not able, alas, to look up the "Penal Code 289" offense, indicating that it wasn't a charge that was listed in any of the law books in the jail. He told me that his attorney wouldn't tell him what was going on with his case, he told me that he thought he was being discriminated against, noting that any number of other of his cellmates had come and gone, while he remained stuck in the jail. He explained that his Public Defender, indeed, all Public Defenders, worked "95% for the D.A., 5% for me." Accordingly, he thought it was going to be important for him to represent himself, "Maybe the jury can work for you (him)."

I asked the Defendant if, since he was going to represent himself, he had read the police reports. He stated that he had not, that, in point of fact, he ripped them up, because they were full of "fucking lies." He insisted that he knew what he did and so he didn't have to read any report. I asked him if he had any witnesses that he wanted to put on. He said that he did not, even going so far as to say that his victim did not want to charge him. He did admit that the victim came to the preliminary hearing, but his thinking became rather clouded at this point, "She is only, is afraid when she saw me. She give me keys. I had alcohol in my mind and I wait for the police." I asked him what the victim said at the preliminary hearing and he said that he didn't speak English well enough to fully understand her, but that he thought that she said pretty much everything that he says, except "I never said kill her. She said I have a knife, she lied." The Defendant insisted that he wanted to go to trial, and he wanted to go now. He was sick of waiting around, he was sick of the fact that his attorney wouldn't give him a good defense, and he thought that all of this was making a mountain out of a molehill. He explained that while he may have been sexual with "'the lady', I didn't force (her).'"

Slipped in amongst his rantings, Mr. Partida did give evidence of some understanding of his legal predicament. He was able to tell me that the District Attorney had made an offer of ten years, but he didn't think that was reasonable: "I'm not crazy." He stated that he was drunk on the day of the event, and that, perhaps, he needed a program in order to help him deal with alcoholism. He understood that it was his attorney's job to defend him, it was just that the system was rigged. He understood that the judge's job was to oversee proceedings, but he allowed as how judges in this country were biased. Insofar as he was concerned, he was not getting a fair trial because he was a Mexican who didn't have the money. He thought that a fair disposition has already been had: he has been in jail for a year, he should be put on probation.

## DISCUSSION OF COMPETENCY ISSUES:

1. **What is the nature of the Defendant's mental disorder?**

RE: PARDITA, Francisco
August 15, 2005
Page 4

Mr. Partida does not have, at least insofar as any of us knows, a psychiatric history. As well, in our brief time together, I did not gain a sense that he suffered some sort of Schizophrenia or serious psychotic disorder. I did, however, become impressed with his paranoid and concrete thinking, his rigid characterological structure, and his rather remarkable self-focus. Lacking a full interview, I cannot offer any definitive diagnosis, but I certainly can tentatively diagnose the existence of a rather severe Personality Disorder, perhaps coupled with mild cognitive limitations.

2. **What is the Defendant's ability or inability to understand the nature of the criminal proceedings or assist counsel in the conduct of a defense in a rational manner?**

Mr. Partida would appear to have a tolerable understanding of the court roles, legal proceedings, and disposition. He is not, however, reasonable and is not now willing to apply himself to the task of cooperating reasonably with his attorney. At issue is "can't" versus "won't." Since I am not impressed that this is a man who suffers a psychosis, and, as a result of this psychosis, is unreasonable, I am left to speculate that he is being unreasonable because of his severe Personality Disorder and possible cognitive limitations.

3. **Is treatment with antipsychotic medications appropriate?**

I don't think so.

4. **Is antipsychotic medication likely to restore the Defendant to mental competence?**

I don't think so.

5. **What are the likely effects of medications, the expected efficacy of medications, and possible alternative treatments?**

It may well be that that Mr. Partida needs a kind of "wake-up call." He has become entrenched in his position, stubborn, unreasonable, and unapproachable owing to his severe Personality Disorder. It may well be that he would find a relatively brief period of reality-based treatment at Atascadero quite beneficial, if only to impress upon him the fact that he cannot continue in his obstinence. As well, were he to be treated at Atascadero State Hospital, we could offer him psychological testing and gain a better sense of his cognitive limitations. And finally, further evaluation might be able to help clarify the nature of this man's diagnostic disorder. As it is, I have inadequate information to definitively rule out the existence of a psychosis. More information is needed in order to rule out a severe mental disorder (as in schizophrenia) so as to insure that the Defendant is not simply incapable of cooperating with counsel.

RE: PARDITA, Francisco
August 15, 2005
Page 5

6. **Does the Defendant have the capacity to make decisions regarding antipsychotic medical?**

Assuming that further evaluation revealed that this is a psychotic man who may do well with antipsychotic medications, I am not at all sure whether he could weigh the pros and cons of taking an antipsychotic medication. By the time such a decision was made to administer medications, we would have determined that he was psychotic and required medication, and that his lack of reason related to psychosis. As such, he would not appear to possess the capacity to make reasonable decisions regarding medications. Should further evaluation reveal that he is characterologically disordered, the medications, of course, would not be needed.

7. **Is the Defendant a danger to self or others?**

The Defendant is certainly not a danger to himself at this point and he is not an immediate risk to harm anyone else. Given, however, his charges and his current intransigence, I would not want to make any prediction regarding dangerousness over the long haul.

Respectively submitted by,

D. Korpi, PhD

Douglas R. Korpi, Ph.D.
Licensed Psychologist PSY 5812

# E. ROBERT CASSIDY, PH.D.

**3867 Howe Street**

**Oakland, California 94611**

**(510)549-1396**

August 21, 2005

The Honorable Mary Morgan
Judge of the Superior Court
Department 22
Hall of Justice
850 Bryant Street
San Francisco, California 94103

Re: Francisco Partida
SC No. 194241

Dear Judge Morgan:

In response to the order of the Honorable Teri L. Jackson dated August 3, 2005, and pursuant to Penal Code Section 1368, I evaluated the above-captioned defendant so as to provide the Court with opinions regarding the following issues:

1. The nature of the defendant's mental disorder, if any.
2. The defendant's competence to stand trial.
3. Whether treatment with antipsychotic medication is appropriate and likely to restore him to mental competence. The likely effects/expected efficacy of the medication and possible alternatives to antipsychotic medication.
4. Whether the defendant has the capacity to make decisions regarding antipsychotic medication.
5. Whether, as a result of a mental disorder, the defendant represents a demonstrated danger of physical harm to himself or others.

For the purposes of this assessment I sought the advantages of two discussions of the most pertinent case issues with Deputy Public Defender Katherine Isa, I conducted a structured psychological interview of Mr. Partida, I reviewed the Jail Psychiatric Services Encounter Report of June 5, 2004 which was obtained from the Medical Records Department of Jail Health Services and I reviewed archival materials kindly made available by counsel. Included in the latter were the San Francisco Police Department Incident Report (040-642-377) of June 4, 2004, the 50 page Transcript of Inspector Lee's interview of the defendant on June 5, 2004 and the Superior Court Complaint filed on December 23, 2004.

Page Two
Re: F. Partida

Date: 8/21/05

I examined Mr. Partida on August 19, 2005, at the San Francisco County Jail No. 2, for a total duration of essentially one and one half hours. His responses to being informed of the nature and purpose of the interview, as well as the limits on confidentiality, suggested that his comprehension of the reasons for the evaluation was inadequate.

## Present Situation

The defendant was arrested on June 4, 2004, as a consequence of an incident that evening at an apartment building on California Street where he had been employed to provide cleaning services. Mr. Partida has been accused of sexually assaulting a 54-year old, female resident of the building who was planning to attend a church choir practice with a male friend that evening. The friend's concern about her well being reportedly led to the police to enter her residence with the assistance of the landlord. According to the Police Incident Report, once in her apartment the police saw the woman "on the bed wearing only underwear" and the defendant was observed to be "sitting next to her and he appeared to be holding her down." He was subsequently charged with violating Penal Code Sections 459—two counts, 243.4(A), 289(A)(1)—eight counts, 245(A)(1) and 236.

Shortly after his arrest the accused was evaluated by a Jail Psychiatric Services clinician on a referral from the Sheriff's Department "due to his serious charges and odd presentation." In the report of that assessment Mr. Partida was described as calm, cooperative, alert, oriented, "future focused" in his thinking, of euthymic affect and displaying no symptoms of psychosis or major mental illness. He reportedly denied "any and all psychiatric history" as well as "substance abuse of any kind." The clinician wrote that it was unclear what this "odd presentation" consisted of and that while later being observed for two hours on F-Pod the deputies "had not seen anything unusual." It was recommended that the defendant be housed in the general population and no further interventions by Jail Psychiatric Services were seen as indicated.

During the intervening fourteen months, Mr. Partida has not had contact with Jail Psychiatric Services. He has not been prescribed psychotropic medications, has not required special housing and has not been admitted to Ward 7L at San Francisco General Hospital. I am aware of no reports that others have seen his condition or mental state as deteriorating in recent months.

## Significant History

Mr. Partida indicated at the outset of the interview with this examiner that he had disclosed his history on a number of other occasions since his arrest over fourteen months ago, and that he did not intend to repeat that information. In response to a number of questions about his past he became irritated and exasperated, and stated, "My lawyer

Page Three                                    Date: 8/21/05
Re: F. Partida

has that. Get it from her." Consequently, his account of his history is somewhat sparse and incomplete.

The defendant did state that he was born in Nayarit, Mexico, that he graduated from the equivalent of high school there and that he is an illegal alien. He provided no information about his parents or siblings, saying only that, "They're not here."

He was quick to assert that he was employed at the time of his arrest and that he had worked hard to support himself financially for a number of years. The available records reveal that for several years he had been employed to provide a range of cleaning services at the apartment building where he was arrested.

He provided virtually no information to this writer about his social situation, but did reveal that he had a "girlfriend" who resided in Millbrae. According to him she had work commitments that prevented her from visiting him in the jail.

As he had done with the Jail Psychiatric Services clinician in June of last year, the defendant denied a history of alcohol and substance abuse. He claimed that there had been very few times in his life when he has consumed alcohol to the point of actual intoxication. He denied a history of alcohol related arrests or any form of treatment for alcohol abuse.

With regard to contact with mental health professionals, the defendant denied having even been evaluated for psychiatric treatment, prior to this past year. He denied ever having been admitted to a psychiatric setting, including inpatient units and outpatient clinics. He insisted that he had never had the need for, or been prescribed, any kind of psychotropic medication.

Mr. Partida claimed that he had never been incarcerated or arrested in either the United States or Mexico. His Criminal History Record was not available to this writer, however it is noted that he acknowledged to Inspector Lee last June a prior arrest in San Bernardino. The details of that legal situation are not clear from Mr. Partida's statements. It is also noted that during that same interview the defendant admitted to his habit of driving a car without a valid license. Whether the defendant had any contacts with the authorities in Mexico as a minor is unknown to this writer.

**Mental Status Examination**

The defendant is a 38-year old Mexican born unmarried male of somewhat less than average height and weight who looks his stated age. He was dressed in clean jail issue attire, was neatly groomed and sported a pen perched on his right ear. His appearance was otherwise unremarkable. On observing him as he approached the interview area his gait was noted to be steady, purposeful and of average speed. Despite the fact that Spanish is his primary and original language his English comprehension and expression skills were quite adequate in meeting the demands of this interview. Upon entering the interview room and being informed of this examiner's role and agenda he

Page Four                                                    Date: 8/21/05
Re: F. Partida

immediately expressed his irritation and frustration with the fact that his current mental state was again being assessed. Throughout this nearly ninety minute interview the defendant was alternately responsive, cooperative and informative or sullen, selectively mute and unwilling to discuss various topics of interest to this examiner. On a number of occasions he repeated, "I've already told my lawyer that. You can get it from her." Although he was obviously miffed in response to this examiner's persistent efforts to engage him in a lengthy and productive conversation, he was in no way verbally or physically threatening, he was not directly hostile and he consistently maintained excellent behavioral control. It is noteworthy that on three different occasions during the course of this interview the defendant did get out of his chair and indicated a desire to terminate the conversation. However, when a female deputy appeared and directed him to be seated "since it's count time," he did cooperate with her directive and was able to be persuaded to converse further. Eventually he closed his eyes, sat facing away from this examiner and refused to verbally respond further. At that point the interview was discontinued by this writer.

At no time during this interview did Mr. Partida exhibit symptoms of an active psychotic disorder. He did make reference to issues related to prejudice several times, but none of those remarks seem to reflect irrational, unrealistic, or grossly distorted beliefs. No frank delusional thinking was expressed. He voiced no paranoid or grandiose ideation and he expressed nothing that would suggest that he believed that he possessed special powers such as clairvoyance, extrasensory perception or thought projection. He did make statements that indicated that he overestimates his grasp of legal issues which he has gleaned from having spent many hours in the law library during the past year, however none of his remarks approached the threshold of delusional thinking. There were no indications, as was consistent with the Jail Psychiatric Services evaluation of June 2004, of the present or past experience of auditory or visual hallucinations. He did not, at any time, appear to be attentive to or preoccupied with internal stimuli. To the contrary, he exhibited the ability to concentrate, and focus for extensive periods, on the array of external stimuli that comprised the interview situation. No manifestations of gross cognitive impairment were observed, however deficits in this area of functioning could no be ruled out since the defendant was unwilling to cooperate with a more comprehensive assessment of his intellectual capacities. He was alert, correctly oriented in all spheres and conversant in a manner that suggested that he is of approximately average intelligence. His expressed fund of knowledge and use of language were consistent with his educational background. References to known past and recent events seemed to indicate that his memory is intact. He did display instances of poor judgment at times, however the etiology of those instances was difficult to ascertain from the results of this examination.

**Competency Assessment**

Mr. Partida was able to describe the circumstances, time and details of his arrest in a manner that was consistent with the Police Incident Report and the transcript of his interview with Inspector Lee at the Richmond Station on June 5, 2004. Although he did take issue with the number of charges against him, he was able to list them and ac-

Date: 8/21/05

knowledge their seriousness. He made comments throughout the interview indicating that he possessed more than the requisite knowledge of the roles and responsibilities of the major courtroom participants. He did voice, at various times, conflicts with and a mistrust of his attorney, however at no time did he express frank paranoia. He was able, without prompting, to recall accurately a settlement offer by the District Attorney as well as the anticipated length of sentence if he is convicted. He detailed the kind of evidence that is typically presented by the prosecution in a case such as his and he re-membered some of the evidence that had been presented during the preliminary hearing. He revealed that he has spent many hours in the law library since his arrest and portrayed himself as well prepared for his defense. In this regard he did convey an overestimation of his knowledge base as it applies to his legal situation. This can cer-tainly pose an impediment to more effectively collaborating with counsel, however, it did not rise to the level of a grandiose delusion.

The defendant expressed considerable frustration regarding the slow pace of the legal proceedings and indicated that he is extremely eager to accelerate the process so as to achieve a disposition of his case. The potential outcome and consequences of a conviction seemed to be less important to him than going "straight to trial." His impa-tience interfered with his exercise of good judgment.

During this interview Mr. Partida clearly over emphasized some of the facts and misconstrued several allegations against him, however that propensity appeared to be a function of his character rather than a psychotic process or disorder. Some of his as-sertions were most certainly unrealistic, but not psychotic distortions of apparent real-ity.

## Conclusions and Discussion

### 1. Is a mental disorder present in the defendant? What is the nature of the mental disorder?

**Opinion: No**

Mr. Partida evidenced no symptoms of a mental disorder during the course of the evaluation with this examiner. More specifically, he displayed no signs of a current or past major mental illness which would meet the criteria for the diagnosis of an Axis I disorder. In addition, it is important to note that the defendant reportedly has had vir-tually no contact with mental health professionals in the past. He has not requested or required the interventions of Jail Psychiatric Services, either psychopharmacological or otherwise, during this fourteen month period of incarceration and he has not needed admission to the inpatient psychiatric unit at San Francisco General Hospital. According to the defendant, as related to both the undersigned and the Jail Psychiatric Services cli-nician who assessed Mr. Partida at the time of his arrest in June of 2004, he has never been prescribed psychotropic medications, he has never been admitted voluntarily or involuntarily to an inpatient psychiatric facility, he has never gone to an outpatient mental health clinic and he has never sought mental health services while incarcerated.

Page Six
Re: F. Partida

Date: 8/21/05

## 2. Is the defendant presently competent to stand trial?

**Opinion: Yes**

It is my opinion that this individual is competent to stand trial at this time. Mr. Partida does not currently display symptoms of, nor does he have a documented or reported history of, a mental disorder which would render him incapable of understanding the nature and purpose of the legal proceedings being taken against him, or of assisting counsel in conducting a defense in a rational manner. Although it is my opinion that the defendant does not meet the threshold of trial incompetence, I recognize that to elicit his cooperation in focused and sustained collaboration is an extremely difficult and challenging task.

## 3. a) Is treatment with antipsychotic medication appropriate for this defendant?

**Opinion: No**

It is my opinion that treatment with antipsychotic medication is not appropriate for this man since he has not evidenced the signs or symptoms of a psychotic disorder at any time during the past fourteen months. Mr. Partida's judgment is somewhat impaired and his style of communication is suboptimal as it related to his current legal predicament, however these are not conditions which would warrant or benefit from antipsychotic medication. This defendant has a tendency to be frustrated, sullen, purposely uncooperative and overly reliant upon his own knowledge of applicable laws, however the combination of these factors does not suggest or justify treatment with antipsychotic medication.

## b) Is treatment with antipsychotic medication likely to restore the defendant to mental competence?

**Opinion: Not applicable**

Since Mr. Partida is neither incompetent to stand trial nor psychotic, the question of the likelihood of restoring him to trial competence through the use of antipsychotic medication does not apply to his particular situation.

## c) Likely effects/ expected efficacy of and possible alternative treatments to antipsychotic medication?

**Opinion: Not applicable**

Alternative treatments to antipsychotic medication are not necessary, since Mr. partida does not require interventions in a psychiatric setting to restore him to trial competence. Mr. Partida is not psychotic, therefore a consideration of alternatives to antipsychotic medication is not necessary.

Page Seven
Re: F. Partida

Date: 8/21/05

**4. Does this defendant have the capacity to make decisions regarding antipsychotic medication?**

**Opinion: Not applicable**

The capacity to consent to antipsychotic medication does not apply to this defendant since treatment with antipsychotic medication is not deemed necessary or appropriate. There are no indications that he has symptoms of a mental illness which would interfere with his ability to weigh the benefits and risks of medications, if they were indicated. Nonetheless, in light of his presentation during the course of the current evaluation is seems probable that Mr. Partida would refuse to accept medications if they were recommended. However, that stance would not be the result of psychotic symptoms, but more a function of his personality.

**5. Does the defendant, as a result of a mental disorder, represent a demonstrated danger of physical harm to himself or others?**

**Opinion: Others: No**
**Self: No**

Based on the allegations against him as contained in the Police Incident Report of June 4, 2004, and the resulting charges currently pending against him, Mr. Partida appears to meet one element of the present legal criteria for demonstrated dangerousness toward others. However, in the absence of a diagnosed psychiatric disorder the defendant does not fully qualify as an individual who represents a danger of inflicting substantial physical harm on others, as a result of a mental disorder or mental defect.

With regard to the question of danger to self, again he does not have a mental disorder which is necessary to satisfy the current legal standard for a determination of self harm risk. He has no known disorder which if untreated would lead to a deterioration of his condition and there is no known history of acts of self injury.

Respectfully submitted,

E. Robert Cassidy, Ph.D.
Licensed Psychologist
PSY 8505

ERC:jfg

# Jeff Gould, M.D.

**2100 Webster Street, Suite 314, San Francisco, California 94115**
**702 Marshall Street, Suite 410, Redwood City, California 94063**
**Phone (415) 339-8405  Fax (415) 704-3490**

December 24, 2004

Hon. Mary Morgan
Superior Court of California
County of San Francisco
Hall of Justice
850 Bryant Street, Department 22
San Francisco, CA 94103

RE: People v. Francisco Partida
MC No.: 2167376

Dear Judge Morgan:

At the request of the Hon. John Anton, I evaluated Mr. Francisco Partida, a 38-year-old, Mexican-American male, at the San Francisco County Jail for two hours on December 22, 2004. This interview was conducted through a court approved Spanish interpreter, Ms. Carol Rhine-Medina. The following report summarizes the results of that evaluation. Should pertinent information become available in the future, I will gladly prepare a supplemental report.

## REASON FOR REFERRAL

Mr. Partida was referred for evaluation pursuant to California Penal Code Section 1368 to assess his competency to stand trial. He is charged with violating California Penal Code Sections 459, 243.4 (A), 289 (A) and 236.

## OPINION

It is my opinion, within a reasonable degree of medical certainty, that Mr. Partida is currently competent to stand trial.

## COLLATERAL INFORMATION

Mr. Partida's medical records at the San Francisco County Jail were reviewed. Messages were left with the defense counsel assigned to this case, but no other collateral information had been obtained as of the date of this report. Specific collateral information that was requested, but had not been received as of the date of this report includes the following:

1. Description of the reason a competency to stand trial was requested.
2. Criminal complaint.
3. Police Report.
4. Criminal History Record.
5. Collateral interviews with individuals that are familiar with Mr. Partida's personal or psychiatric history.

## INFORMED CONSENT

I interviewed Mr. Partida on December 22, 2004. At the outset of this interview, I notified Mr. Partida that I am a forensic psychiatrist who was ordered by the court to assess his competency to stand trial. I informed him that I would prepare a report summarizing the results of my evaluation and that any information he might provide me could be included in that report. I explained that I would send a copy of the report to the court and that I might be called to testify should there be a trial. I informed him that I would not be providing any treatment services and that he did not have to answer any questions he did not want to. Mr. Partida indicated that he understood these issues and agreed to proceed with the interview.

## ASSESSMENT OF COMPETENCY

### Circumstances Surrounding the Instant Offense

Mr. Partida was asked to describe the circumstances surrounding his arrest. He stated, "Nothing." Mr. Partida was again asked to describe the circumstances surrounding his arrest. He responded, "I had just been drinking and I made a mistake. You know everything already. Why don't you just look at your papers? I've told the detective and everyone everything already. Well, the thing is, I had a beer and I went out of control. That is all." Mr. Partida was informed that I did not have any collateral information regarding his arrest at the time of this interview, and therefore requested that he provide me with this information. He continued to refuse to describe the circumstances surrounding his arrest.

### Understanding of Charges

Mr. Partida was asked what charges had been brought against him. He responded, "It is a mistake. I don't know yet. I'm responsible only for what happened, not for those charges." Mr. Partida was asked again what charges had been brought against him. He responded, "They are all swearing that I raised my hand, but that is a lie. They are the ones raising their hands and swearing. They make you raise your right hand and swear to tell the truth here and lie. I never raised my hand to swear. I don't need to swear to tell the truth. I don't lie. All those witnesses came and raise their hands and swear. I have always been told to tell the truth. I tell the truth. There are a lot of people out there that know me and I have always had witnesses on my behalf, that back up what I say. I don't think this female attorney believes me. I don't think we can do the case together. She doesn't believe what I say."

The defendant was asked again what charges had been brought against him. He stated, "All I know is that it is very serious. The attorney said I could get 15, 20, 25 years. I know it is serious." When asked whether his current charge was a felony or misdemeanor, he responded, "I don't know anything because the attorney hasn't told me anything. She doesn't speak Spanish and I don't speak English. There are a whole lot of lies thrown together." Mr. Partida was asked to describe what lies are being said about him in court. He stated, "I don't know. All I know is what happened. Nobody else seems to know. What I say is right. I've never lied to anyone. My attorney doesn't believe me. I have seven or eight witnesses. I've always behaved myself. What she says is a lie." Once the difference between a felony and misdemeanor was explained to him, the defendant then correctly identified a felony as more serious than a misdemeanor. He defined a misdemeanor as, "Maybe theft." The first time he was asked to define the term felony, the defendant refused to answer. When asked again to define a felony, he responded. "I think the

finger. I think rape with a finger, that is pretty serious. That is the most serious thing they have against me, even though there was consent."

Appraisal of Available Defenses

Mr. Partida was asked to list the possible pleas a person might enter in court. He responded, "There are a lot of things. Attempted murder, there is not enough proof. There is no injury. I never hurt her. She can't prove anything." Mr. Partida was asked again to list the possible pleas a person might enter in court. He stated, "There are several. It would depend. When you committed a crime you have to admit it, but I have not, she is lying. She can't prove anything." The pleas that an individual may enter in court were explained to the defendant. He continued to refuse to respond to this question.

Mr. Partida was asked if a defendant were to admit in court that they had committed a crime, would that be equivalent to a plea of guilty or not guilty. He responded, "Apparently we are already here paying for our crimes. I am here and I have not admitted to doing any crime, but I am still held here." Mr. Partida was asked again if a defendant were to admit in court that they had committed a crime, would that be equivalent to a plea of guilty or not guilty. He stated, "You have to see what type of charge it is. Then the person would have to decide if they accept it or not. I am not going to plead guilty. Well, it depends on the way things are going and how they are likely to come out. I need to see how things develop in my case. I could plead guilty but have to wait and see how my case goes." Mr. Partida defined the term *not guilty* as follows: "The person has not done anything." He initially stated that he did not know the definition of the term *not guilty by reason of insanity.* This concept was explained to him, and he again was asked to provide a definition of this term. He stated, "I am not crazy. It was a mistake I made and I am paying for it now."

Appreciation of Penalties

Mr. Partida was asked what would happen to an individual who was found guilty as charged. He responded, "I don't know. I don't think I am guilty. I just hope that the scale is balanced. There is a lot of discrimination here." He was asked to list the possible sentences a judge could administer to someone, besides himself, who was found guilty. He stated, "I think this is one of the few countries where they put people to death." He was asked to list the possible sentences a judge could administer to someone besides the death penalty. He stated, "I don't know, maybe life." He was asked to define the word *probation.* He stated, "They give you another opportunity. You have to participate in programs and do what they say." When Mr. Partida was asked to list some possible conditions an individual might have to follow while on probation, he stated, "I've never been on probation." Mr. Partida was again asked to list some possible conditions an individual might have to follow while on probation, and he stated, "You can't use drugs. You have to do the programs and not get in trouble." When asked what would happen to a person found guilty, he responded, "They get another chance, but not in my case." He was asked why this concept was not relevant to his case. He responded, "If I am found not guilty I just go back to work and keep proving I made one mistake." He was asked whether or not he would remain in custody if, in his case, he was found not guilty. He stated, "I would be released from jail."

## Appraisal of Functions of Courtroom Participants

Mr. Partida defined the job of the courtroom participants as follows:

| | |
|---|---|
| Public Defender: | "Not a lot. It depends. They work for the state also. I really don't pay much attention to what they are supposed to do. When they say they are going to come see me they should come see me and not just not show up. If they are working on my case they should prove that they are actually working on it. They shouldn't doubt the word of the person they are supposed to be taking care of." |
| District Attorney: | "They always want people to stay inside jail." |
| Judge: | "He is the person who sentences. I don't pay much attention to what he does. He could sentence someone or send them to a program." |
| Jury: | "I have never seen a jury in my courtroom. I don't know. I've never been in jail before." |
| Defendant: | "He is the person held to answer." |
| Witnesses: | "The person that goes to testify about what happened. They told me in my case the victim." |

## Understanding of Court Procedures

Mr. Partida was asked if a defendant were to go to trial, would he necessarily have to testify in his own case. He responded, "If things continue to go as they have up until now I prefer to do it all myself. My attorney does not come see me when she says she will. She does not do what she says she will do. She doesn't believe me. I am better off doing this myself." He was asked if a defendant were to testify, would he necessarily have to report everything that happened in the case. He stated, "No, but I am not going to swear. I don't need to take an oath to say what happened. I don't need any oath to tell the truth. I tell the truth always. If I swear and later it was a lie, things might happen. they will call me a liar. I'm not going to put myself in that kind of situation." When asked what the district attorney would be trying to do during his questioning of him, Mr. Partida responded, "Trying to find out if I am lying or not."

## Understanding of the Legal Process

When asked what he wanted the outcome of his case to be, Mr. Partida responded, "I am paying for what happened now. They hold me here and I have not proven anything against me. He was again asked what he wanted the outcome of his case to be. He stated, "I don't know. It depends. If they give me jail time I will have to do it. The problem is that I want it over with. I want to know as soon as possible, either inside or outside. If I don't have a chance in this case, then I have to pay for it through jail time." He defined the word *evidence* as, "That they prove everything that they say to you." He was then asked if he knew of any evidence that the prosecution might have against him in this case. He stated, "I know everything that I said. They have what I said. She can't prove anything."

When Mr. Partida was asked to define the term *plea bargain,* he responded, "I haven't gotten that far yet." This concept was explained to him and he was again asked to provide a definition. He stated, "I understand I'm headed for that." Mr. Partida was again asked to define the term *plea bargain,* he stated, "My attorney said she can't ask for a deal. She said she was going to ask for one. She is saying the judge wants ten years and the D.A. wants sixteen years and she is not sure who will win out." Mr. Partida correctly stated that a plea bargain is a negotiation process. When asked what is being negotiated in a plea bargain, he stated, "I know exactly what happened and

she can't prove anything. She is not injured. It [the possible sentence] shouldn't be that much. Let's see what happens. Right now nothing is clear. It has not been clarified what will happen. I know both attorneys work for the state. If they want you to tell them the truth and they want to believe you that is another thing. Right now my attorney doesn't believe me and doesn't do what she says she will do." When Mr. Partida was asked what rights he would give up by accepting a plea bargain, he said, "Everything that has to do with wrongdoing." The rights he would give up by accepting a plea bargain were explained. He again refused to explain this concept and responded by proclaiming his innocence in the instant offense. He was asked, if he were to accept a plea bargain, whether or not he still retained the right to a trial. He responded, "They are going to need a trial if they want to give me the time they are saying. There can't be a trial because in order to have a trial they are going to have to have a base of proof. If I just came in and said, 'Oh, this person wants to kill me,' and that is all there is, what can happen? You have to have more than that. I would have to go through with it, there is nothing else that can be done." When asked if he would accept a plea bargain if his attorney offered one to him, he responded, "I don't know because we haven't gotten that far. I'll see when we get to that point. Don't you think we should know by now what is going to happen?" When asked whether he could agree with his attorney if his attorney advised him not to testify, he responded, "It depends. I would have to see how the attorneys work it out. If she is going to do something like what she has done up to now, tell me I have to wait for the witness, or victim, or whatever they are calling, I will do better on my own." When asked how he planned to plead, Mr. Partida responded, "Not guilty."

Ability to Cooperate Rationally with Counsel

Mr. Partida correctly stated the name of his current defense counsel as Kati Isa. He indicated that he did not have confidence in his current attorney, stating, "Well, in the first few months I was confident in her and thought she was doing a good job, but now for the past three months, she doesn't tell me the truth. She doesn't tell me what is going on. She is always acting bothered when we speak. I think the least I could expect of her is to come see me. At least she should come see me whenever I have a court date. Supposedly she is here for that. You have to demand a lot being inside, but if they were being paid they at least have to tell you what is going on. She also lies." Mr. Partida was asked to describe the circumstances in which he believed that his attorney had lied to him. He stated, "They are asking me for a lot of telephone numbers and I think she wanted more. She said she called them. So, I don't think she is protecting me like she should. What I need to know is, these things she asked for, has she spoken with them? What did they say? Why does she need to talk to them? She doesn't explain any of this to me. She lies and says she has spoken to them. Why have I not heard what was said? She needs to protect me better." Mr. Partida was asked to explain how Ms. Isa could protect him better. He stated, "She needs to help me better. These things that are being said about me, I want to know more. I want to know what is going to happen that day, each day in court. I want to know what is going on, what may happen in the future. She never comes to see me before my court dates."

When he was asked how he could assist his attorney, Mr. Partida responded, "I don't know, help them do what? I tell her everything that happened. That is all there is to do. I've told it already to everybody. Where I was working, about my girlfriend. I've told everything. I've always been telling the truth." When asked what he could do if he disagreed with his attorney, he responded, "Let's see in this next court date. That is the time I can tell them how I feel. I haven't said it before. I don't like her to look bad in front of the judge either. If I say that, then he is going to say that I am on my own." Mr. Partida explained that he was aware of his right to request a new attorney. When asked if he had considered this alternative, he responded, "It is the same thing.

The same thing, they all work for the state. They don't work for you one-hundred percent, they work on your case 5% and the rest is for their own benefit. Whether they win or lose will depend on the promotion they get. They just care about their own promotions." Mr. Partida correctly defined the term *confidentiality.*

Ability to Manifest Appropriate Courtroom Behavior
When asked what behavior would be expected of him in court, Mr. Partida responded, "Keep quiet, not move." He was asked if there might ever be an occasion in which he would be allowed to speak out in a courtroom without permission. He responded, "No." He was asked what he thought would happen if he were to speak out or move around in the courtroom without permission. He responded, "Why do you ask me? I would not do that." He was asked again what he thought would happen if he were to speak out or move around in the courtroom without permission. He stated, "They would put me back in the cell again." Mr. Partida denied that he has ever had difficulty manifesting appropriate courtroom behavior. When asked what his reaction is when witness tells lies about him in court, he answered, "The witness took an oath and then lied. I know it wasn't true." He was asked again what his reaction would be if a witness were to tells lies about him in court. He stated, "I would ask to make a statement, ask my attorney." When asked what he should do if he did not understand something the witness said, he answered, "Nothing, my attorney always tells me to keep quiet and not talk."

## BRIEF PSYCHIATRIC HISTORY

Mr. Partida denied any history of experiencing psychiatric symptoms, receiving psychiatric diagnoses or treatment. He has never been hospitalized in a psychiatric facility, taken psychiatric medications, or attempted suicide. Mr. Partida denied any history of alcohol or substance use.

According to the medical records at the San Francisco County Jail, Mr. Partida was evaluated by the Jail Psychiatric Services (JPS) on one occasion. On June 5, 2004, the medical records state, "Mr. Parido [sic] was referred by SFSD for 'odd presentation.' It is unclear of what this consisted; he displayed no odd behavior during our interaction and the SFSD on F-Pod (who had been there for about 2 hours) had not seen anything unusual. He denied any and all hx [history] of psych treatment or self harm behavior or ideation. Future focused thinking was noted. He was informed how to request JPS in the future." Mr. Partida was not given any psychiatric diagnosis and did not receive any treatment.

## CURRENT MENTAL STATUS EXAMINATION

| | |
|---|---|
| Appearance and Behavior: | Mr. Partida repeatedly did not answer the questions he was asked, often proclaiming his innocence for the instant offense instead. No signs of cognitive impairment were present. No abnormal motor activity was noted. |
| Sensorium and Orientation: | Mr. Partida was oriented to person, place, time, and the situation. |
| Pattern of Speech: | Mr. Partida's speech was of normal rate, rhythm, and tone per translator. |
| Affect: | His affect was full and congruent with his mood. |

People v. Francisco Partida

Mood:                    Mr. Partida appeared euthymic (stable mood) throughout the
                         interview.

Thought Process:         Mr. Partida's thought process was linear. There was no evidence of
                         looseness of association or flight of ideas.

Thought Content:         Mr. Partida denied auditory or visual hallucinations. He denied
                         psychotic delusions. He denied current homicidal or suicidal
                         ideation.

## CONCLUSIONS

It is my opinion, within a reasonable degree of medical certainty, that Mr. Partida is currently
competent to stand trial. Although Mr. Partida did not answer most of the questions he was asked
regarding his competency to stand trial, the information he did provide indicates that he has an
adequate understanding of the nature and purpose of the proceedings taken against him and has
the capacity to rationally cooperate with his counsel in preparing and presenting a defense.

Mr. Partida was uncooperative throughout most of this interview, refusing to answer almost all of
the questions asked. He mostly either proclaimed his innocence or stated he did not know the
answer. He repeatedly refused to describe the charges against him and also stated he did not
know what they were. However, when asked to define the term, *felony*, he described some of the
charges against him by stating, "I think rape with a finger, that is pretty serious. That is the most
serious thing they have against me, even though there was consent." Also when questioned
regarding the charges against him, he described an understanding of the possible penalties,
stating, "All I know is that it is very serious. The attorney said I could get 15, 20, 25 years. I
know it is serious." During the brief episodes in which he cooperated with this interview, he
demonstrated the ability to learn concepts he previously did not know. He made the statement
that the concept of *not guilty* did not apply to his case. However, when questioned specifically
regarding the consequences of being found not guilty, he correctly stated that under these
circumstances he would be released from custody.

Mr. Partida indicated that he had difficulty working with his attorney. He indicated that he did
not have confidence in his current attorney. His defense attorney could not be reached as of the
date of this report. Mr. Partida demonstrated a rational thought process regarding other questions
regarding his ability to cooperate with counsel. There was no indication that a mental disease or
defect had an effect on his decision-making process. It is my opinion that his lack of cooperation
with this interview process, and with his attorney, was most likely the product of a dysfunctional
interpersonal style and is not the product of an Axis I, serious mental disorder.

Several factors may improve the likelihood that Mr. Partida will cooperate with his attorney in
the future. If he is given the opportunity to meet with his defense counsel immediately prior to
his court proceedings, and given written and verbal information in Spanish regarding what events
are likely to occur in these proceedings, he may be more likely to cooperate in an appropriate
manner.

People v. Francisco Partida

Page 7

If additional information regarding this matter becomes available in the future, I will gladly prepare a supplemental report.

Thank you for referring this matter to me for evaluation and report.

Respectfully submitted,

Jeff Gould, M.D.

Patricia Pérez-Arce, Ph.D., QME
Clinical Neuropsychologist
CA Lic. PSY 10176
◆

5866 Harbord Drive
Oakland, CA 94611
Tel. 510/601-0166
Fax. 510.658.4764

# NEUROPSYCHOLOGICAL EVALUATION OF FRANCISCO PARTIDA

**Age: 36 years old (DOB: 12/3/66)**

**Education: 9th grade**

**Place of Birth: Tecualá (a ranch), Nayarit, Mexico**

**Primary Language: Spanish**

**Handedness: Right**

**Referred by:    Katherine Isa, Esq.**
**Office of the Public Defender**
**City and County of San Francisco**

**Date of Evaluation: 6/11/05**

**Date of Report: 1/12/06**

## Identifying Information

Mr. Francisco Partida, born in Mexico, is a single male and was referred for a neuropsychological evaluation in Spanish by myself, a bilingual and bicultural neuropsychologist, in order to determine whether he is suffering from central nervous system dysfunction that prevents his rational understanding of the charges against him. Mr. Partida was arrested in connection with two counts of robbery, one count of sexual battery, eight counts of penetration with a foreign object, one count of assault with a deadly weapon, and one count of false imprisonment of a 54 year old woman. According to his attorney, Ms. Katie Isa, the defendant acknowledges the charges of intrusion but denies that his sexual interactions with the victim were forced. He fails to comprehend the seriousness of the charges regardless of how many times this information has been repeated to him.

## Psychosocial History

Mr. Partida was born in a ranch community named Tecualá in the Mexican state of Nayarit. Apparently the ranch is located in the flood path of a river, and thus the ranch tends to get flooded during the rainy season. According to Mr. Partida the water destroyed everything in its path. He was one of 3 children born to his mother, all from different fathers. He never met his father. At the age of 6 years his mother took him with her when she moved to the border state of Sonora. The mother worked as a cook for the

seasonal farm workers throughout the state, and, consequently young Francisco and his mother were, "always moving from ranch to ranch." Mr. Partida does not have any memory of being physically or sexually abused as a child.

Mr. Partida met his siblings when they visited their mother in Sonora. Mr. Partida's mother met a man when he was 20 years old and left to live with her new partner. Mr. Partida lost contact with his mother and occasionally would run into her. In terms of friends, Mr. Partida recalled having only one best friend ever, and this friend drowned in the river. He was between 4 and 6 years old at the time.

Mr. Partida recalled that his mother and family were very poor. He went to a public school and he stopped going after 9th grade. The subject he found most difficult was mathematics. When asked the reason for his not continuing in school he stated that there was no money for the school shoes and the school uniform. In the public schools in Mexico students have to buy their own uniform.

From age 6 to 12 years Francisco Partida spent his time playing soccer. He was a member of a team, and his team participated in championship games for 2 years. When talking about this period, Mr. Partida stated, "I have always been lucky—healthy, no drugs, and there goes one's youth (juventud), playing and talking." From age 17 to 27 he played baseball. He was his team's pitcher and played in championships games.

In Sonora Mr. Partida's first job was selling newspapers in the streets from the time he was 12 and until he was 15 years old. At 17 he began to work as a farm worker picking cotton and grapes and getting paid by the kilo for cotton and by the box for grapes. Regardless of his age and the type of work he did, Mr. Partida related that he would always give or send money to his mother.

At 25 years of age (1991) Mr. Partida began to cross the border into the United States seeking work in the fields. He worked around Calexico for about 3 or 4 years in the watermelon and melon fields. With the extra money he kept for himself he would at times travel to Los Angeles and go to Disneyland. He began to do bricklayer's work and carpentry in Mexicali and Tijuana. Around 1998 he began to take the train up to the San Francisco Bay Area to paint buildings and do gardening work. Eventually he met a Filipina who hired him and recommended him to her friends. Mr. Partida stated that these employers esteemed his work.

According to Mr. Partida, his work schedule, doing carpentry, gardening, or painting, consisted of working 8 to 12 hours a day. Depending on his employment status he would live in single room hotels or in his car. If he needed money his Filipina employer would loan it to him. In the course of the 8 years that he lived in the Bay Area Mr. Partida went to Mexico twice for a couple of weeks each time.

In terms of alcohol or other drugs of abuse, Mr. Partida denied any history of either. He stated that he did not like alcoholic beverages and seldom drank them. But when he did drink he had a low tolerance level and became somewhat disinhibited. He also smoked marijuana once, felt dizzy and did not like it. He also denied any mental health problems.

Mr. Partida describes himself as someone how is very isolative. He mentioned that it was very difficult to have male friends, that they do not exist in his life, that there are few good friends in life. He got married to a 15-year old girl and fathered a daughter who is now 17 years old. Due to economic hardships the couple could not find a place to live and his wife's family took her back and he left. "One cannot force anybody to do anything if one does not have a future…the poverty…" Mr. Partida mentioned that he has always tried to look for his daughter. He feels a lot of sorrow in that he never met her.

Throughout his life Mr. Partida has had many "novias" (girlfriends); he counted between 20 and 25. The relationships would be short-lasting, between 2 or 3 months. He would meet these women at dance halls in the rural areas in Sonora. His longest relationship is the one he has now which has lasted 3 years.

Mr. Partida denies any major illnesses or accidents in his life. No previous legal problems.

## Tests Administered

Test of Memory Malingering
Cancellation Tests: attention and sustained concentration
WAIS-III: Coding, Digit Span, Similarities, Comprehension, Matrix Reasoning, Block Des
PPVT Spanish
WISC-IV Spanish vocabulary
Pruebas de habilidad cognitive-Revisada, Bateria-R: vocabulary, analysis-synthesis
Bateria Neuropsicológica en Español: Logical Memory, FAS, List Learning
Trails A & B
Wisconsin Card Sort
Porteus Mazes
Rey Osterrieth Complex Figure
Finger Tapper
Dynamometer
Thematic Apperception Test

## Mental Status Exam

Mr. Partida came into the first exam session wearing standard jail wear. He was well groomed. He sat in a straight posture. Eye contact with me was sporadic. His responses to open ended questions were brief and to the point. There was some element of suspicion and defensiveness towards the examiner. During the second session Mr. Partida appeared more relaxed and was more communicative. He joked now and then. He showed appropriate eye contact with the examiner. He was administered a test of malingering. He obtained a perfect score, no errors. This plus his cooperative attitude throughout the testing, and the pattern of results confirm that he put his best effort in responding to the tests.

Mr. Partida was vocal about his mistrust of his attorney; he said she was a lier. He stated that he was unsure that she would help him and was willing to take on his own case at court. He expressed lack of understanding of why he was still in jail after one year and about the reasons why his legal case was complicated. He repeated over and over that he had made an error in judgment and accepted the consequences. "Hay que ser hombre y reconocer los errores," (One has to be a man and recognize one's errors.). Mr. Partida stated that when one admits culpability matters should be resolved quickly. However he thought it unreasonable that he should have to serve a jail sentence of 10 years.

There was no evidence of psychomotor acceleration or retardation. Mr. Partida spoke in Spanish fluently and coherently. His affect was pleasant overall. He showed some irritability in his mood. There was no evidence of and he denied ever experiencing hallucinations and delusions. He denied any suicidality or homicidality.

## Testing Results

The results of neuropsychological testing indicated that, in general, Mr. Partida is functioning in the average range when compared to individuals with an equivalent number of years of schooling. His ability to understand and to express himself in the Spanish language is at the level of a high school graduate. The fact that he scored higher in language functions than his actual school experience suggests that he has increased his vocabulary level over the course of his life, i.e., he continued to learn from his environment how to express himself verbally. Mr. Partida also scored in the average range in attention and concentration, visual-motor planning under structured conditions, verbal contextual memory, common sense judgment in familiar situations, and understanding social rules and conventions. Thus, in general Mr. Partida's language processes and his understanding of what goes on in his daily environment are within the normal range for young adults.

Mr. Partida performed in the borderline range of impairment of tests that involved arithmetic computation (5th grade level), visual-spatial construction and manipulation, visual-spatial reasoning, and complex psychomotor speed.

Significant deficits, in the mild range, were evident in certain processes of what is called, in neuropsychological terms, executive functions of the brain. Mr. Partida's impairment is specific to cognitive organization and planning, insight, cognitive flexibility or the ability to switch his attention between two or more demands of the environment, ability to self-correct behaviors when given negative feedback, reasoning in unfamiliar situations, and to see relationships between seemingly disparate objects, situations, or groups, a type of abstract thinking. Mr. Partida was concrete in his thinking.

On a classic test of the cognitive flexibility, the Wisconsin Card Sort, Mr. Partida was immediately informed every time he had obtained an incorrect answer. The normal expectation is that the examinee will change his strategy at solving the task when given corrective feedback, and thus he would be expected to use the correct strategy until the conditions changed. Mr. Partida failed to change his strategy after he had completed four out of six categories and even though he was told 29 times that his strategy was incorrect. The repetition of an incorrect response in spite of its inappropriateness is termed  perseveration in clinical neuropsychology. The research literature gives evidence that a perseverative response, i.e., locked into a dysfunctional response or behavior, is more likely to occur when there is a sense of pressure or high arousal. Mr. Partida tended to perseverate and use a familiar or overlearned strategy or behavior when a task was novel and there was ambiguity as to what was expected.

## Summary Findings

1. Mr. Francisco Partida is functioning within normal limits or slightly higher, given his educational experience, in the expression and understanding of the Spanish language.
2. Cognitive functions that were in the low-average to average range included sustained attention and concentration, common sense judgment in familiar situations, visual-spatial planning under structured conditions, auditory verbal memory, and psychomotor speed.

3. He was mildly impaired on executive functions related to cognitive organization and planning, behavioral control, cognitive flexibility, common sense judgment in novel or unfamiliar situations, and conceptual thinking or the ability to extract levels of meaning or characteristics from concrete situations or objects and apply that knowledge to similar situations or group of objects. These deficits have a significant impact on Mr. Partida's ability to make decisions, organize his behavior, and make rational plans when he is in novel situations. Under duress and/or under the influence of alcohol the negative impact of these deficits on his ability to problem-solve effectively would be exacerbated.

4. The cerebral dysfunction related to executive functions that Mr. Partida exhibits would not be apparent in the course of his normal work and personal life. This is because the type of work he was involved in was repetitive, familiar, and, therefore, overlearned. The people that were part of his world also behaved towards him in predictable ways. His inability to organize his behavior in order to problem-solve effectively in unfamiliar and/or stressful circumstances seemed to have surfaced rarely prior to his being arrested.

5. Mr. Partida's deficits in conceptual thinking and reasoning abilities, the fact that he is very concrete in his thinking and is unable to self-reflect, have the real-life effect of making him unable to accumulate, bring to mind, and integrate prior knowledge in order to make a sound decision in unexpected circumstances. He cannot bring that knowledge to bear when required to analyze a current question about a novel situation. The concreteness of his thinking processes center his universe of knowledge and awareness in himself. He can only understand what is his direct experience.

6. Mr. Partida lacks insight, i.e., the ability to take a step back from oneself and at the same time place oneself in the position of the other person to understand what they might be feeling in order to understand the impact of one's behavior on others and the behavior of others on oneself.   The effect of this lack of insight or concrete self-centeredness explains Dr. Korpi's comment about Mr. Partida's, "remarkable self-focus…stubborn…unreasonable," Dr. Cassidy's comment of Mr. Partida's, "overestimation of his knowledge base in his situation…impaired poor judgment…", Dr. Gould's observation that Mr. Partida, "could not respond to the possible pleas a person can enter." Dr. Gould quoted Mr. Partida as saying, "I'm only responsible for what happened not for those charges…I don't think I'm guilty." Mr. Partida cannot conceive or believe that others, the legal system, the jury would mete out a punishment that is out of his own range of experience. He is stuck in that mind set. That is part of his perseverative thinking pattern and his cognitive inflexibility. And that is part of the reason that he cannot assist in his own defense.

Respectfully submitted,

Patricia Pérez-Arce, Ph.D.
Clinical Neuropsychologist
PSY 10176

COURT OF APPEALS OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

---oOo---

*all read*

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff/Respondent,<br><br>vs.<br><br>FRANCISCO PARTIDA,<br><br>    Defendant/Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)Appellate No.<br>)San Francisco Co. No.<br>)<br>)<br>)<br>) |

**COPY**

ON APPEAL FROM THE JUDGMENT
OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SAN FRANCISCO

THE HONORABLE MARY C. MORGAN, JUDGE

REPORTER'S TRANSCRIPT ON APPEAL

December 27, 2004

*1st*

$\triangle$ *Compet*

*X TW*

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 8 2006

GORDON PARK-LI, Clerk
BY: __MA. BENIGNA D. GOODMAN__
Deputy Clerk

Reported by:  Teanna L. Ward, CSR #11918

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

BEFORE THE HONORABLE MARY C. MORGAN, JUDGE PRESIDING

DEPARTMENT NUMBER 22

---oOo---

PEOPLE OF THE STATE OF CALIFORNIA, )
                                    )
          Plaintiff,                )     SCN 194241
                                    )     Court No. 2167376
vs.                                 )
                                    )
FRANCISCO PARTIDA,                  )
                                    )
          Defendant.                )
                                    )
_____)


## Reporter's Transcript of Proceedings

Monday, December 27, 2004

**APPEARANCES OF COUNSEL:**

     For Plaintiff:

          KAMALA D. HARRIS, DISTRICT ATTORNEY
          850 Bryant Street - Suite 300
          San Francisco, California 94103
          BY: **MARIANNE BARRETT**, Assistant District Attorney

     For Defendant:

          JEFF ADACHI, PUBLIC DEFENDER
          555 Seventh Street - Suite 205
          San Francisco, California  94103
          BY: **STEVE GAYLE & KATY ISA,** Deputy Public Defenders

Reported By:  Teanna L. Ward, CSR #11918

1    Monday, December 27, 2004, a.m. session

2                              ---oOo---

3        **THE COURT:**  Line 604, Francisco Partida.

4        **THE BAILIFF:**  Custody.

5        **MS. BARRETT:**  Good morning, your Honor.  Marianne Barrett

6    for the People.

7        **MR. GAYLE:**  We will need Ms. Isa for that.

8        **THE COURT:**  We will pass that until Ms. Isa is here.

9        Was a doctor appointed in this matter?

10       **MS. BARRETT:**  Yes.  One was appointed down in 20 after the

11   preliminary hearing.

12       **THE COURT:**  Do you remember who it was?

13       **MS. BARRETT:**  I don't.

14       **THE COURT:**  Jacques, can you look and see who it was?

15       **MS. BARRETT:**  Jeffery Gould, your Honor.  I just consulted

16   our file.

17       **THE COURT:**  Okay.  Great.

18                              (Whereupon, the matter was passed and

19                               other unrelated matters were heard)

20       **THE COURT:**  Line 604, Francisco Partida.

21       **MS. BARRETT:**  Good morning, your Honor.  Marianne Barrett

22   for the People.

23       **MS. ISA:**  Good morning, your Honor.

24       **THE COURT:**  Mr. Partida is present in custody.  He is being

25   assisted by the Spanish interpreter.

26       **MS. ISA:**  Katy Isa appearing on behalf of Mr. Partida who is

27   present.

28       **THE COURT:**  I do not have a report from Dr. Gould.  We have

1    a call in to him to find out what is happening.

2        **MS. ISA:**  I did receive a report from him that was faxed to

3    me.  And he has indicated that it's his belief that Mr. Partida

4    is competent.

5        May I approach?

6        **THE COURT:**  Yes.

7        Have you seen this?

8        **MS. BARRETT:**  No.

9                                    (Sidebar discussion held off the

10                                   record)

11       **THE COURT:**  Okay.  I now have in front of me a letter from

12   Dr. Jeff Gould who was appointed to evaluate Mr. Partida.  It is

13   an eight-page report.

14       Is the matter submitted on that report?

15       **MS. ISA:**  Yes, your Honor.

16       **MS. BARRETT:**  Yes, your Honor.

17       **THE COURT:**  All right.  Based upon Dr. Gould's report, I

18   will find Mr. Partida competent to stand trial.

19       Criminal proceedings are reinstated.  Bail remains at

20   $1 million.

21       I will return this copy of this report to Ms. Isa.

22       Mr. Partida, I am going to re-appoint the Public Defender's

23   Office to represent you for free.

24       At the end of your case, the judge may hold a hearing to see

25   if you have enough money to pay the county back for the free

26   lawyer.  If the judge decides that you do have enough money, the

27   judge will order you to pay some or all of the cost of the

28   services of the public defender, and that order can be enforced

1  just like a civil judgment.

2      Do you understand, sir?

3      **THE DEFENDANT:**  Yes.

4      **THE COURT:**  Okay.  Ms. Isa.

5      **MS. ISA:**  Your Honor, I've received the information.

6      We will waive instruction and arraignment, enter pleas of

7  not guilty to all charges, and deny all allegations.

8      **MS. ISA:**  Let me speak with Mr. Partida for a moment?

9                    (Brief pause in the proceedings)

10     **MS. ISA:**  I think we are prepared to waive time, your Honor.

11     **THE COURT:**  Mr. Partida, you have a right to have your jury

12  trial within 60 days of today.  Do you understand that, sir?

13     **THE DEFENDANT:**  Yes.

14     **THE COURT:**  Do you wish to give up that right?

15     **THE DEFENDANT:**  Yes.

16     **THE COURT:**  Okay.  Jury trial date?

17     **MS. BARRETT:**  Sometime in February or March?

18     **MS. ISA:**  February is actually not going to work for me.

19     **THE COURT:**  Well, let's have a date.

20     **MS. BARRETT:**  How about March?

21     **THE COURT:**  Just a moment, please.

22     **MS. BARRETT:**  Sorry.

23     **THE CLERK:**  March 11 for trial.

24     **THE COURT:**  And a pretrial conference?

25     **THE CLERK:**  February 25th -- strike that.  The 24th.

26     **MS. BARRETT:**  That's fine.

27     **THE COURT:**  9:00 a.m.  The defendant is ordered present on

28  both dates.  All motions must be heard prior to or on the date

1   of the pretrial conference.

2        **MS. BARRETT:**   Thank you, your Honor.

3        **THE COURT:**   Thank you.

4        **MS. ISA:**   Thank you, your Honor.

5                              ---oOo---

State of California                    )
                                       )
City and County of San Francisco       )



    I, Teanna L. Ward, Official Reporter for the

Superior Court of the State of California, City and County of

San Francisco, do hereby certify:

    That I was present at the time of the above proceedings;

    That I took down in machine shorthand notes all proceedings

had and testimony given;

    That I thereafter transcribed said shorthand notes with the

aid of a computer;

    That the above and foregoing is a full, true, and correct

transcription of said shorthand notes, and a full, true and

correct transcript of all proceedings had and testimony taken;

    That I am not a party to the action or related to a party

or counsel;

    That I have no financial or other interest in the outcome

of the action.



Dated:  July 31, 2006

                    Teanna L. Ward, CSR #11918

COURT OF APPEALS OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

---oOo---

THE PEOPLE OF THE STATE OF CALIFORNIA,

      Plaintiff/Respondent,

vs.

FRANCISCO PARTIDA,

      Defendant/Appellant.

)
)
)
)
)
)
)Appellate No.
)San Francisco Co. No.
)
)
)
)

ON APPEAL FROM THE JUDGMENT
OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE

REPORTER'S TRANSCRIPT ON APPEAL

OCTOBER 31, 2005

Volume IV

Pages 70 - 79

ENDORSED
F I L E D
San Francisco County Superior Court

JUL 2 6 2006

GORDON PARK-LI, Clerk
BY: MA. BENIGNA D. GOODMAN
Deputy Clerk

Reported by:  Kent S. Gubbine, CSR #5797

1          SUPERIOR COURT OF CALIFORNIA

2            COUNTY OF SAN FRANCISCO

3   BEFORE THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE PRESIDING

4              DEPARTMENT NUMBER 27

5                 ---ooXoo---

6   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
7              Plaintiff,            )   SCN 194241
                                      )   Court No.
8   vs.                              )
                                      )   **MOTIONS**
9   FRANCISCO PARTIDA,               )
                                      )   **VOLUME IV**
10             Defendant.            )
    _____  )   Pages 70 - 79
11

12

13

14        **Reporter's Transcript of Proceedings**

15            Monday, October 31, 2005

16

17  **APPEARANCES OF COUNSEL:**

18        For Plaintiff:

19            Kamala Harris, District Attorney
              850 Bryant Street - Suite 300
20            San Francisco, California 94103
              BY:  MARIANNE BARRETT, Assistant District Attorney
21

22        For Defendant:

23            JEFF ADACHI, PUBLIC DEFENDER
              555 Seventh Street - Suite 205
24            San Francisco, California  94103
              BY:  KATIE ISA, Deputy Public Defender
25

26

27  Reported By:  Kent S. Gubbine, CSR #5797

28

72

1    Monday, October 31, 2005                    9:53 o'clock p.m.

2                        ---ooXoo---



3       **THE COURT:**  We will go on the record in People versus

4    Francisco Partida.

5       And the record will reflect that both counsel are present.

6    Mr. Partida is present and being assisted by the certified

7    Spanish interpreter.  And the record shall reflect that the

8    jurors and alternate jurors are not present in Court.

9       Ms. Isa.

10      **MS. ISA:**  Your Honor, it came to my attention this morning

11   based upon a conversation with my expert who is an

12   neuropsychologist as the Court knows, that it was her belief

13   that Mr. Partida is not competent in at least a couple of the

14   areas for which the defendant should be competent to stand

15   trial.

16      I had sent her three, the prior 1368 evaluations over the

17   weekend at her request prior to the cross-examination that was

18   to be conducted this morning, and in reviewing them, she noted

19   not only that the three psychologists were not Spanish-speakers,

20   but they did not use an interpreter as part of their evaluation.

21   She reviewed their findings and supported much of my believe

22   during the many months that I have been working with Mr. Partida

23   that there is a impairment which renders him incompetent.

24      So I felt it incumbent upon me to bring this issue to the

25   Court prior to trial or before this trial continues any further

26   because I do think this is a serious issue that needs to be

27   addressed.

28      **THE COURT:**  So you yourself are also declaring a doubt?

1     **MS. ISA:** I also have a doubt, especially based upon my

2 conversation with her. It is bolstered by my conversation with

3 her. I have had it for a long time, but because I am not a

4 psychologist it is not something that I could identify.

5     **THE COURT:** Well, the Court also in dealing with Mr. Partida

6 does have a doubt as well, and the Court is going to suspend the

7 criminal proceedings at this time; however, not discharge the

8 jury. The Court is going to appoint Dr. Rowland Levy who is on

9 our panel and who I believe can evaluate the defendant and

10 prepare a report very quickly.

11     And we have a phone call into him. If Dr. Levy is not

12 available for some reason, the Court will contact counsel and

13 seek further input as to what should be done at this point. I

14 am wondering whether I should order the return on Tuesday

15 afternoon?

16     **MS. BARRETT:** I think that would be ideal.

17     **THE COURT:** Tuesday at 2:00 in this department, and Mr.

18 Partida is ordered present. So that would be November 1st, 2:00

19 o'clock in the afternoon, and hopefully the report will be ready

20 and we can proceed further.

21     And as to the jury, the Court will not discharge the jury

22 and will order them to return at 10:00 o'clock on Wednesday

23 morning.

24     **MS. BARRETT:** And, Your Honor, as to the continued 402

25 hearing with Dr. Perez-Arce that is scheduled now for 9:00

26 o'clock, November 3rd; is that correct?

27     **MS. ISA:** She is coming back November 3rd. I did not give

28 her a time specifically because I wanted to see what the

1  Court -- I didn't know the Court's schedule.  She is available

2  in the morning.

3      **THE COURT:**  We can set it for 9:00 o'clock on November 3rd.

4  Obviously until the 1368 issue is resolved, we cannot proceed

5  with any of the substantive issue.  Although counsel will

6  stipulate that we have a few juror issue that we can proceed

7  with this morning?

8      **MS. ISA:**  That's fine.  The only other, just to make sure

9  for the record, that Dr. Levy when he does evaluate Mr. Partida,

10  that he does use an interpreter just so that is on the record

11  and he is aware of that.

12      **THE COURT:**  It is important that Dr. Levy use a Spanish

13  interpreter.  Apparently the other evaluations were conducted in

14  English which is not Mr. Partida's native language and no

15  Spanish interpreter was available.  So, yes, that is correct.

16  Okay.

17      **MS. BARRETT:**  Thank you.

18      **THE COURT:**  So off the record.

19      (Recess taken.)

20      **THE COURT:**  Ms. Isa had another idea regarding the selection

21  of a doctor for the 1368 evaluation.

22      **MS. ISA:**  I just wanted to make it clear for the record that

23  as part of my conversation with Dr. Perez-Arce, I think it's

24  clear that the incompetency that she disclosed or found is

25  related to a brain dysfunction, not a mental health disorder

26  such bi-polar or schizophrenia, and I think it would be

27  important in order to properly diagnose it or properly evaluate

28  his competency in that area, that the doctor that is evaluating

1    him is a neuropsychologist or is familiar with brain

2    dysfunctions and can adequately give tests or whatever needs to

3    be done to make that determination.

4        And in an abundance of caution, so we are not just putting a

5    rubber stamp on previous competency evaluations which have found

6    him to be competent, and in fact there was a very short

7    conversation in English which is not his native language, I

8    think I would request that a neuropsychologist be appointed,

9    that this not be rushed, that adequate time be given to this

10   evaluation.

11       I think it is a difficult one to diagnose and it is one that

12   if this is rushed by a doctor who is not experienced in that

13   area, will again go unnoticed and we will not have a proper

14   evaluation.

15       And so it's my request that a neuropsychologist be

16   appointed, and if they are not available to do it within the

17   next day, so be it.  I think it is still important to make

18   certain the competency evaluation is done properly and by a

19   qualified psychologist.

20       I wanted to state that for the record.

21       **MS. BARRETT:**  Your Honor, given the fact that this is the

22   third 1368 evaluation done on this particular defendant and

23   given that the issue really is whether or not he competently

24   comprehended the English language on his prior evaluations, I

25   think the fact that the Court is ordering that this current

26   evaluation be done with the assistance of a Spanish interpreter,

27   I think that is going to resolve this issue once and for all.

28       Dr. Levy is very experienced with examining defendants for

1   trial competency.  I think his opinion as an expert is more than

2   adequate.  I am not aware at all of this requirement under 1368

3   that a neuropsychologist be appointed for determining trial

4   competency.

5       So given the fact that he has been evaluated by a number of

6   professionals before and has been found competent, given the

7   fact that the language issue will be entirely addressed this

8   time, I think it is more than adequate and I think a

9   neuropsychologist is not required at this point.

10      **THE COURT:**  Let's go off the record for a moment.

11      (Brief recess taken.)

12      **MS. BARRETT:**  Your Honor, may I add one more thing to the

13  record?

14      **THE COURT:**  Let's go on the record.

15      **MS. BARRETT:**  I would like to point out also that during the

16  prior 1368 evaluations, there have been no indications by those

17  professionals that language was even a problem.  So I think the

18  Court entertaining this 1368 request at this point is being done

19  in an abundance of caution to absolutely ensure the defendant's

20  right to put any potential issue regarding the interpreter

21  aside.

22      But I just wanted to make it a point that this was not

23  raised previously by the examining therapist, and I am sure that

24  if it was problem for them when they evaluated the defendant, it

25  would have been brought to the Court's attention.

26      **THE COURT:**  Anything else, Ms. Isa?

27      **MS. ISA:**  No.  I think I stated everything I needed to state

28  for the record.

77.

1      **THE COURT:**  In looking at our panel of court-appointed

2    doctors, Dr. Rowland Levy has various specialities.  He is

3    specialized in the following categories.  In fact in most of our

4    categories:

5      He is a specialist in post-traumatic distress disorders,

6    Drug abuse disorders, organic brain injury disorders,

7    psycho-pharmacological issues, dissociative disorders and

8    multiple personality disorders, sexual offenders, schizophrenic

9    disorders, dangerousness, psychotic and effective disorders,

10   personality disorders, HIV and dementia, malingering,

11   depression, mood disorders, and major psychiatric disorders and

12   violence.

13     He is well qualified to perform this examination, and I am

14   hopeful that he will soon call back and tell us that he can

15   perform the evaluation.  I trust that with the assistance of the

16   Spanish interpreter, that he will be able to do a very good job

17   with the evaluation.  And I do not see any need for a

18   neuropsychologist at this time.

19     **MS. ISA:**  Just for the record I don't see cognitive

20   disorders listed in the areas in which he has expertise by the

21   Court, and I think that is the area to which I am referring.

22     **MS. BARRETT:**  I believe, Your Honor, did mention an

23   expertise in organic brain disorders?

24     **THE COURT:**  Organic brain injury disorders.  I don't see,

25   quote, "cognitive disorders," close quote, as even listed on our

26   specialities.  So in any event, Dr. Levy is highly competent and

27   we will see if he can assist us in these evaluation.

28     Anything else for the record?

1    **MS. BARRETT:**  No.

2    **MS. ISA:**  No.

3    **THE COURT:**  No.  Okay.  We will go off the record.

4    (Whereupon, the proceedings were adjourned at 10:59 o'clock

5    a.m.)

6                          ---ooXoo---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | State of California ) |
| 2 | County of San Francisco ) |

3

4

5      I, Kent S. Gubbine, Official Reporter for the Superior

6  Court of California, County of San Francisco, do hereby certify:

7          That I was present at the time of the above proceedings;

8          That I took down in machine shorthand notes all proceedings

9  had and testimony given;

10         That I thereafter transcribed said shorthand notes with the

11  aid of a computer;

12         That the above and foregoing is a full, true, and correct

13  transcription of said shorthand notes, and a full, true and

14  correct transcript of all proceedings had and testimony taken;

15         That I am not a party to the action or related to a party

16  or counsel;

17         That I have no financial or other interest in the outcome

18  of the action.

19

20

21  Dated:   July 25, 2006

22

23  _____

24            Kent S. Gubbine, CSR No. 5797

25

26

27

28

1        COURT OF APPEALS OF THE STATE OF CALIFORNIA

2                FIRST APPELLATE DISTRICT

3                    ---oOo---

4   THE PEOPLE OF THE STATE OF
    CALIFORNIA,
5
             Plaintiff/Respondent,
6
    vs.                                )Appellate No.
7                                      )San Francisco Co. No.
    FRANCISCO PARTIDA,
8
             Defendant/Appellant.
9   _____

10

11                ON APPEAL FROM THE JUDGMENT
         OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
12        IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

13

14       THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE

15

16            REPORTER'S TRANSCRIPT ON APPEAL

17                  November 7, 2005

18                Supplemental Transcript

19                    Pages 1 - 25

20

21

22

23

24

25                                    ENDORSED
                                       FILED
26                             San Francisco County Superior Court

27  Reported by:   Kent S. Gubbine, CSR #5797    OCT  3 2006

28                                    GORDON PARK-LI, Clerk
                                      BY: ___Tawanna Edwards
                                               Deputy Clerk

1                    SUPERIOR COURT OF CALIFORNIA

2                    COUNTY OF SAN FRANCISCO

3  BEFORE THE HONORABLE CHARLOTTE WALTER WOOLARD, JUDGE PRESIDING

4                    DEPARTMENT NUMBER 27

5                       ---ooXoo---

6  PEOPLE OF THE STATE OF CALIFORNIA,)
                            )

7            Plaintiff,     )  SCN 194241
                           )  Court No.

8  vs.                    )
                           )  **SUPPLEMENTAL TRANSCRIPT**

9  FRANCISCO PARTIDA,      )

10           Defendant.     )
                           )  Pages 1 - 25

11

12

13

14            **Reporter's Transcript of Proceedings**

15             Monday, November 7, 2005

16

17  **APPEARANCES OF COUNSEL:**

18      For Plaintiff:

19          Kamala Harris, District Attorney
          850 Bryant Street - Suite 300

20          San Francisco, California 94103
          BY:  MARIANNE BARRETT, Assistant District Attorney

21

22      For Defendant:

23          JEFF ADACHI, PUBLIC DEFENDER
          555 Seventh Street - Suite 205

24          San Francisco, California  94103
          BY:  KATIE ISA, Deputy Public Defender

25

26

27  Reported By:  Kent S. Gubbine, CSR #5797

28

```
 1  Monday, November 11, 2005                    2:06 o'clock p.m.
 2                        ---ooXoo---
 3      THE COURT:  Let's call the case.  This is People versus
 4  Francisco Partida.  The record will reflect both counsel are
 5  present.  The jurors and alternate jurors are not present.  And
 6  the defendant is not present.
 7      Do you waive his appearance for these proceedings?
 8      MS. ISA:  Yes, Your Honor.
 9      THE COURT:  Thank you.  Why don't we address the
10  information first.
11      MS. BARRETT:  Your Honor, I do have an amended information
12  to conform to proof.  I must say I had reviewed the information
13  prior to starting the trial a number of times, and there have
14  always been eight counts of 289.  And from the very beginning of
15  this case there has been no question that five related to
16  vaginal penetration and three related to anal penetration.  It
17  was clear as early as the inspector's interview with the
18  defendant, and that certainly is what proof we produced at the
19  preliminary hearing.
20      And in putting this information together, that was the
21  People's intention, that five would go towards the vaginal
22  penetration and three counts were for the anal penetration.  And
23  despite my proof reading of the information, I failed to see
24  that it specifically indicated fingers into the vagina for all
25  eight counts.  So I have prepared an mended information changing
26  Counts IX, X and XI to correctly reflect fingers in anus as the
27  evidence adduced.
28      THE COURT:  And not fingers in vagina?
```

1  **MS. BARRETT:**  Correct, so that the only amendment would be

2  that one word n Counts IX, X and XI, the word "vagina" has been

3  change to "anus."

4      **THE COURT:**  Ms. Isa.

5      **MS. ISA:**  I will submit on that.

6      **THE COURT:**  Okay.  It does conform to proof and there is no

7  prejudice by allowing the amendment at that time.

8      Do you have an amended information typed?

9      **MS. BARRETT:**  I do, Your Honor.  If I may file it at this

10  time?  The original is on top.

11     **THE COURT:**  Please.  And all the other charges and

12  allegations are identical to the information we have been

13  working off of?

14     **MS. BARRETT:**  Exactly.

15     **THE COURT:**  So shall we next turn to the issue regarding Dr.

16  Patricia Perez-Arce who testified at the hearing outside the

17  presence of jurors on behalf of the defense?

18     **MS. ISA:**  Sure.  I guess just to make sure the record is

19  correct, we actually spoke about this and the Court made its

20  ruling on Friday.  That's why we closed today.  We just

21  indicated we would put it on the record after, after the close

22  of proceedings this morning.

23     **THE COURT:**  Yes.

24     **MS. ISA:**  I just wanted to make sure the record is clear.

25     **THE COURT:**  Yes, the Court did off the record indicate it

26  was not going to allow the testimony of Dr. Patricia Perez-Arce,

27  and perhaps you would like to articulate why you believe it was

28  admissible, relevant and appropriate at this proceeding?

1        **MS. ISA:**  Your Honor, with respect to her testimony, I was

2   seeking to admit on the issue of specific intent as to both the

3   burglary charge as a specific intent crime as well as the 289(a)

4   which is a specific intent crime, and I believe that it would be

5   relevant that any testimony that a defendant suffered from a

6   mental disease or defect is admissible on the issue of whether

7   or not they formed, they actually had the required intent.

8        And in this case there is a specific intent required as to

9   both the burglary charge as well as the 289(a).

10       Additionally the People have alleged, chosen to allege, the

11  personal use of a knife.  And in that allegation it requires

12  pursuant to the jury instructions, Caljic jury instruction, it

13  requires that -- and I am referring to 17.16 and 17.19.1.  The

14  first, being personal use of a deadly or dangerous weapon; the

15  second being the person use of firearm or deadly weapon

16  specifically with respect to sex crimes.

17       In both of those the People have to show that the defendant

18  personally used the deadly weapon.  And the definition of that

19  later in the instruction indicates that he must have

20  intentionally displayed it in a menacing manner.  And I think

21  that his intent with the displaying of that knife is certainly

22  at-issue and it would certainly be an area in which, whether or

23  not he formed that intent, would be an issue for the province of

24  a jury to decide.

25       And Ms. Perez Arce's testimony would directly go to that

26  issue, her testimony with respect to his mental defects to use

27  the terms written in Penal Code Section 28.  It exactly relates

28  to whether or not he formed the intent to display that knife in

6

1    a threatening manner on that day.

2        So I believe it should be admissible on those issues, and I

3    think it is relevant, and I think under the Penal Code such

4    testimony should be included on those issues.

5        We just for the record, we did not seek to introduce it

6    under the issue of consent, the mistaken belief of consent,

7    because there is case law which describes that introduction, the

8    People v Castillo, C-a-s-t-i-l-l-o, case.

9        **THE COURT:**  It is found at 1987, 193 Cal App 3rd 119.

10       Ms. Barrett.

11       **MS. BARRETT:**  Your Honor, in response, first of all I found

12   Dr. Perez-Arce's opinions unreliable.  I don't believe she

13   conducted as thorough an evaluation of the defendant as she

14   could have or should have.  She did not consult any school

15   records.  She did not interview any of his family or friends.

16   She only interviewed the defendant and assumed everything he

17   said was truthful.

18       So number one, I fault her opinion.

19       Secondly, her opinion was that he had this organic brain

20   disorder that impaired his executive functions.  She also found

21   that he had a mild cognitive disorder.  And as I cross-examined

22   her, it was very clear, she admitted that "mild" under the DSM

23   TR IV was not a significant impairment at all.

24       I would submit that given her, even her opinion, assuming it

25   was an accurate evaluation of the defendant, it did not rise to

26   the level such that her testimony would assist the trier of fact

27   in this case.

28       Under 801 Subsection A of the Evidence Code, before an

1    expert can testify, it has to be shown that their testimony

2    would assist the trier of fact.  In this particular case, given

3    these facts that we have heard in this trial, I don't believe

4    there is much confusion as to what the defendant intended by his

5    actions, both his actions and his words at the time he was

6    committing these offenses, make his intent quite clear.

7        Under 352 my main argument was that allowing Dr. Perez-Arce

8    to testify would unduly confuse the issues.  It would be unduly

9    prejudicial to the People's case.  Its prejudicial value

10   entirely outweighs its probative value.  And for those reasons I

11   objected to her testimony.

12       In additional, under the Castillo case, People versus

13   CAstillo, a 1987 case at 193 Cal App 3rd 119, even if the

14   defense were to want to argue that somehow the defendant was

15   under the mistaken, reasonable and good faith belief that the

16   victim was consenting, that case specifically holds that mental

17   illness is not an appropriate basis for providing Caljic 10.65.

18       So for all of those reasons I believe the Court made the

19   appropriate decision in not allowing this doctor to testify.

20       **THE COURT:**  Anything else, Ms. Isa?

21       **MS. ISA:**  I would just submit that.  I think any question in

22   her opinion goes to the weight.  It doesn't go to its

23   admissibility.  I think that has always been the province of the

24   jury to decide what weight they are going to give a witness's

25   testimony.  And I do think it was relevant on the issues that I

26   stated.  And there would be no undue prejudice to the People's

27   case.

28       I will submit.

1    **THE COURT:** So the matter being submitted, the Court having

2    considered the testimony of Dr. Perez-Arce agrees with the

3    People that under a 352 analysis her testimony is far more

4    prejudicial to the People's case than it was probative of any

5    issue.

6        The evidence is presented in this case both from the

7    victim's testimony and from the tape of interview of the

8    defendant after he was arrested, clearly indicates that he knew

9    what he was doing was wrong. He indicates that the knife was

10   used as a joke. The jury can consider that as any lay person

11   can. Dr. Perez-Arce would not offer any additional probative

12   evidence on that particular specific intent element.

13       He indicated apparently that he was in the victim's

14   apartment to take a shower. Likewise the jury can consider as

15   lay persons that testimony and Dr. Perez-Arce would not offer

16   anything at all relevant in terms of his specific intent to the

17   burglary charges.

18       So the Court considered Dr. Perez-Arce's testimony to be not

19   probative to the issues that the jury must decide, and therefore

20   is inadmissible.

21       So should we discuss, why don't we try the tying and binding

22   instruction first and see if -- the People had proposed a tying

23   and binding instruction, and I have not had the opportunity to

24   hear any argument on that issue or whether there was any

25   opposition to the instruction as phrased.

26       Do you have that before you, Ms'. Isa.

27   **MS. ISA:** I do. One moment.

28   **THE COURT:** It states in the form currently presented by the

9

1   People, quote, "binding of a victim's head with a blind fold,

2   covering her eyes so that she cannot see, increases a victim's

3   vulnerability and falls within the prohibition on tying or

4   binding of a victim during the commission of a felony sexual

5   offense.  And the citation is People versus Campbell, a 2000

6   case, found at 82 Cal App 4th, 71.

7       **MS. ISA:**  I would object to increasing a victim's

8   vulnerability.  I think the purpose of this instruction is just

9   to let them know that the blind folding falls within that

10  prohibition.  I don't think increasing the vulnerability -- I

11  know that comes from a case because they are trying to explain

12  why they feel it is appropriate.

13      And I think it is not -- well, it is during the commission

14  of a felony sexual offense, but I don't think it applies to

15  243.4, sexual touching.  I think it only applies to the 289 as

16  charged.  So that should be clear as well.

17      **MS. BARRETT:**  Your Honor, we do not have a tying or binding

18  allegation alleged along with Count III, the 243.4.  We only

19  have it alleged on the forcible sex crimes.

20      **MS. ISA:**  Right.  As I was saying, I don't know if we should

21  change that, during the commission of digital penetration or

22  however you want to do it.

23      **THE COURT:**  Well, technically she is correct.

24      **MS. BARRETT:**  Do you want to say during the commission of a

25  felony forcible sex.  I mean however you want.  I mean I have no

26  problem with this being curtailed accordingly as we have it

27  alleged.  But I think a very clear word is alleged where it is

28  applicable.  It's not even going on the jury verdict forms

1    unless it is relevant to that particular form.

2        **MS. ISA:**  That's true.  My only real objection would

3    increasing the victim's vulnerability.

4        **MS. BARRETT:**  This is out of a case, Your Honor.  I think it

5    is helpful for the jury to understand why it applicable.

6        **MS. ISA:**  I don't think it matters as to why as long as it

7    is there.  The jury is just told to follow it.

8        **MS. BARRETT:**  Submitted.

9        **THE COURT:**  Well, I agree with Ms. Isa on this one.  I don't

10   think the jury needs to know why this particular allegation is

11   included, so I will instruct counsel to delete "increases a

12   victim's vulnerability and."  And then the comma after "she

13   cannot see," there is a comma, we can take that comma out.

14       **MS. ISA:**  Right.

15       **THE COURT:**  And delete the reference to the case.

16       **MS. ISA:**  Okay.

17       **THE COURT:**  And if you could please prepare a clean copy for

18   the jury?

19       **MS. BARRETT:**  Certainly.

20       **THE COURT:**  Thank you.  Okay.  Shall we turn to the mistaken

21   belief and consent instruction?

22       **MS. ISA:**  I have prepared an instruction.  I have both the

23   original 10.65 and I started to take out the brackets.  I have

24   provided one to counsel if counsel wants a copy.

25       **THE COURT:**  This Caljic 10.65, belief as to consent for

26   penetration by foreign object.

27       **MS. BARRETT:**  I object to use of 10.65.  I think the case

28   law is quite clear in this area, specifically the case of People

1   versus Williams which is a 1992 case at 4 Cal 4th 354.  This is

2   a case out of our own Superior Court, Judge Timothy Riordan.

3   That case held that there was no substantial evidence warranting

4   an instruction on reasonable and good faith but mistaken belief

5   of consent.  It was sexual intercourse in that case.

6       The biggest point of that case held that when there was no

7   substantial evidence warranting an instruction on reasonable and

8   good faith but mistaken belief of consent, an instruction should

9   not be given.  And that is exactly what happened in that case.

10  There has to be substantial evidence giving rise to the

11  instruction.

12      In this particular case, I would submit to the Court that

13  there is absolutely no substantial evidence supporting this

14  conclusion.  This defendant not only committed this offense

15  inside the victim's apartment without her permission, but he

16  surprised her.  He blind folded her.  He committed this offense

17  at knife point.  He committed it in conjunction with threats to

18  break her neck.  He committed it in part before she tried to

19  escape and in large part after she tried to escape.  He held her

20  against her will overpowering her.  The size difference was such

21  that the victim felt overpowered.

22      And under the facts before this Court, I cannot imagine any

23  reasonable person in the defendant's shoes believing that the

24  victim was consenting in this case.

25      **MS. ISA:**  Are you done?

26      **MS. BARRETT:**  Yes.

27      **MS. ISA:**  First of all if I could respond with respect to

28  Williams.  The key component that the defense offered in that

12

1    case was one of actual consent.  And the holding of that case

2    was that where the defense is actual consent and not the

3    defendant was mistaken in his belief that there was consent, the

4    Mayberry instruction should not be given.

5        And I think the facts of that case are quite different

6    because the defense was proffering that this didn't happen.  I

7    didn't do these things.  I didn't rape.  It wasn't that I was

8    mistaken as to her belief and consent.

9        I think the more pointed case is going to be the Mayberry

10   case and I think that if the Court reads the Mayberry case, the

11   Court would find facts that are actually quite similar to this

12   case in that it may not be, it's not for -- I think the Court

13   has a duty to give this instruction when there is evidence of

14   equivocal conduct that could be interpreted and give rise to a

15   reasonable and good faith belief and consent.

16       And in this case there are some facts.  We have to look at

17   this case as the three hour time frame in which it occurred.

18   The digital penetration happened in the last two hours where

19   there was not a knife used, where there were no threats made.

20   And there were no -- and just to be clear, this reasonable good

21   faith belief and consent 10.65 only applies to the digital

22   penetration -- are the only charges to which it applies.

23       We are not talking about consent to be in the apartment or

24   any of the facts that proceeded it.  And I think that there is

25   some equivocal conduct such as when she does say no versus to do

26   some conduct and he doesn't do that conduct.  Or when she said

27   something hurts and he stops.  And when she says it's fine, yes.

28       And I think that the instruction itself deals with the issue

1   of whether or not that ambiguous conduct is the product of force

2   or violence and duress and menace because it directly addresses

3   that.   If it felt that any time there is ambiguous conduct that

4   is the result of force or violence or duress, this instruction

5   should not be given, there would be no need to put that section

6   in brackets in the 10.65 instruction.   But certainly they do.

7   And that is for the jury to decide whether, whether or not this

8   ambiguous conduct was the result of these, this force, this

9   duress or this violence.

10      And that is a decision that they are to make, and certainly

11  that would be part of instruction the Court would give.   But I

12  think that even People versus Castillo which indicated -- I am

13  sorry, we raised that early.   It 193 Cal App 3rd 119, that 10.65

14  should be given sua sponte when the defense is raised to a

15  charge of forcible penetration with an object.

16      In People versus Mayberry you had a situation where the

17  victim and the defendant in that case are outside of a liquor

18  store and there was violence that occurred according to the

19  victim's statement.   He hit her.   He yelled obscenities at her.

20  The threatened to hurt her if she didn't go with him.   She went

21  to the store.   She bought cigarettes.   She came outside.   He

22  made her get up and walk several blocks.   This is based on

23  threats.   He took her to the apartment.   He barricaded the door.

24  He talked to her for awhile and then the sexual acts began that

25  she said were not the consensual.

26      She said that during the sexual act she was struck by him

27  because she did not physically resist.   And then another person

28  came home, a co-defendant came home, and he grabbed her and hit

14

1    her in the face.  And the defendant testified in that case that

2    this was, that he believed that this consensual.  There were

3    issues as to whether or not she was hit, though there was

4    testimony that friends saw her the next day and she had bruises

5    and a swollen face.

6        And in that case, although her testimony could reasonably be

7    interpreted differently, there was some evidence that showed he

8    could have acted under the mistake of fact of her consent to

9    those sexual acts.  And it was her failure to physically resist

10   or to say no to him that could have led to that.

11       This doesn't mean that all of us here agree and believe, oh,

12   yes, I see, we were 100 percent agreed with what the defendant

13   is proffering.  That is not the issue.  And in that case, the

14   Mayberry instruction was -- should have been given, and the

15   Court erred by not giving that instruction.

16       And I think that the facts of that case are completely

17   analogous to the facts we have here.  We have a situation where

18   there was entry into the apartment.  The allegation is that

19   there was force used in the beginning and when she tried to

20   escape, force used, but there was conduct after that last act of

21   force which could be equivocal.

22       And it is based on that that I am seeking to introduce this

23   10.65 instruction.  And I do believe that the qualification

24   within the instruction, that if you believe as a juror the

25   ambiguous conduct is a product of coercive force, then you can

26   find that that is not a reasonable and good faith belief.  And I

27   think that is cured by the instruction for the jury to

28   determine.  But I think the facts here are more evidence than

15

1    that in Mayberry because here when she does say no, the act is
2    not done.  And again we are not proffering actual consent.  We
3    have never said that.  And that's the distinction between the
4    Williams -- the big distinction between the Williams, because in
5    that case that was the defense.

6        **THE COURT**:  Can you articulate for the record what the
7    substantial evidence would be in this particular case?  Because
8    what I have done is I have listened very carefully to the
9    victim's version and also examined the taped statement, looking
10   for that substantial evidence.

11       So can you articulate for the record the substantial
12   evidence that defendant had a reasonable and good faith mistake
13   of fact regarding the consent to the sexual penetration?

14       **MS. ISA**:  With respect to the sexual penetration, that did
15   occur in the last -- we are not sure exactly what time in the
16   last hour and a half.  Sometime after she tried to run and came
17   back.  And with respect to that time period, there was testimony
18   that he was kissing her and he said, do you like it and he was
19   touching here and saying do you like this and she said it was
20   fine.

21       There was testimony that he digitally penetrated her and she
22   did not say no.  And there was testimony that after that point
23   he asked if he could kiss her in the vaginal area and she said
24   no and he did not comply.  Then following that digital
25   penetration continued.  She did not resist and she did not say
26   no, well knowing when she said no a moment earlier, that he did
27   not do that which he asked her to do.

28       In the defendant's statement he indicated she never asked

1    him to leave.  He indicated --

2        **THE COURT:**  Well, actually she did.  Well, not in the

3    defendant's statement.

4        **MS. ISA:**  No, in his statement he indicated she didn't ask

5    him to leave.  He indicated --

6        **THE COURT:**  Well, didn't he indicate in his statement that

7    she wanted to go to church and he said, no, wait until it gets

8    dark?

9        **MS. ISA:**  That's different.  That's with respect to earlier

10   on.  She had said she had to go the church.  And he said, I

11   know, but can you wait until later and he said she said okay.

12   You can go but will you wait for me until it is dark and she

13   said okay.

14       And with respect to -- first of all I think that in and of

15   itself rises to a level of equivocal conduct.  And based solely

16   on the evidence that was in Mayberry which was a case that this

17   instruction came out of, that's enough.  The equivocal conduct

18   of her saying not saying no, but here we actually have a no.

19   And then when he continues to do penetration she doesn't say to

20   stop.

21       And -- and I think that despite the way it appears in the

22   transcript, although Mr. Partida -- or despite the way it has

23   been phrased, I think that although Mr. Partida admits there was

24   wrongdoing in stealing in January and this case, he never says

25   he did something wrong with respect to the sexual act.  He never

26   once says that in the transcript.  The Only thing he says is I

27   was wrong.  I betrayed my boss' trust.  I used the key.

28       He never said that what he was doing -- in fact if the Court

1    listens to the transcript, when asked if he did certain things
2    like, did you kiss her?  Yes, absolutely.  That's not the
3    indication of someone who is trying to hide something.  Did you
4    put your fingers into her?  Yes.  Did you kiss her ears?  Yes.
5    Did you kiss her armpits?  Absolutely.

6        It's just an affirmative response.  I think that also shows
7    evidence of a misinterpretation or ambiguous conduct.  And based
8    on Mayberry you don't need more than that.  I think that is
9    substantial enough for this jury instruction to be introduced.

10       Your Honor, I mean this is the only defense in this case,
11   and to deprive the defense of this instruction, it's been
12   reversible error in many other cases and I think that this is
13   the essence of it.  There is no question that the evidence in
14   this case is overwhelming in many respects.  But there is the
15   evidence that was laid out, the necessary amount of evidence
16   that was laid out in Mayberry exists in this case.  And if the
17   Court was to review all of the cases and the ones that admit
18   this instruction, it is not much more than that, if even that
19   amount.

20       I think that key point where she says no, and he stops and
21   then continues and there is no other point of no, I think that's
22   more than ever found in Mayberry or any of the other cases.  And
23   I think it is sufficient substantial evidence to at least give
24   this to the jury and let them decide whether it is reasonable or
25   not.  That would be their decision.

26       **MS. BARRETT:**  Your Honor, while Ms. Isa has argued as best
27   as she can, I still don't see the existence of substantial
28   evidence as the case law requires warranting this instruction

1    after all that the defendant did to set up this horrifying

2    scenario for Carolyn.  I quote a passage in People versus

3    Williams.  It is on page 967 to 968, and it indicates, "No doubt

4    it would offend modern sensibilities to allow a defendant to

5    assert a claim of reasonable and good faith but mistaken belief

6    and consent based on the victim's behavior after the defendant

7    had exercised or threatened force, violence, duress, menace or

8    fear of immediate and unlawful bodily injury on the person of

9    another."

10    There is absolutely no substantial evidence of equivocal

11    conduct in this case warranting this instruction, certainly

12    considering the totality of the circumstances of threats and

13    violence that this defendant exercised before these acts were

14    committed.  I think it would be entirely inappropriate and the

15    evidence is entirely lacking to support this instruction.

16    **THE COURT:**  The citation that you read was not from the

17    official cite.  Do you happen to know what the official cite

18    pages were?  You said 900 something.

19    **MS. BARRETT:**  I am so sorry.  That must be the -- it's 447

20    to 448.  I am sorry.

21    **THE COURT:**  Thank you.

22    **MS. BARRETT:**  The Court is absolutely correct.

23    **MS. ISA:**  And in response to that.

24    **THE COURT:**  Actually that is Cal Reporter.  What is the

25    official cite?

26    **MS. BARRETT:**  I am sorry.  Let me back track.  You are

27    keeping me on my toes here.

28    All right.  It's page 364.  Page 364.

19

1      **MS. ISA:** If I may briefly respond? People versus Mayberry

2  has never been overturned. Williams interprets the some

3  evidence required in Mayberry to be substantial evidence. And

4  that quote the District Attorney just read, if that were the new

5  adoptive method by which we determine whether evidence is put

6  before a jury, whether this instruction is put before a jury,

7  then certainly Caljic would have deleted it. And again in the

8  more recent Caljic, the new jury instructions that are put out

9  there, they would have deleted the bracketed portion which tells

10  the jury that they can consider that the belief is based on the

11  ambiguous conduct by the alleged victim, that is the product of

12  conduct by the defendant amounting to force, violence, duress,

13  menace or fear of immediate and unlawful injury on that person,

14  that is not a good faith reasonable belief.

15      This has not been changed since People versus Williams.

16  Every other case cites the Mayberry standard is which is some

17  evidence. And People versus Williams does not go to introduce a

18  whole new standard that is thereby written into the jury

19  instructions. This instruction leaves it to the province of the

20  jury to decide whether this ambiguous conduct was the product of

21  the defendant's action of force and violence.

22      And the statement that the District Attorney just read, if

23  that were the law and that were the holding of all standards,

24  then this would not be in the Caljic jury instructions and it

25  wouldn't be in the new instructions that were just revised. But

26  it is. It's in both of them. And that's why the decision is

27  for the jury to decide, if there is some equivocal conduct.

28      And I think in this case that the Court should error on the

1   side that there was.

2      **MS. BARRETT:**  The standard is substantial evidence, not some

3   evidence.  I would submit it.

4      **THE COURT:**  Submitted?

5      **MS. ISA:**  It is submitted.

6      **THE COURT:**  I happen to personally agree with Ms. Barrett

7   but I will find that substantial evidence has been presented.  I

8   think that the evidence is overwhelming that this was the

9   product of, that there was not consent.  However, he did stop

10  when she said to stop certain conduct.  The evidence indicates

11  that he may have been operating under a different belief system

12  than the rest of us recognize.

13      I think the evidence is overwhelming that he is going to be

14  convicted even with this instruction 10.65.  But I am going to

15  allow the jury to make that determination as opposed to leaving

16  him basically with nothing to argue.  And, you know, again, it's

17  based upon the things that he said to her, the fact that he did

18  stop when she said to stop certain conduct.

19      So we will go ahead and I will read the instruction to the

20  jury with the bracketed portion.

21      **MS. ISA:**  So just so I can give the Court a clean copy, the

22  one that I submitted I will, of course, take off the stuff down

23  below, the case names.  I will unbracket "the however" portion,

24  and there is another portion that still has a bracket and it's

25  in the second paragraph, the last sentence.

26      **MS. BARRETT:**  I would suggest also, Ms. Isa, that you have

27  it mirror all of the rest of the instructions or I would be

28  happy to produce it myself.

1    **MS. ISA:**  Sure, if you want to do it because I don't think I

2    can get it in the exact format as you.  This is how ours will

3    print out and I can take this part off.

4    **MS. BARRETT:**  Why don't I do it then.  And it's going to be

5    given as is without all brackets?

6    **THE COURT:**  Yeah, you need to strike some of the parts of

7    instruction that don't apply such as sodomy, oral copulation, et

8    cetera.  But we need to delete bracketed -- the brackets around

9    the portions we are giving.

10    Let's go off the record for a moment.

11    (Brief pause.)

12    **THE COURT:**  Back on the record.  Counsel are present and we

13    have discussed off the record the admissibility of various

14    exhibits and counsel have stipulated that Exhibit 3, the

15    diagram; Exhibit 4, eight-mounted photographs; Exhibit 5,

16    five-mounted photographs; Exhibit 6, one-mounted photograph;

17    Exhibit 7, the colored pink towel; Exhibit 8, the black scarf;

18    Exhibit 9, blue underwear; Exhibit 10, the knife; Exhibit 11,

19    the white tissue paper; 12, the audio tape -- and this was

20    preserving of course the defense's objection to the tape --

21    12-A, the transcript of that audio tape also preserving

22    defense's objection to providing the transcript to the jury; 13,

23    the Polaroid photo of the victim's back, each of those are

24    admitted into evidence.

25    So stipulated, Counsel?

26    **MS. BARRETT:**  Yes.

27    **MS. ISA:**  Yes.

28    **THE COURT:**  H is a photo of a toilet which defense is

1  withdrawing; is that correct?

2      **MS. ISA:**  Yes.

3      **THE COURT:**  And Exhibit 14 and 15 which are two diagrams and

4  also 16, evidence envelope with 10 keys, those three are

5  admitted.  So stipulated?

6      **MS. BARRETT:**  Yes.

7      **THE COURT:**  Ms. Isa?

8      **MS. ISA:**  Yes.  Could I look at 14 and 15?  Okay.

9      **THE COURT:**  So there is nothing on there that needs to be

10  redacted, right?

11      **MS. ISA:**  I don't believe so.

12      **THE COURT:**  So the Defense I, J, K, L, M and N are each one

13  page of the interview of the victim which was used to refresh

14  the victim's recollection, and the defense would like to have

15  each of those pages admitted.

16      Do you want to state on the record why?

17      **MS. ISA:**  Your Honor, well, I think that each of them

18  were -- Carolyn clearly didn't have a memory of saying each of

19  those things that I had brought to her attention with each of

20  these exhibits.  I think there is no prejudice by introducing

21  them.  These were statements that she agreed that if they were

22  in the transcript she must have said it.

23      It is very easy to redact the other statements made

24  surrounding that.

25      I don't see any prejudice not to introduce them.  This is in

26  fact evidence that the jury is entitled to refer to when back in

27  their deliberation room and trying to remember things that were

28  said.  It would prevent unnecessary read back of, you know, of

1  an entire cross-examination if they were seeking to find these

2  pieces of information.

3      And I think it is relevant.  It's relevant to the questions

4  that she answered and she didn't know for sure that she admitted

5  that she must have said.

6      **THE COURT:**  Ms. Barrett.

7      **MS. BARRETT:**  Your Honor, I think it is all very clear in

8  the testimony that Carolyn indicated if that's what I said,

9  that's what I said.  Basically I don't see the need for extra

10  documentation.  I think the record is clear that she said

11  certain statements to the inspector and she was accurately

12  impeached with that and I think that is adequate.

13      **MS. ISA:**  I don't think there is rule when someone is

14  impeached with a statement, it doesn't come into evidence in the

15  evidence room.  They heard a tape of messages that is going back

16  into the evidence room.  They heard them.  They heard them

17  clearly and if they need to listen to it, it is part of the

18  evidence in the case and they are entitled to them.

19      **THE COURT:**  I think you were just referring to Number 12

20  which was the telephone calls that the witness Paul Angelo had

21  made.  And as the Court indicated at the time the Court felt

22  that playing that tape was relevant for the jury to hear the

23  tenor of the voice.  It also had the time stamp on the tape and

24  the transcript is to follow along as the tape is being played.

25      As to these individual pages of the interview of the victim,

26  the testimony about them is clearly in the record and if the

27  jury has a question, then we will read back from our record

28  which is evidence the relevant portions of the testimony.  The

1  introductions of the pages will not come in.  It unduly

2  highlights the particular portion of impeachment and is more

3  prejudicial than probative to any of the issues in this case.

4  So those items will not be admitted but will be preserved for

5  our record.

6      So let's go off the record.

7      (Whereupon, the proceedings were concluded at 3:00 o'clock

8  p.m.)

9                           ---ooXoo---

10

11

12

13

14

15

16

17

18

19

20                                                        .

21

22

23

24

25

26

27

28

1    State of California                    )
2    County of San Francisco               )
                                            )
3

4

5        I, Kent S. Gubbine, Official Reporter for the Superior
6    Court of California, County of San Francisco, do hereby certify:
7        That I was present at the time of the above proceedings;
8        That I took down in machine shorthand notes all proceedings
9    had and testimony given;
10        That I thereafter transcribed said shorthand notes with the
11    aid of a computer;
12        That the above and foregoing is a full, true, and correct
13    transcription of said shorthand notes, and a full, true and
14    correct transcript of all proceedings had and testimony taken;
15        That I am not a party to the action or related to a party
16    or counsel;
17        That I have no financial or other interest in the outcome
18    of the action.

19

20

21    Dated:   October 3, 2006

22

23    _____

24              Kent S. Gubbine, CSR No. 5797

25

26

27

28

1              COURT OF APPEALS OF THE STATE OF CALIFORNIA

2                      FIRST APPELLATE DISTRICT

3                            ---oOo---

4    THE PEOPLE OF THE STATE OF                    )
     CALIFORNIA,
5                                                  )
            Plaintiff/Respondent,                  )
6                                                  )
     vs.                                           )Appellate No.
7                                                  )SF No.: 194241/2167376
     FRANCISCO PARTIDA,                            )
8                                                  )
            Defendant/Appellant.                   )
9    _____               )

10

11                  ON APPEAL FROM THE JUDGMENT
           OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
12         IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO

13

14          THE HONORABLE TERI L. JACKSON, JUDGE

15

16            REPORTER'S TRANSCRIPT ON APPEAL

17                    August 3, 2005

18

19

20

21

22

23

24                                        ENDORSED
                                          F I L E D
25                                San Francisco County Superior Court

26                                    JUL 1 2 2006

27                            GORDON PARK-LI, Clerk
                              BY: MA. BENIGNA D. GOODMAN
                                              Deputy Clerk
28   Reported by:  Judith N. Thomsen, CSR #5591, RMR, CRR

1          SUPERIOR COURT OF CALIFORNIA

2             COUNTY OF SAN FRANCISCO

3     BEFORE THE HONORABLE TERI L. JACKSON, JUDGE PRESIDING

4                DEPARTMENT NUMBER 27

5                     ---oOo---

6   PEOPLE OF THE STATE OF CALIFORNIA,)
                                      )
7             Plaintiff,             )    SCN 194241
                                      )    Court No. 2167376
8   vs.                              )
                                      )    **1368 PROCEEDINGS**
9   FRANCISCO PARTIDA,               )
                                      )    Pages 1 - 15
10            Defendant.             )
    _____)

11

12           **Reporter's Transcript of Proceedings**

13              Wednesday, August 3, 2005

14

15   **APPEARANCES OF COUNSEL:**

16       For Plaintiff:

17          KAMALA HARRIS, District Attorney
            850 Bryant Street - Suite 300
18          San Francisco, California 94103
            BY:  **MARIANNE BARRETT**, Assistant District Attorney
19

20       For Defendant:

21          JEFF ADACHI, PUBLIC DEFENDER
            555 Seventh Street - Suite 205
22          San Francisco, California  94103
            BY:  **KATIE ISA**, Deputy Public Defender
23               **KAUSER SIDDIQUI**, Deputy Public Defender

24

25       Court-Certified Spanish Interpreter:

26          Edward M. Silva

27

28   Reported By:  Judith N. Thomsen, CSR #5591, RMR, CRR

1   going to say. I want to come back by myself, by myself. I

2   don't want to hear anymore.

3     **THE COURT:** Mr. Partida, I don't quite understand you. You

4   have to tell me what you meant by that. So can you come to the

5   door and explain to me what you meant?

6     **THE DEFENDANT:** (Through interpreter) I told you what I want

7   to do is come by myself. I want nothing to do with a lawyer.

8     **THE COURT:** Well, Mr. Partida, you are going to have to come

9   out here and tell me what you want. I cannot talk to you in the

10   holding cell. I cannot deal with this issue in the holding cell.

11   If you want to represent yourself, you are going to have to come

12   into this courtroom.

13     **THE DEFENDANT:** (Through interpreter) When I bring the

14   papers, the documents, that I need from the library, I will --

15   what I am doing now is catching up on the law.

16     **THE COURT:** All right. Mr. Partida, do you have anything in

17   the holding cell that you are reading right now?

18     **THE DEFENDANT:** (Through interpreter) No. I left them -- I

19   left them behind. I already told you that I had them and that I

20   would bring them and that I would bring them to court to tell

21   you.

22     **THE COURT:** Okay. Mr. Partida, you have to come to the door

23   because I want to get some clarification, and I cannot talk to

24   you in this manner.

25     **THE DEFENDANT:** (Indicating.)

26     **THE COURT:** Thank you.

27     **THE DEFENDANT:** (Through interpreter) I told you that I am

28   going to bring -- I already told you that I am going to bring in

1 written form the information.

2 **THE COURT:** All right. Mr. Partida, I need clarification.

3 **THE DEFENDANT:** (Through interpreter) And the sentence that
4 will be imposed on me for each one of the charges.

5 **THE COURT:** Mr. Partida, you don't make the decision as to
6 what can be imposed.

7 **THE DEFENDANT:** One is a year, another one is six months. I
8 don't know.

9 **THE COURT:** Mr. Partida, it's going to be my decision as to
10 what gets imposed.

11 All right. So let me ask you something. You made a
12 statement that you want to represent yourself.

13 **THE DEFENDANT:** (Through interpreter) Yes, I, by myself.

14 **THE COURT:** You do not want to have the representation of an
15 attorney?

16 **THE DEFENDANT:** (Through interpreter) No. My attorney has
17 been deceiving me for a whole year.

18 **THE COURT:** Well, then, you are not going to address this
19 issue in the holding cell. If you want to represent yourself --

20 **THE INTERPRETER:** Your Honor, give me a chance.

21 **THE COURT:** -- you will come out into the courtroom.

22 **THE DEFENDANT:** (Through interpreter) I already said
23 something to the judge, and the judge denied my petition. I --
24 I put it in front of him, and the same thing happened.

25 **THE COURT:** Well, in order for this Court, for this judge,
26 to deal with this issue, you will have to come and be in the
27 courtroom.

28 **THE DEFENDANT:** (Through interpreter) To what end?

1    **THE COURT:** I don't know. You have to tell me the facts.

2  You have got to tell me why you believe you should represent

3  yourself.

4    **THE DEFENDANT:** (Through interpreter) I already told you. I

5  already told you.

6    **THE COURT:** Not from the holding cell.

7    **THE DEFENDANT:** (Through interpreter) I already went to a

8  judge, and he denied my petition.

9    **THE BAILIFF:** I think he missed something here because the

10  defendant is interrupting the translator. The translator needs

11  to convey to him the reason you need him out here, to convey to

12  you the reasons. I don't think the defendant caught that.

13    **THE COURT:** Mr. Partida, if you wish to represent yourself,

14  this will not be conducted in the holding cell. You will have

15  to come out in the courtroom.

16    **THE DEFENDANT:** (Through interpreter) Well, I'll come back

17  another day because today I'm too tired.

18    **THE COURT:** No.

19    **THE DEFENDANT:** (Through interpreter) No.

20    **THE COURT:** Mr. Partida, the Court has been very patient

21  with you, and I believe yesterday you were concerned about your

22  rights, and one of the rights that I told you that I will ensure

23  in this case is that you receive a fair trial and respect. What

24  you are doing right now, you are not showing the Court any

25  respect. To get respect, you have to --

26    **THE DEFENDANT:** (Through interpreter) I am disrespecting

27  some people, yes.

28    **THE COURT:** You are being disrespectful to this Court.

1      **THE DEFENDANT:**  (Through interpreter) I came here.  I am

2  respecting you.

3      **THE COURT:**  No.  You have to come out into the courtroom.

4      **THE DEFENDANT:**  (Through interpreter) So what am I going to

5  come out for?  I am all boxed in between the judge and the

6  lawyer and the system.

7      **THE COURT:**  So you can address the Court properly and

8  explain to the Court why you feel you should represent yourself.

9      **THE DEFENDANT:**  (Through interpreter) If that's what you

10  want me to do, I will come out by myself.  Like this

11  (indicating)?

12      **THE COURT:**  Will you make some space for him, please?  Why

13  don't you make a little space for him?

14      **MS. ISA:**  We will sit back here.

15      **THE COURT:**  And let the record reflect that Mr. Partida is

16  now in the courtroom.

17      Mr. Partida, I need to find out if you are trying to tell

18  this Court that you want to represent yourself in this trial.

19      **THE DEFENDANT:**  (Through interpreter) Uh-huh.

20      **THE COURT:**  You do not want the attorneys who have been

21  assigned to this case, who have worked on this case, and who are

22  experienced to represent you?

23      **THE DEFENDANT:**  (Through interpreter) No.

24      **THE COURT:**  Now, you understand that you will be treated as

25  an attorney if you represent yourself.  The Court will not give

26  you any special consideration.

27      **THE DEFENDANT:**  (Through interpreter) I don't care.

28      **THE COURT:**  And that means we are going to bring in a jury,

1  and we are going to select a jury, and you will be tried in this

2  case.

3      **THE DEFENDANT:**  (Through interpreter) Bring me whatever you

4  want.  I am going to face them.

5      **THE COURT:**  Okay.  That means that there is going to be a

6  process where we are going to select a jury, a jury of your

7  peers.  That means the People will have to put on their case,

8  and this is a very experienced prosecutor with at least 15 years

9  of experience -- excuse me, 12?

10      **MS. BARRETT:**  Twenty.

11      **THE COURT:**  -- twenty years of experience who will be

12  prosecuting this case.

13      **THE DEFENDANT:**  (Through interpreter) No problem.  It has

14  already been decided.

15      **THE COURT:**  What has been decided, sir?  Nothing has been

16  decided in this case.

17      **THE DEFENDANT:**  (Through interpreter) Of course.

18      **THE COURT:**  You have to be clearer for this Court.  What has

19  been decided?

20      **THE DEFENDANT:**  (Through interpreter) It's already ten

21  years; right?

22      **THE COURT:**  No, it's not ten years.  Sir, if you are

23  convicted of all the charges -- and there are several.  Well,

24  not even several.  There are approximately --

25      **MS. BARRETT:**  Thirteen.

26      **THE COURT:**  -- thirteen charges.  And if you are convicted

27  of 13 charges, some of the charges, if convicted, will be 25

28  years to life.

1      **THE DEFENDANT:** (Through interpreter) That's fine.

2      **THE COURT:** The D.A. before this case is proceeding has made

3    an offer to your attorneys who are currently -- I have not

4    relieved them from this case -- of 10 years. That is before

5    trial. That 10 years, if you are convicted by jury, will not

6    happen. If you are convicted, you are possibly looking at 25

7    years to life.

8      **THE DEFENDANT:** (Through interpreter) That's fine, so long

9    as they produce a body.

10      **THE COURT:** They have witnesses. My understanding, I have a

11    witness list.

12      **THE DEFENDANT:** (Through interpreter) That's fine.

13      **THE COURT:** All right. So do you still --

14      **THE DEFENDANT:** (Through interpreter) And the dead man is

15    not on that list?

16      **THE COURT:** There is no murder charge in this case, and that

17    is why the Court questions whether or not you can competently

18    represent yourself. You think there is a murder charge. There

19    is no murder.

20      **MS. BARRETT:** Your Honor, maybe you can explain to

21    Mr. Partida that sexual assault cases oftentimes result in much

22    higher sentences than murder cases.

23      **THE COURT:** Did you hear that? The D.A. just said that

24    sexual assault cases, particularly of this nature, can carry a

25    bigger penalty, a larger penalty, than even murder cases, and

26    you don't have to be dead.

27      **THE DEFENDANT:** (Through interpreter) No problem. Add on

28    whatever years you want.

1   **THE COURT:**  But, sir, let's get to the issue -- I am not

2   going to talk about the 10 years or the 25 years to life because

3   what I said to you yesterday, you have a right to your jury

4   trial.  I am right now trying to determine if you can and should

5   represent yourself.

6   **THE DEFENDANT:**  (Through interpreter) How many times do I

7   have to tell you, yes.

8   **THE COURT:**  All right.  I want to go through this process.

9   What is your level of education?

10  **THE DEFENDANT:**  (Through interpreter) I have enough

11  education as to defend myself.

12  **THE COURT:**  No.  You have to tell the Court specifically,

13  what is your level of education?

14  **THE DEFENDANT:**  (Through interpreter) Third year of

15  secondary school.

16  **THE COURT:**  Okay.  And where was the secondary school?

17  **THE DEFENDANT:**  (Through interpreter) In Mexico.

18  **THE COURT:**  And, Mr. Partida, what are the charges involved

19  in this case?  What do you know them to be?

20  **THE DEFENDANT:**  That I remember, it's six or seven and that

21  I invest myself.

22  **THE COURT:**  All right.  What's six or seven?  That's not the

23  charge.  What are you being accused of?

24  **THE DEFENDANT:**  (Through interpreter) They -- the way they

25  accuse all Latins, only illegal Latins, of kidnapping, rape,

26  everything.  And if a person is not white or without -- or

27  familyless, then -- then -- then they -- they accuse you of

28  everything because they pay taxes and I don't.

1      **THE COURT:**  Sir, you are not being clear.  I need to know if
2    you can represent yourself, and the only way I know you can
3    represent yourself --

4      **THE DEFENDANT:**  (Through interpreter) I already told you
5    that, as far as I am concerned, there are only six or seven
6    charges.

7      **THE COURT:**  No, there are 13.

8      **THE DEFENDANT:**  (Through interpreter) We'll see.

9      **THE COURT:**  All right.  What are those charges?  I need to
10   know what you believe you are being charged with.

11     **THE DEFENDANT:**  (Through interpreter) As far as I am
12   concerned, the lady did not press charges.

13     **THE COURT:**  What are the charges in this case, sir?

14     **THE DEFENDANT:**  (Through interpreter) If they punish me,
15   it's because the government wants to.

16     **THE COURT:**  Mr. Partida, I am trying to figure out or
17   ascertain if you are capable and competent to represent
18   yourself.

19     **THE DEFENDANT:**  (Through interpreter) I have proof that she
20   spoke to somebody, that she don't want to press charges, and I
21   have a letter that said that I was going to get one year of
22   incarceration and six years of probation.

23     **THE COURT:**  You received a letter?  From whom?

24     **THE DEFENDANT:**  And they are not keeping their word, and I
25   have it there, safe.

26     **THE COURT:**  But you are not answering my question.  So you
27   want to represent yourself.  And in order for this Court to
28   allow you to represent yourself -- which is your right, but I

1    have to understand that you understand and you are competent to

2    represent yourself.

3        **THE DEFENDANT:**   (Through interpreter) I understand

4    everything.

5        **THE COURT:**   So do you understand that you are charged with

6    two counts of robbery?

7        **THE DEFENDANT:**   (Through interpreter) Everything.

8        **THE COURT:**   And you are also charged --

9        **THE DEFENDANT:**   (Through interpreter) According to what it

10   says, there is nothing about either life sentencings or 25

11   years.  I just say --

12       **THE COURT:**   Excuse me, not robbery, burglary.  Excuse me.

13   You are charged with two counts of burglary, a count of -- let

14   me -- Mr. Partida, I want you to listen to me.

15       **THE DEFENDANT:**   (Through interpreter) I am listening.

16       **THE COURT:**   You are charged with a count of sexual battery?

17       **THE DEFENDANT:**   (Through interpreter) That has a sentence of

18   one month, six years.

19       **THE COURT:**   No.  You know what?  I am going to go through --

20       **THE DEFENDANT:**   (Through interpreter) One year, six months.

21       **THE COURT:**   Mr. Partida, listen, I am going to tell you, for

22   burglary the charge can carry a minimum of two years.  You could

23   be charged with -- serve four years or six years.  That's only

24   on one burglary count.

25       **THE DEFENDANT:**   (Through interpreter) It's very clear, one

26   year of county jail.

27       **THE COURT:**   Mr. --

28       **THE DEFENDANT:**   (Through interpreter) And the highest -- the

1   highest fine is $10,000.

2       **THE COURT:**   You know what?  I am now going to express a

3   doubt.

4       Folks --

5       **THE DEFENDANT:**   (Through interpreter) I will bring you the

6   book if you wish.

7       **THE COURT:**   -- why don't you approach quickly?

8       **MS. BARRETT:**   How about this side, guys?

9               (Proceedings off the record at sidebar.)

10      **THE COURT:**   Mr. Partida, don't say anything right now.

11              (Pause in the proceedings.)

12      **THE COURT:**   Hi.  Why don't we approach?

13              (Proceedings off the record at sidebar.)

14      **THE COURT:**   Back on the record.

15      And present still are Mr. Partida's attorneys, Ms. Isa and

16  Ms. Siddiqui, as well as the Assistant District Attorney

17  Ms. Barrett, and the certified interpreter is still present, and

18  Mr. Partida has joined us in the courtroom.

19      Through the Court's questioning as to whether or not the

20  defendant could competently represent himself, the Court has

21  expressed a doubt as to his competence overall to stand trial in

22  this case.  So I am expressing a doubt pursuant to 1368 of the

23  California Penal Code.  And since the Court is expressing a

24  doubt, I will then appoint two experts to interview to determine

25  whether or not Mr. Partida is, in fact, competent.

26      I did check with Department 22 to make sure I was doing it

27  procedurally correct, and I do appoint two psychiatrists, or two

28  experts, and they would be -- and I asked for suggestions from

1  the attorneys -- Dr. Korpi and Dr. Cassidy.

2     Criminal proceedings are now suspended pursuant to 1368

3  since the Court has expressed a doubt as to the defendant's

4  mental competency to stand trial.  The 1368 report will be due

5  in Department 22 in 15 court days from today, or is it 15 days?

6     **MS. ISA:**  I think it's court days.

7     **THE CLERK:**  I counted 15 court days.

8     **THE COURT:**  Okay.  And the date would be?

9     **THE CLERK:**  August 24th.

10    **THE COURT:**  August 24th at 9:00 o'clock.

11    I also asked Department 22 in the event that the reports

12 come back that he is competent to stand trial, what happens to

13 the clock?  It is the opinion of Department 22 it's 60 days from

14 that date of the competence once competence has been restored.

15 Of course, I believe the Public Defender's office has a

16 different opinion, so brief and let us all know.

17    **MS. BARRETT:**  In the meantime, Your Honor, are the witnesses

18 released?

19    **THE COURT:**  The witnesses are released because the criminal

20 proceedings in this matter have now been suspended, and the jury

21 trial is now vacated until we get a competency report pursuant

22 to 1368 of the California Penal Code.

23    **MS. BARRETT:**  Thank you, Your Honor.

24    **THE COURT:**  All right.  And we have not sworn a jury so

25 jeopardy has not attached.

26    Thank you.

27    **THE DEFENDANT:**  (Through interpreter) I don't want anyone.

28 I want to go by myself.  I have all of the papers ready.

1    **THE COURT:**  All right.  Thank you, everybody.

2    **MS. BARRETT:**  Thank you, Your Honor.

3    **MS. ISA:**  Thank you.

4    (Whereupon, proceedings adjourned at 3:08 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 | State of California                              )
                                                     )
2 | County of San Francisco                          )

3

4

5 |     I, Judith N. Thomsen, Official Reporter for the Superior

6 | Court of California, County of San Francisco, do hereby certify:

7 |     That I was present at the time of the above proceedings;

8 |     That I took down in machine shorthand notes all proceedings

9 | had and testimony given;

10 |     That I thereafter transcribed said shorthand notes with the

11 | aid of a computer;

12 |     That the above and foregoing is a full, true, and correct

13 | transcription of said shorthand notes, and a full, true and

14 | correct transcript of all proceedings and testimony taken;

15 |     That I am not a party to the action or related to a party

16 | or counsel;

17 |     That I have no financial or other interest in the outcome

18 | of the action.

19

20

21 | Dated:   July 11, 2006

22

23

24 |                     Judith N. Thomsen, CSR No. 5591

25

26

27

28